UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STYLINE STUDIOS INTERNATIONAL LIMITED,  :  Case No.: 24 - 1192

                                        :

                   Plaintiffs,          :

                                        :  **F I L E D**
                                        :  IN CLERK'S OFFICE
        -against-                       :  U.S. DISTRICT COURT E.D.N.Y.
                                        :
JAY LITVACK,                            :  ★  FEB 15 2024  ★
                                        :
                   Defendant.           :  LONG ISLAND OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF TINA EY VEAN LIU IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, Tina EY-Vean Liu, under penalty of perjury under the laws of the United States of America, declare the following statements to be true and correct:

1.     I am a citizen of Taiwan Republic of China and reside in Montreal, Canada.  I am in the business of manufacturing footwear.

2.     I am a shareholder and chairwomen of the board of directors of Plaintiff Styleline Studios International Limited ("Plaintiff").  I submit this declaration in support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction. Except as otherwise stated, I have personal knowledge of all the facts and circumstances contained herein.

**A.     Plaintiff's J/SLIDES Mark**

3.     Plaintiff manufactures, markets, distributes and sells footwear that is sold in many countries, including the United States, that bear the trademark J/SLIDES (the "J/SLIDES Mark").

4.     Plaintiff owns the J/SLIDES Mark that it uses in connection with the manufacture, marketing, distribution and sales of its footwear.  Plaintiff owns registration for the

3497974v2

J/SLIDES Mark for footwear in many countries of the world. Details of the registrations owned by Plaintiff for the J/SLIDES Mark are attached hereto at **Exhibit A**. In the United States, Plaintiff owns Registration No. 4746857 on the Principal Trademark Register of the United States Patent and Trademark Office ("USPTO") for the J/SLIDES Mark for its footwear products (the "857 Registration").

5.    Plaintiff, its predecessor and/or authorized licensees have used the J/SLIDES Mark in commerce throughout the United States continuously since at least as early as September 2012 on or in connection with the distribution, offering for sale, marketing, advertising and promotion of the footwear. Attached hereto at **Exhibit B** are photographs and copies of representative samples of footwear and promotional materials showing Plaintiff's or its authorized licensee's use of the J/SLIDE Mark on or in connection with footwear.

6.    As a result of Plaintiff's or its authorized licensee's extensive use and advertising of footwear bearing the J/SLIDES Mark, consumers and the trade have grown to identify Plaintiff as the source of high quality footwear sold in connection with the J/SLIDES Mark.

7.    Defendant is in the business of importing into, marketing and distributing footwear in the United States. I believe Defendant is the sole member of JSL Studio.

**B.    Plaintiff's Business Relationship With Defendant**

8.    The application underlying the 857 Registration (the "857 Application") was filed on September 3, 2014 by JSL Studio Intl LLC ("JSL Studio"), based on a claim of the use of mark in commerce as of September 2012. Copies of the Certificate of Registration and USPTO Trademark Status and Document Retrieval printout for the 857 Registration is attached hereto at **Exhibit C.**

2

9.     In or around 2014, Dimitrios Mavridakis ("Mavridakis") and I, who are both involved in the footwear industry, met the Defendant to discuss the possibility of doing business together.   Mr. Mavridakis is in the business of, among other things, designing footwear. Defendant advised Mr. Mavridakis and I that he did not have the resources or infrastructure to exploit the J/SLIDES Mark. We ultimately agreed to work together to manufacturer, market, distribute, and sell footwear and related accessories in connection with the J/SLIDES Mark with the hope of developing and enhancing the image and reputation of the brand and grow its sales.

10.     In connection with our venture, Defendant, Mavridakis and I took a number of actions and entered into a series of agreements.  First, on or about December 18, 2014, we Styleline Studios LLC ("Styleline New York") to import into, distribute, market and sell footwear bearing or associated with the J/SLIDES Mark in the United States.  Our membership interest in Styleline New York are as follows: Defendant (33.34%), Mavridakis (33.33%) and me (33.33%).

11.     Pursuant to Section 4.1.A of Styleline New York's Operating Agreement,  all activities and transactions require the approval of each of its three members.  A true and correct copy of the Operating Agreement is attached hereto as **Exhibit D**.

12.     No single member is authorized to take any action without the knowledge and consent of the other Members, except for the dissolution of the entity, which can be accomplished by a vote of the majority of the members. "The Company will be dissolved upon . . . [t]he vote of the Members holding at least a majority of the Voting Interest of the Company to dissolve the Company . . ." (Operating Agreement at Section 8.1).

3497974v2

13.    Next, Defendant, Mavridakis and I formed the Plaintiff on January 22, 2015. Each of us own a thirty three percent (33.3%) interest in the Plaintiff. I am the chairwomen of Plaintiff's board of directors.

14.    On or about April 2 , 2015, we entered into the following agreements:

a. a Joint Venture and Shareholders' Agreement between Plaintiff, Defendant, Mavridakis and myself (the "JV Agreement"), which defines the purpose and operation of Plaintiff and the obligations of its shareholders;

b. an Intellectual Property Rights Transfer Agreement between JSL Studio, Plaintiff and Defendant (the "IP Transfer Agreement"), in which for $150,000 Defendant agreed to cause JSL Studio to assign to Plaintiff all right and title to the J/SLIDES Mark, the J/SLIDES Application and all other intellectual property rights owned by JSL Studio;

c. an Asset Purchase Agreement between JSL Studio, Defendant and Plaintiff (the "APA") in which for $150,000, Defendant agreed to cause JSL Studio to assign to Plaintiff all of JSL Studio's inventory, purchase orders and goodwill in connection with the J/SLIDES Mark;

d. a Service Agreement between Defendant and Plaintiff (the "JL Service Agreement") in which JL agreed to provide sales and distribution services in connection with footwear sold with the J/SLIDES Mark in the United States;

e. a Services Agreement between Mavridakis and Plaintiff (the "DM Services Agreement") in which Mavridakis agreed to provide footwear design services to Plaintiff; and

f. a Supply Agreement between Plaintiff and E-Teen (the "E-Teen Supply Agreement"), in which Plaintiff appointed E-Teen as a "non-exclusive" manufacturer of footwear bearing or associated with the J/SLIDE Mark.

True and correct copies of the JV Agreement, IP Transfer Agreement, APA, JL Service Agreement, DM Service Agreement and the E-Teen Supply Agreement are attached hereto as **Exhibits E through J.**

15.    Even though the E-Teen Supply Agreement is "non-exclusive," that agreement and JV Agreement provide a number of limitations on Plaintiff's ability to retain any other party to manufacture or supply footwear bearing or associated with the J/SLIDES Mark. For example,

4

under the E-Teen Supply Agreement, E-Teen has a right of first refusal before Plaintiff may retain any other party to manufacture or supply any footwear bearing or associated with the J/SLIDES Mark. Also, the JV Agreement expressly provides that "a 75% quorate shareholders meeting" is required before Plaintiff may enter into a manufacturing or supply agreement for the production of footwear bearing or associated with the J/SLIDES mark with any party other than E-Teen.

16.    On or about March 20, 2015 a Trademark Assignment assigning the J/SLIDES Mark and the J/SLIDES Application from JSL Studio to Plaintiff was recorded with the USPTO. A copy of the Trademark Assignment and Trademark Assignment Cover Sheet is attached as **Exhibit K.**

**C.    Defendant Acts Unilaterally to the Financial Detriment of Plaintiff**

17.    In or around 2018, Mr. Mavridakis and I discovered that Defendant was acting and making decisions for, and binding, Styleline New York to numerous obligations without our knowledge or consent. These actions included, but are not limited to, ordering the manufacturing of footwear and obtaining significant loans to do so. In so doing, Defendant caused Styleline New York to incur significant debt that it could not pay.

18.    For example, on January 16, 2016 Defendant, without mine or Mavridakis's knowledge, caused Styleline New York to enter into a Factoring Agreement with Hilldun Corporation ("Hilldun"). A true and correct copy of the Factoring Agreement is attached at **Exhibit L**. As security for Styleline New York's obligations under the Factoring Agreement, Defendant granted Hilldun a security interest in all its assets, "including, without limitation all trademarks." At the time Defendant executed the Factoring Agreement, Styleline New York did not own the J/SLIDES Mark.

3497974v2

19.     Mavridakis and I objected to Defendant's unauthorized actions and negotiated with him to seek to settle our dispute. In this regard, on April 1, 2018, Styleline New York and Plaintiff entered into a Deed (the "2018 Deed") in which Defendant agreed to pay certain moneys owed by Styleline New York in exchange for Plaintiff assigning the worldwide right, title and interest in and to the J/SLIDE Mark to Styleline New York. A copy of the 2018 Deed is attached hereto at **Exhibit M.**

20.     In connection with the 2018 Deed, Plaintiff executed a Trademark Assignment assigning the 857 Registration to Styleline New York. This Trademark Assignment was recorded with the USPTO on February 12, 2020. A true and copy of the Trademark Assignment and Trademark Assignment Cover Sheet is attached hereto as **Exhibit N.**

21.     Styleline New York and Defendant, however, breached the 2018 Deed by failing to pay the agreed amounts in a timely manner. Accordingly, on or about 12, 2022, Plaintiff rescinded the 2018 Deed and demanded that the worldwide right, title and interest in and to the J/SLIDE Mark be assigned back to Plaintiff.

22.     On or about August 12, 2022, Mavridakis and I became aware that, without our knowledge or consent, Defendant obtained a Small Business Administration Loan in the name of Styleline New York. We also received a notice of default from Hilldun Corporation, a secured creditor of Styleline New York.

23.     On August 12, 2022, Plaintiff and Styleline New York entered into a second Deed (the "2022 Deed") in which Plaintiff provided Styleline until October 31, 2022 to pay it $2,733,800.61. If Styleline New York breached this obligation, all the worldwide right, title and interest in and to the J/SLIDE Mark, including 857 Registration, would be assigned back to Plaintiff. A true and correct copy of the 2022 Deed is attached hereto as **Exhibit O.**

24.    To secure Styleline New York's obligations under the 2022 Deed, a Deed of Assignment assigning, among other rights, the 857 Registration to Plaintiff was placed in escrow.  A true and correct copy of the Deed of Assignment and Escrow Agreement is attached hereto as **Exhibit P.**

25.    Styleline New York defaulted under the 2022 Deed.  Thus, on October 31, 2022, Plaintiff advised Styleline New York, Defendant and the escrow agent of the default, and on November 16, 2022, the escrow agent released the Deed of Assignment to Plaintiff.  True and correct copies of the notice and letter from the escrow agent are attached hereto as **Exhibit Q.**

26.    The Deed of Assignment was recorded with the USPTO on November 17, 2022. A copy of the Deed of Assignment and related Trademark Assignment Cover Sheet are attached hereto as **Exhibit R.**  On or about December 14, 2023, Plaintiff advised Styleline New York that it was no longer authorized to use the J/SLIDE Mark on or in connection with footwear in the United States. .

**D.  Defendant Infringes the J/SLIDES Mark**

27.    Defendant, who is only a one-third member of Styleline New York, continued to cause Styleline New York to continue using the J/SLIDES mark in connection with the manufacture, marketing and sales of footwear.  Therefore, on or about December 14, 2023, counsel for Plaintiff sent a demand letter to Defendant reminding him of Plaintiff's rights to the J/SLIDES Mark, and demanding that he immediately cease and desist his infringing use of the J/SLIDES Mark.

28.    Defendant, however, did not respond to the cease and desist letter and continued to use the J/SLIDE Mark on or in connection with footwear, all without Plaintiff's authorization.

**E.**    **The Members Vote to Dissolve Styleline New York**

29.    Concerned about Defendant's unauthorized actions, Mavridakis and I properly noticed a special meeting of the members of Styleline New York, which took place on February 1, 2024.  At that meeting a majority of the members voted to dissolve Styleline New York.  Copies of the notice for and resolution from the special meeting are attached hereto as **Exhibit S**.

30.    Despite the dissolution, Defendant continued to unilaterally cause Styleline New York to use the J/SLIDES Mark in connection with the promotion, marketing and sales of footwear.  Thus, in January and February 2024, counsel for Plaintiff sent demand letters to a number of third parties acting on instructions from Defendant in connection with the counterfeit goods being offered by Defendant.  These included letters to a manufacture in Hong Kong and the operators of trade shows in the Unites States. In the letters counsel for Plaintiff advised such third-party's of Plaintiff's ownership of the J/SLIDE Mark, that Defendant had no rights to the mark and is not authorized to use the J/SLIDE Mark, and that they should not contribute to Defendant's infringing activity.

31.    All such third-parties have ignored or chosen not to take an action in connection with Plaintiff's demands.  Copies of the letters and correspondence with such third parties are attached hereto as **Exhibit T**.

32.    As a result of Defendant's actions, Plaintiff has lost control over the J/SLIDES Mark.  Defendant's continued unauthorized use of the J/SLIDES Mark will result in Plaintiff suffering losses and damages to its reputation and goodwill and potentially its entire business.

3497974v2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of February 2024.

Tina EY-Vean Lau

3497974v2

**Annex 1. Trademark**

| Trade Mark | Country | Application No. | File Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK00914629943 | 9/29/2015 | UK00914629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | UK | UK00915054265 | 1/29/2016 | UK00915054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK00003104508 | 4/17/2015 | UK00003104508 | 7/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |
| J/SLIDES | Japan | 2015- 043608 | 5/8/2015 | 5802609 | 10/30/2015 | REGISTERED |
| J/SLIDES | Korea | 40-2015-0037156 | 5/20/2015 | 40-1150538 | 12/23/2015 | REGISTERED |
| J/SLIDES | China | 16749476 | 4/20/2015 | 16749476 | 6/7/2016 | REGISTERED |



# United States of America

## United States Patent and Trademark Office

# J/SLIDES

**Reg. No. 4,746,857**

**Registered June 2, 2015**

**Int. Cl.: 25**

**TRADEMARK**

**PRINCIPAL REGISTER**

STYLELINE STUDIOS INTERNATIONAL LTD. (HONG KONG LIMITED COMPANY)
42/F BANK OF CHINA TOWER
1 GARDEN ROAD, CENTRAL
HONG KONG, HONG KONG

FOR: FOOTWEAR, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 9-0-2012; IN COMMERCE 9-0-2012.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 86-384,358, FILED 9-3-2014.

ZACHARY R. SPARER, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

For assistance with TSDR, email teas@uspto.gov and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.

| STATUS | DOCUMENTS | MAINTENANCE |

Back to Search    🖶 Print

**Generated on:** This page was generated by TSDR on 2024-02-15 10:44:55 EST

**Mark:** J/SLIDES

# J/SLIDES

**US Serial Number:** 86384358                    **Application Filing Date:** Sep. 03, 2014

**US Registration Number:** 4746857              **Registration Date:** Jun. 02, 2015

**Register:** Principal

**Mark Type:** Trademark

**TM5 Common Status Descriptor:**    LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** A Sections 8 and 15 combined declaration has been accepted and acknowledged.

**Status Date:** Apr. 13, 2021

**Publication Date:** Mar. 17, 2015

## ▼ Mark Information

**Mark Literal Elements:** J/SLIDES

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## ▼ Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Footwear

**International Class(es):** 025 - Primary Class              **U.S Class(es):** 022, 039

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Sep. 2012                    **Use in Commerce:** Sep. 2012

## ▼ Basis Information (Case Level)

| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## ▼ Current Owner(s) Information

**Owner Name:** STYLELINE STUDIOS INTERNATIONAL LIMITED

**Owner Address:** 2-12 AU PUI WAN STREET, FO TAN, SHATIN
UNIT 7F-15, 7/F, VALIANT INDUSTRIAL CENTRE
NEW TERRITORES HONG KONG

Legal Entity Type: LIMITED COMPANY

Status: Select Status

State or Country Where Organized: HONG KONG

### ▼ Attorney/Correspondence Information

**Attorney of Record**

Attorney Name: Erik M. Pelton

Attorney Primary Email Address: uspto@tm4smallbiz.com          Attorney Email Authorized: Yes

**Correspondent**

Correspondent Name/Address: Erik M. Pelton
ERIK M. PELTON & ASSOCIATES, PLLC
PO BOX 100637
ARLINGTON, VIRGINIA UNITED STATES 22210

Phone: 703-525-8009

Correspondent e-mail: uspto@tm4smallbiz.com          Correspondent e-mail Authorized: Yes

**Domestic Representative - Not Found**

### ▼ Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jan. 18, 2023 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Dec. 28, 2022 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Apr. 13, 2021 | NOTICE OF ACCEPTANCE OF SEC. 8 & 15 - E-MAILED | |
| Apr. 13, 2021 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | |
| Apr. 13, 2021 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | |
| Dec. 28, 2020 | TEAS SECTION 8 & 15 RECEIVED | |
| Jun. 02, 2020 | COURTESY REMINDER - SEC. 8 (6-YR) E-MAILED | |
| Feb. 19, 2020 | AUTOMATIC UPDATE OF ASSIGNMENT OF OWNERSHIP | |
| Jun. 02, 2015 | REGISTERED-PRINCIPAL REGISTER | |
| Apr. 08, 2015 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Mar. 25, 2015 | ASSIGNMENT OF OWNERSHIP NOT UPDATED AUTOMATICALLY | |
| Mar. 17, 2015 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Mar. 17, 2015 | PUBLISHED FOR OPPOSITION | |
| Feb. 25, 2015 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Feb. 10, 2015 | LAW OFFICE PUBLICATION REVIEW COMPLETED | |
| Feb. 10, 2015 | ASSIGNED TO LIE | |
| Jan. 23, 2015 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jan. 22, 2015 | EXAMINER'S AMENDMENT ENTERED | |
| Jan. 22, 2015 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| Jan. 22, 2015 | EXAMINERS AMENDMENT E-MAILED | |
| Jan. 22, 2015 | EXAMINERS AMENDMENT -WRITTEN | |
| Dec. 16, 2014 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Dec. 16, 2014 | NON-FINAL ACTION E-MAILED | |
| Dec. 16, 2014 | NON-FINAL ACTION WRITTEN | |
| Dec. 15, 2014 | ASSIGNED TO EXAMINER | |
| Sep. 13, 2014 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Sep. 06, 2014 | NEW APPLICATION ENTERED | |

**TM Staff and Location Information**

**TM Staff Information - None**

**File Location**

Current Location: TMO LAW OFFICE 115                    Date In Location: Apr. 13, 2021

**Assignment Abstract Of Title Information - Click to Load**

**Proceedings - Click to Load**

---

### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:** Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at http://www.uspto.gov.

**NOTE:** A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at http://www.uspto.gov.

Page: 2 / RN # 4,746,857



Title: J/Slides On-Trend Footwear| Women's New Arrivals
Link/URL: https://jslidesfootwear.com/new-arrivals/
Date Accessed: 2020-11-04

FREE GROUND SHIPPING ON ALL CONTIGUOUS U.S. ORDERS

## J/SLIDES
### NYC

SIGN IN    REGISTER

GIFT CERTIFICATES    SEARCH    BAG

NEW ARRIVALS    J'S FAVES    MASKS    SNEAKERS    URBAN SPORT    FURRY    BOOTIES    SANDALS    SALE

HOME    NEW ARRIVALS

**REFINE BY**

No filters applied

**COLOR**

| | |
|---|---|
| Animal Prints | Beige |
| | Black |
| Bronze | Brown |
| Gold | Green Camo |
| Grey | Nude/Bone |
| Pewter | |

**SIZE**

| | | | |
|---|---|---|---|
| 5 | 5.5 | 6 | 6.5 |
| 7 | 7.5 | 8 | 8.5 |
| 9 | 9.5 | 10 | 11 |
| ONE SIZE | | | |

Sort By:  Newest Items





NORIE Taupe Waterproof Suede
$219.00

NORIE Brown Waterproof Suede
$219.00

NORIE Black Waterproof Suede
$219.00

LOVLIE Natural Faux Fur
$79.00





LOVLIE Light Grey Faux Fur
$79.00

LOVLIE Leopard Faux Fur
$79.00

LOVLIE Green Camo Faux Fur
$79.00

LOVLIE Black Faux Fur
$79.00






NELL Black Suede
$189.00

SLEEK Natural Shearling
$179.00

SLEEK Leopard Shearling
$179.00

SLEEK Grey Shearling
$179.00






Title: J/Slides On-Trend Footwear| Women's New Arrivals
Link/URL: https://jslidesfootwear.com/new-arrivals/
Date Accessed: 2020-11-04

**SLEEK Camo Shearling**
$179.00

**SLEEK Black Shearling**
$179.00

**NELL Tan Suede**
$189.00

**SKY Grey Distressed Leather**
$179.00




**SKY Cognac Distressed Leather**
$179.00

**SKY Black Distressed Leather**
$179.00

**TRISTAN Taupe Waterproof Suede**
$179.00

**TRISTAN Brown Waterproof Suede**
$179.00






**TRISTAN Black Waterproof Suede**
$179.00

**TRISTAN Black Waterproof Leather**
$179.00

**SPAT Tan Waterproof Nubuck**
$199.00

**SEAN Off White Metallic Pony**
$179.00






**SEAN Taupe Waterproof Suede**
$179.00

**SEAN Tan Waterproof Nubuck**
$179.00

**SEAN Black Waterproof Suede**
$179.00

**TINA Tan Distressed**
$189.00






**TINA Grey Distressed**
$189.00

**TINA Black Distressed**
$189.00

**LACEE Natural Metallic Multi Embossed Leather**
$159.00

**LACEE Chestnut Metallic Multi Embossed Leather**
$159.00

Title: J/Slides On-Trend Footwear| Women's New Arrivals
Link/URL : https://jslidesfootwear.com/new-arrivals/
Date Accessed: 2020-11-04









LACEE Black Metallic Multi Embossed Leather

$159.00

CARING MASK CHAIN Small Link Gold

$18.00

CARING MASK CHAIN Large Link Silver

$18.00

CARING MASK CHAIN Large Link Gold

$18.00

























CARING MASK CHAIN Black Bead

$18.00

NYRIE Black Leather

$169.00

NYRIE White Leather

$169.00

AMANDA White Patent Leather

$169.00





AMANDA White Leather

$169.00

AMANDA Black Patent Leather

$169.00

AILEEN Ivory Leather

$159.00

AILEEN Dark Grey Nubuck

$159.00









ABA White Leather

$169.00

NILA Taupe Suede

$169.00

NILA Dark Grey Suede

$189.00

NILA Black Suede

$189.00

1  2  3

Next >



Title: J/Slides On-Trend Footwear| Women's New Arrivals
Link/URL: https://jslidesfootwear.com/new-arrivals/
Date Accessed: 2020-11-04

Be in the KNOW - sign up here                    SUBSCRIBE

ABOUT US     CUSTOMER SERVICE     CONTACT     PRIVACY POLICY

© 2019 J/Slides. All Rights Reserved.

Title: EVE Tan Suede - JSlides
Link/URL: https://jslidesfootwear.com/eve-tan-suede/
Date Accessed: 2020-11-04

HOME    SNEAKERS    EVE TAN SUEDE





   

## EVE Tan Suede

### $159.00

or 4 installments of **$39.75 USD** with afterpay⬦ More info

**EVE**

A striped platform and perfectly scaled tractor bottom make these sneakers ones that you will turn to over and over again. P.S.- they also look fabulous with a skirt.

- Suede, pony or smooth leather upper
- Leather lining
- Cushioned footbed with removable gel insole
- Rubber sole
- Approx. 1.5" platform
- Imported

**Size Information:** true to size.

**COLOR:**



**SIZE:** Required

| | | 6 | 6.5 | 7 |
| 7.5 | 8 | 8.5 | 9 | 9.5 |
| 10 | 11 | | | |

**QUANTITY:**



ADD TO BAG    ADD TO WISH LIST

Title: HARLING Black Nubuck - JSlides
Link/URL: https://jslidesfootwear.com/harling-black-nubuck/
Date Accessed: 2020-11-04



J/SLIDES
NYC

SIGN IN    REGISTER

GIFT CERTIFICATES    SEARCH    BAG

NEW ARRIVALS    J'S FAVES    MASKS    SNEAKERS    URBAN SPORT    FURRY    BOOTIES    SANDALS    SALE





### HARLING Black Nubuck

$160.00

or 4 installments of $40.00 USD with  afterpay  Learn more

**HARLING**

Double zippers give ease of entry into our sure to be a hit, moto inspired sneaker of the season.

- Leather, pony hair, or nubuck upper
- Leather lining
- Cushioned footbed with removable gel insole
- Rubber sole
- Hi-Construction with 1.5" tiered rubber platform
- Round toe
- Cushioned heel grip
- Imported

**Size information:** true to size.

**COLOR:**



**SIZE:** Required

| | 5.5 | 6 | 6.5 | 7 |
| 7.5 | 8 | 8.5 | 9 | 9.5 |
| 10 | 11 | | | |

**QUANTITY:**



| 1 |

ADD TO BAG      ADD TO WISH LIST

Related Products







Title: HARLING Black Nubuck - JSlides
Link/URL: https://jslidesfootwear.com/harling-black-nubuck/
Date Accessed: 2020-11-04

| HARLING Dark Grey Nubuck | HARLING Taupe Nubuck | HARLING Ivory Leather |
|---|---|---|
| $160.00 | $160.00 | $69.00 |

Be in the KNOW - sign up here

SUBSCRIBE

ABOUT US    CUSTOMER SERVICE    CONTACT    PRIVACY POLICY

© 2019 - JSlides. All Rights Reserved

Title: LUDLOW Chestnut Metallic Multi Embossed Leather - JSlides
Link/URL: https://jslidesfootwear.com/ludlow-chestnut-metallic-multi-embossed-leather/
Date Accessed: 2020-11-04

HOME  ›  SNEAKERS  ›  LUDLOW CHESTNUT METALLIC MULTI EMBOSSED LEATHER



### LUDLOW Chestnut Metallic Multi Embossed Leathe

**$179.00**

or 4 installments of **$44.75 USD** with afterpay  More Info

**COLOR:**



**SIZE:** Required

| | | | | |
|---|---|---|---|---|
| 5 | 5.5 | 6 | 6.5 | 7 |
| 7.5 | 8 | 8.5 | 9 | 9.5 |
| 10 | 11 | | | |

**QUANTITY:**

1

ADD TO BAG    ADD TO WISH LIST





Title: @jslidesfootwear • Instagram photos and videos
Link/URL: https://www.instagram.com/p/CGsrGruHAmq/
Date Accessed: 2020-11-04





Title: BRYCE Grey Shearling - JSlides
Link/URL: https://jslidesfootwear.com/bryce-grey-shearling/
Date Accessed: 2020-11-04



J/SLIDES
NYC

SIGN IN    REGISTER                    GIFT CERTIFICATES    SEARCH    BAG

NEW ARRIVALS    J'S FAVES    MASKS    SNEAKERS    URBAN SPORT    FURRY    BOOTIES    SANDALS    SALE

HOME    SANDALS    BRYCE GREY SHEARLING



### BRYCE Grey Shearling

**$159.00**

or 4 installments of $39.75 USD with afterpay

**BRYCE**

A chic, super cozy slide that you will never take off. The rubber sneaker bottom is designed to be worn inside AND outside. Collect them all!

- Leopard, camo, grey, black or natural
- 100% sheep shearling upper and lining
- Cushioned shearling footbed
- Rubber sole
- Approx. 2.25" platform
- Imported

**Size Information:** true to size - if between sizes go down.

**COLOR:**

    

   

**SIZE:**

| 5 | 6 | 7 | 8 | 9 |
| 10 | 11 |

**QUANTITY:**

1

ADD TO BAG        ADD TO WISH LIST



Related Products



            

BRYCE Black Shearling    BRYCE Camo Shearling    BRYCE Leopard Shearling    BRYCE Natural Shearling
$159.00                  $159.00                  $159.00                     $159.00

# STATE OF NEW YORK

## DEPARTMENT OF STATE

I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.



WITNESS my hand and official seal of the Department of State, at the City of Albany, on December 22, 2014.

*Anthony Giardina*

Anthony Giardina
Executive Deputy Secretary of State

Rev. 06/13

141219000 0 282

# ARTICLES OF ORGANIZATION

## OF

## STYLELINE STUDIOS, LLC

### Under Section 203 of the Limited Liability Company Law

**FIRST.** The name of the limited liability company is STYLELINE STUDIOS, LLC.

**SECOND.** The county within this state in which the limited liability company is to be located is Nassau.

**THIRD:** The secretary of state is designated as agent of the limited liability company upon whom process against it may be served. The address within or without this state to which the Secretary of State shall mail a copy of any process accepted on behalf of the limited liability company served upon him or her is: 10 Cutter Mill Road, Great Neck, New York 11021.

**FOURTH:** The name and street address in this state of the registered agent upon whom and at which process against the limited liability company may be served is: Jan Pasternack, 10 Cutter Mill Road, Great Neck, New York 11021.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization on the date below.

LegalZoom.com, Inc., Organizer

Date: December 18, 2014

/s/ Cheyenne Moseley
By: Cheyenne Moseley, Assistant Secretary
9900 Spectrum Drive
Austin, TX 78717

141219000282

282

## ARTICLES OF ORGANIZATION

### OF

### STYLELINE STUDIOS, LLC

Under Section 203 of the Limited Liability Company Law

FILED

2014 DEC 19 AM 10: 49

I CC

**STATE OF NEW YORK
DEPARTMENT OF STATE**

FILED: DEC 19 2014

TAX $ _____

BY: _____

Filed By:   Cheyenne Moseley
            c/o LegalZoom.com, Inc.
            9900 Spectrum Drive
            Austin, TX 78717

Drawdown
Account: AF
LegalZoom.com, Inc.

RECEIVED

2014 DEC 19 AM 10: 10

308

2

N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS          ALBANY, NY 12231-0001

FILING RECEIPT

===========================================================================

ENTITY NAME: STYLELINE STUDIOS, LLC

DOCUMENT TYPE: ARTICLES OF ORGANIZATION (DOM LLC)          COUNTY: NASS

===========================================================================

FILED:12/19/2014 DURATION:********  CASH#:141219000308 FILM #:141219000282
                                    DOS ID:4682779

                                                          EXIST DATE
                                                          ----------
    FILER:                                                12/19/2014
    ------
    CHEYENNE MOSELEY
    C/O LEGALZOOM.COM, INC.
    9900 SPECTRUM DRIVE
    AUSTIN, TX 78717

    ADDRESS FOR PROCESS:
    --------------------
    THE LLC
    10 CUTTER MILL ROAD
    GREAT NECK, NY 11021

    REGISTERED AGENT:
    -----------------
    JAN PASTERNACK
    10 CUTTER MILL ROAD
    GREAT NECK, NY 11021



    The limited liability company is required to file a Biennial Statement with
    the Department of State every two years pursuant to Limited Liability
    Company Law Section 301. Notification that the biennial statement is due
    will only be made via email. Please go to www.email.ebiennial.dos.ny.gov
    to provide an email address to receive an email notification when the
    Biennial Statement is due.

===========================================================================
                                            SERVICE CODE: AF *
SERVICE COMPANY: LEGALZOOM.COM, INC. - AF

                                            PAYMENTS      235.00
FEES            235.00                                    --------
                --------                     CASH           0.00
FILING          200.00                       CHECK          0.00
TAX               0.00                        CHARGE         0.00
CERT              0.00                        DRAWDOWN     235.00
COPIES           10.00                        OPAL           0.00
HANDLING         25.00                        REFUND         0.00
===========================================================================
                                            DOS-1025 (04/2007)
===========================================================================

Operating Agreement

STYLELINE STUDIOS, LLC,
a New York Limited Liability Company

THIS OPERATING AGREEMENT of STYLELINE STUDIOS, LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.      The Members have formed the Company as a New York limited liability company under the New York Limited Liability Company Law. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of New York. The Members hereby adopt and approve the articles of organization of the Company filed with the New York Department of State.

B.      The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the New York Limited Liability Company Law.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, (3) decreased by any distributions made by the Company to such Member, and (4) otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Exhibit" means a document attached to this Agreement labeled as "Exhibit A," "Exhibit B," and so forth, as such document may be amended, updated, or replaced from time to time according to the terms of this Agreement.

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the New York Limited Liability Company Law, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest or Units, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

A.    If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or

B.    If ownership in the Company is expressed in Units, the ratio, expressed as a percentage, of:

(1)    the number of Units owned by the Member (expressed as "MU" in the equation below) divided by

-2-

(2)    the total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below).

$$\text{Percentage Interest} = \frac{MU}{TU}$$

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Units" mean, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, entitles the Member to a Membership Interest which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1  **Initial Capital Contributions.** The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2  **Subsequent Capital Contributions.** Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members in a consent in writing, the Members may make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3  **Additional Members.**

A.    With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by a unanimous written agreement signed by all of the existing Members.

-3-

B.    Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Members deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4  **Capital Accounts.** Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5  **Interest.** No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6  **Limited Liability; No Authority.** A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the New York Limited Liability Company Law. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1  **Allocations.** Unless otherwise agreed to by the unanimous consent of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2  **Distributions.** The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Members in accordance with the New York Limited Liability Company Law.

3.3  **Limitations on Distributions.** The Company must not make a distribution to a Member if, after giving effect to the distribution:

A.    The Company would be unable to pay its debts as they become due in the usual course of business; or

-4-

B. The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

4.1 Management.

A. Generally. Subject to the terms of this Agreement and the New York Limited Liability Company Law, the business and affairs of the Company will be managed by the Members.

B. Approval and Action. Unless greater or other authorization is required pursuant to this Agreement or under the New York Limited Liability Company Law for the Company to engage in an activity or transaction, all activities or transactions must be approved by the Members, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Members authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

C. Certain Decisions Requiring Greater Authorization. Notwithstanding clause B above, the following matters require unanimous approval of the Members in a consent in writing to constitute an act of the Company:

    (i) A material change in the purposes or the nature of the Company's business;

    (ii) With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

    (iii) The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

-5-

(iv)    The amendment of this Agreement.

4.2  **Officers.** The Members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the Members determine from time to time. Each officer will continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the Members; or (b) the officer is dismissed or terminated by the Members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Members, and may be terminated, at any time and for any reason, by the Members.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1  **Accounts.** The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

5.2  **Records.** The Members will keep or cause the Company to keep the following business records.

(i)    An up to date list of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

(ii)    A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

(iii)    A copy of the articles of organization of the Company, as may be amended from time to time ("Articles of Organization"); and

-6-

(iv) An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3  **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4  **Subchapter S Election.** The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulations.

5.5  **Tax Matters Member.** Anytime the Company is required to designate or select a tax matters partner pursuant to Section 6231(a)(7) of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner of the Company and keep such designation in effect at all times.

5.6  **Banking.** All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Members are authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 6: MEMBERSHIP – VOTING AND MEETINGS

6.1  **Members and Voting Rights.**

A. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the New York Limited Liability Company Law requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the New York Limited Liability Company Law, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2  **Meetings of Members.** Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem

-7-

necessary or desirable for the reasonable management of the Company. A written notice setting forth the date, time, and location of a meeting must be sent at least ten (10) days but no more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the New York Limited Liability Company Law. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the New York Limited Liability Company Law, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1  **Withdrawal.** Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account, which must be paid by the Company to such Member within ninety (90) days of the withdrawal date unless otherwise agreed in writing.

7.2  **Restrictions on Transfer; Admission of Transferee.** A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding all of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

-8-

## ARTICLE 8: DISSOLUTION

8.1  **Dissolution.** The Company will be dissolved upon the first to occur of the following events:

(i)  The vote of the Members holding at least a majority of the Voting Interest of the Company to dissolve the Company;

(ii)  Entry of a decree of judicial dissolution under Section 702 of the New York Limited Liability Company Law;

(iii)  At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 180 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

(iv)  The sale or transfer of all or substantially all of the Company's assets;

(v)  A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2  **No Automatic Dissolution Upon Certain Events.** Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

**9.1 Indemnification.** The Company will have the power to indemnify and hold harmless any Member, officer, employee, or other agent of the Company acting in any of such capacities, from and against and in connection with any Proceeding (as defined below) to the maximum extent now or hereafter permitted under Section 420 of the New York Limited Liability Company Law.

**9.2 Expenses Paid by the Company Prior to Final Disposition.** Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification). Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Section 9.1 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

**10.1 Notice.** (a) Any notices (including requests, demands, or other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

**10.2 Entire Agreement; Amendment.** This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement,

-10-

except as otherwise required by the New York Limited Liability Company Law. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the New York Limited Liability Company Law.

10.3  **Governing Law; Severability.** This Agreement will be construed and enforced in accordance with the laws of the state of New York. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4  **Further Action.** Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5  **No Third Party Beneficiary.** This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6  **Incorporation by Reference.** The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7  **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

*[Remainder Intentionally Left Blank.]*

-11-

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

Dated: 1/12/2015

_____
Signature of Jay Litvack

_____
Signature of Tina Liu

_____
Signature of Dimitri Mavridakis

EXHIBIT A
MEMBERS

The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement, including, but not limited to, Sections 2.1, 2.3, 2.4, 7.1, 7.2, and 10.1.

| Members | Capital Contribution | Percentage Interest |
|---|---|---|
| Jay Litvack<br>Address:<br>55 Lumber Road<br>Roslyn, New York 11576 | | 33.34% |
| Tina Liu<br>Address:<br>55 Lumber Road<br>Roslyn, New York 11576 | | 33.33% |
| Dimitri Mavridakis<br>Address:<br>55 Lumber Road<br>Roslyn, New York 11576 | | 33.33% |

-13-

Execution copy

Dated this 2nd day of April 2015

between

(1)  TINA EY-VEAN LIU

and

(2)  JAY STEVEN LITVACK

and

(3)  DIMITRIOS MAVRIDAKIS

and

(4)  STYLELINE STUDIOS INTERNATIONAL LIMITED

---

JOINT VENTURE
AND
SHAREHOLDERS'
AGREEMENT

---

**THIS JOINT VENTURE AND SHAREHOLDERS' AGREEMENT** is made on 2nd day April 2015.

**BETWEEN:**

(1)  **Tina Ey-Vean Liu**, a citizen of the Republic of China (Passport no. 306225658) of 36A, Aster Sky, The Cullinan, 1 Austin Road, Kowloon, Hong Kong ("**Tina**");

(2)  **Jay Steven Litvack**, a citizen of the United States of America (American passport no. 513438398), of 135 Crescent Lane, Roslyn Heights, New York, 11577 ("**Jay**");

(3)  **Dimitrios Mavridakis**, a citizen of Canada (Canadian passport no. GJ303407), of 2174 Sherbrooke Street West 12, Montreal, Quebec, H3H 167 ("**Dimitri**"); and

(4)  **Styleline Studios International Limited**, a company incorporated under the laws of Hong Kong with company number 2194884 whose registered office is at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong (the "**Company**").

together referred to as the "**Parties**" or singly as a "**Party**".

**RECITALS:**

(A)  Tina is in the business of manufacturing shoes as beneficial owner of E-Teen Market Ltd. and related subsidiaries.

(B)  Jay is in the business of marketing and distributing shoes in the US market as the beneficial owner of JSL Studio Int LLC, which has applied for the US Trademark Application.

(C)  Dimitri is *inter alia* in the business of designing shoes.

(D)  Tina, Jay and Dimitri have agreed to cooperate and combine their resources for the purposes of:

    (i)  manufacturing, marketing and distributing footwear and related accessories bearing the J/Slides Brand and any Additional Styleline Studios Brands; and

    (ii)  developing and enhancing the image and reputation of the J/Slides Brand and any Additional Styleline Studios Brands

as a joint venture through the medium of the Company and any other JV Operating Companies.

(E)  The Company is a company limited by shares incorporated on 22 January 2015 under the laws of Hong Kong and has at the date hereof a shareholding structure as set out in Schedule 1 hereto.

(F)  Tina, Jay and Dimitri have agreed to enter into this Agreement on the terms and conditions hereinafter set out to regulate their relationship with each other, the organisation and operation of the Company and certain aspects of the offices of and their dealings with the Company.

(G)  The Company has agreed with the Shareholders that it will comply with the terms and conditions of this Agreement.

**IT IS HEREBY AGREED** as follows:

1.  <u>DEFINITIONS AND INTERPRETATION</u>

1.1.    Unless otherwise provided herein, the terms below shall have the following meanings:

(a)    "**Additional Required Working Capital**" has the meaning ascribed under Clause 7.2.

(b)    "**Additional Styleline Studios Brands**" means any brands other than the J/Slides Brand which may be registered by the Company upon Shareholders' resolution for the purposes of bearing, marketing and distributing the Styleline Studios Products.

(c)    "**Articles**" means the articles of association, for the time being, of the Company and references to "Article" shall be construed accordingly;

(d)    "**Asset Transfer Agreements**" means the collectively the agreements under Clause 3.

(e)    "**Auditors**" means the auditors from time to time of the Company.

(f)    "**Board**" means the board of directors.

(g)    "**Business**" has the meaning ascribed under Clause 2.

(h)    "**Business Day**" means a day other than a Saturday or Sunday on which banks are open for business in Hong Kong.

(i)    "**Business Plan**" means a business plan for the first three years of Business operations of the Company Group attached hereto as Schedule 2.

(j)    "**Cash In**" means the aggregate of revenues from customers and the Tina Facility.

(k)    "**Commanding Deadlock Notice**" has the meaning ascribed under Clause 12.

(l)    "**Company Group**" means collectively the Company, Styleline Studios LLC and any other JV Operating Companies.

(m)    "**Company Net Asset Value**" is the greater of (i) the fully paid up corporate capital of the Company as at the Determination Date and (ii) the amount equal to the Company total assets (less depreciation and amortization) minus total liabilities as at the Determination Date, to be calculated in accordance with Hong Kong Generally Accepted Accounting Principles, as supplemented, if necessary, by International Financial Reporting Standards.

(n)    "**Confidential Information**" means any information which is proprietary and confidential to a Party including but not limited to the terms and conditions of this Agreement, information concerning or relating in any way whatsoever to its distributorship, franchise or other arrangements, principals, any of the trade secrets or confidential operations, processes or inventions carried on or used by a Party, any information concerning the organisation, business, finances, transactions or affairs of a Party, dealings of a Party, secret or confidential information which relates to the business or Party or any of its principals', clients or customers' transactions or affairs, any Party's technology, designs, documentation, manuals, budgets, financial statements or information, accounts, dealers' lists, customer lists, marketing studies,

drawings, notes, memoranda and the information contained therein, any information therein in respect of trade secrets, technology and technical or other information relating to the development, manufacture, clinical testing, analysis, marketing, sale or supply or proposed development, manufacture, clinical testing, analysis, marketing, sale or supply of any products or services by a Party, and plans for the development or marketing of such products or services and information and material which is either marked confidential or is by its nature intended to be exclusively for the knowledge of the recipient alone;

(o)    "**Deadlock**" has the meaning ascribed in Clause 12.1.

(p)    "**Deadlock Notice**" has the meaning ascribed in Clause 12.

(q)    "**Deadlock Period**" has the meaning ascribed in Clause 12.

(r)    "**Deed of Adherence**" means the Deed to be entered into between the Company and any third parties wishing to subscribe to Shares of the Company, in the form under Schedule 9.

(s)    "**Determination Date**" has the meaning ascribed under Clause 7.5.

(t)    "**Dimitri Service Agreement**" means the service agreement to be entered into between Dimitri and the Company within 10 (ten) Business Days following the execution of this Agreement in the form under Schedule 7.

(u)    "**E-Teen Market Ltd.**" means a limited liability company incorporated under the laws of the British Virgin Islands, controlled and managed by Tina, with offices at 6/F., No. 467, Section 6, Zhongxiao East Road, Nangang District, Taipei City 115, Taiwan.

(v)    "**E-Teen Supply Agreement**" means the supply agreement to be entered into between E-Teen Market Ltd and the Company within 10 (ten) Business Days following the execution of this Agreement in the form under Schedule 8.

(w)    "**Encumbrances**" means and includes any interest or equity of any person (including, without prejudice to the generality of the foregoing, any right to acquire, option or right of pre-emption) or any mortgage, pledge, lien or assignment or any other encumbrances priority or security interest or arrangement of whatsoever nature over or in the relevant property.

(x)    "**Existing Allotted Shares**" means the number of Shares allotted as at the Determination Date.

(y)    "**Hong Kong**" means the Hong Kong Special Administrative Region of the People's Republic of China.

(z)    "**Intellectual Property Rights**" means any trademark, pending trademark application, patent, pending patent application, know-how, registered and unregistered design, copyright, trade secrets, licences relating to any of the above or other similar industrial or commercial rights owned and possessed by the Company, including the trademark "J/Slides".

(aa)    "**J/Slides Brand**" means the trade name, symbol and all related intellectual property rights uniquely associated with the goods sold under the J/Slides mark and under which goodwill and reputation has been established.

(bb)    "**Jay Service Agreement**" means the service agreement to be entered into between Jay and the Company within 10 (ten) Business Days following the execution of this Agreement in the form under Schedule 6.

(cc)    "**JSL Studio Int LLC**" means a New York limited liability company whose registered office is at 55 Lumber Road #201, Roslyn, New York 11576, United States and wholly owned by Jay.

(dd)    "**JV Operating Companies**" means any subsidiary of the Company, including Styleline Studios LLC, as may be incorporated and/or held by the Company from time to time for the purposes of the Business.

(ee)    "**Loan Shares**" has the meaning ascribed in Clause 7.2.

(ff)    "**Lock-Up Period**" has the meaning ascribed in Clause 11.1.

(gg)    "**Net Asset Value per each Existing Allotted Share**" has the meaning ascribed in Clause 7.3.

(hh)    "**Non Participating Shareholder**" has the meaning ascribed in Clause 7.4.

(ii)    "**Offer**" has the meaning ascribed in Clause 11.2.

(jj)    "**Parties**" means collectively Tina, Jay, Dimitri and the Company.

(kk)    "**Reserved Matters**" has the meaning ascribed in Clause 9.

(ll)    "**Share**" or "**Shares**" means any issued shares from time to time in the share capital of the Company or any of them.

(mm)    "**Shareholders**" means collectively Tina, Jay and Dimitri.

(nn)    "**Styleline Studios Products**" means footwear and any other goods bearing the J/Slides Brand or any other brands as decided by the Shareholders which will be manufactured for the Company Group by E-Teen Market Ltd or any other third party suppliers in accordance with the terms and conditions of the E-Teen Supply Agreement.

(oo)    "**Styleline Studios LLC**" means a New York limited liability company whose registered office is at 10 Cutter Mill Road, Great Neck, New York 11021, which shall act as a JV Operating Company.

(pp)    "**Tina Initial Funding**" has the meaning ascribed in Clause 5.1.

(qq)    "**Tina Credit Facilities**" means collectively the Tina Initial Funding and the Tina Facility.

(rr)    "**Tina Facility**" has the meaning ascribed in Clause 5.2.

(ss)    "**Tina Facility Term of Duration**" has the meaning ascribed in Clause 5.2.

(tt)    "**Transferring Shareholder**" has the meaning ascribed in Clause 11.2.

(uu)     **"US Trademark Application"** means the US Trademark Application No. 86384358 for the mark "J/Slides" filed with the US Patent and Trademark Office applied by JSL Studio Intl, LLC.

1.2.    Any reference in this Agreement to a statutory provision shall include that provision and any regulations made in pursuance thereof as from time to time modified or re-enacted, whether before or after the date of this Agreement.

1.3.    The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

(a)     Any reference in this Agreement to **"this Agreement"** includes all amendments, additions, and variations thereto agreed between the Parties hereto.

(b)     Unless the context otherwise requires, words importing the singular shall include the plural and vice versa; words importing a specific gender shall include the other genders (male, female or neuter), and **"person"** shall include an individual, corporation, company, partnership, firm, trustee, trust, executor, administrator or other legal personal representative, unincorporated association, joint venture, syndicate or other business enterprise, any governmental, administrative or regulatory authority or agency (notwithstanding that **"person"** may be sometimes used herein in conjunction with some of such words), and their respective successors, legal personal representatives and assigns, as the case may be, and pronouns shall have a similarly extended meaning.

2.     **THE BUSINESS**

2.1.    Unless and until the Shareholders otherwise unanimously agree, the business of the Company (the **"Business"**) shall exclusively consist of:

(a)     developing and enhancing the image and reputation of the J/Slides Brand and any Additional Styleline Studios Brands;

(b)     holding any and all Intellectual Property Rights related to the J/Slides Brand, as well as Additional Styleline Studios Brands;

(c)     manufacturing, marketing and distributing footwear and related accessories bearing the J/Slides Brand and the Additional Styleline Studios Brands;

(d)     owning and holding shareholdings and/or equity interests in the JV Operating Companies; and

(e)     providing continuing operational, investment and financial assistance to the JV Operating Companies.

3.     **TRANSFER OF JAY'S ASSETS**

3.1.    Jay undertakes as beneficial owner of Styleline Studios LLC to transfer 100% equity interest in Styleline Studios LLC to the Company free and clear of all Encumbrances for no consideration, representing and guaranteeing that Styleline Studios LLC has not commenced trading and that it has no liabilities (whether actual or contingent) of any nature whatsoever to any party.

3.2.    Jay undertakes as beneficial owner of JSL Studio Int LLC to cause and procure JSL Studio Int LLC to:-

    (a)    assign wholly and exclusively to the Company all legal and beneficial title in respect of the Intellectual Property Rights of the J/Slides Brand, including but not limited to all rights related to the US Trademark Application; and

    (b)    assign wholly and exclusively to Styleline Studios LLC all legal and beneficial title in respect of inventory, purchase orders and goodwill associated to its clients, as better identified under Schedule 3.

3.3.    In consideration of the transfer as described under Clauses 3.2(a), the Company shall pay to JSL Studio Int LLC an amount equal to US$ 150,000. The terms and conditions of the relevant transaction are recorded in the document attached hereto as Schedule 4 which the Company shall sign and execute with, and deliver to, JSL Studio Int LLC.

3.4.    In consideration of the transfer as described under Clauses 3.2(b), the Company shall cause and procure Styleline Studios LLC to pay to JSL Studio Int LLC an amount equal to US$ 150,000.. The terms and conditions of the relevant transaction are recorded in the document attached hereto as Schedule 5 which the Company shall cause and procure Styleline Studios LLC to sign, execute with, and deliver to JSL Studio Int LLC.

3.5.    The transaction under Clauses 3.1, 3.2(a) and 3.2(b) shall be completed within 10 (ten) Business Days following the execution of this Agreement.

## 4.    JAY AND DIMITRI SERVICE AGREEMENTS

4.1.    In accordance with the terms and conditions as set out in the Jay Service Agreement, Jay shall procure sales of the Styleline Studios Products on behalf of the JV Operating Companies and supervise and attend to any matters and activities relating to such sales. Unless terminated pursuant to the relevant terms and conditions, the Jay Service Agreement shall forthwith terminate being in full force and effect on the date Jay ceases to be beneficially entitled to any Shares in the Company.

4.2.    In accordance with the terms and conditions as set out in the Dimitri Service Agreement, Dimitri shall provide design collections of footwear to the Company Group, as reasonably required in view of the demands of the Business and in line with the Business Plan. Unless terminated pursuant to the relevant terms and conditions, the Dimitri Service Agreement shall forthwith terminate being in full force and effect on the date Dimitri ceases to be beneficially entitled to any Shares in the Company.

## 5.    TINA CREDIT FACILITIES

5.1.    Subject to the terms and conditions of this Agreement, Tina shall make available to the Company within 10 (ten) Business Days following the execution of this Agreement a non-refundable loan in the amount of US$ 300,000 (the "**Tina Initial Funding**") which shall be used for the purposes of discharging the obligation undertaken by the Company and Styleline Studios LLC vis-a-vis JSL Studio Int LLC under the Asset Transfer Agreements.

5.2.    In addition to the Tina Initial Funding, Tina shall make available to the Company within 10 (ten) Business days following the execution of this Agreement and for a term of 36 (thirty six) months (the "**Tina Facility Term of Duration**"), when and if required by the Company's Board, refundable and interest-bearing shareholder loans ("**Tina Facility**") to finance the working capital of the Company Group, under the terms and conditions of the Business Plan, by ensuring that in each calendar month throughout the Tina Facility Term of Duration, the Company Group will have available Cash In for an amount US$ 120,000 at least.

5.3.   The maximum amount of the Tina Facility will be US$ 1,000,000, and will operate under the terms and conditions similar to a revolving banking facility throughout the Tina Facility Term of Duration.

5.4.   The Company shall pay interest on the Tina Facility at the rate of 1% above the HSBC HKD Prime Lending Rate  per annum. Interest shall accrue on the Tina Facility during each 12 (twelve) months throughout the Tina Facility Term of Duration and shall be due and be paid in arrears. Interest will be calculated on the basis of the actual number of days elapsed and on a 360 (three hundred sixty) days year.

5.5.   All amounts drawn and outstanding under the Tina Facility and all interest and other sums payable in respect of the Tina Facility will be due and payable or, as the case may be, repayable on the expiration of the Tina Facility Term of Duration (for the avoidance of doubt, on the third anniversary of this Agreement).

## 6.   TINA PRIVILEGED SUPPLY

6.1.   In consideration for Tina providing the Tina Credit Facilities, the Shareholders shall cause and procure that unless otherwise agreed in writing with Tina, the Company shall grant, in relation to the Business, E-Teen Market Ltd with a right of first refusal in the manufacture and product development of the Styleline Studios Products under the terms and conditions set out under the E-Teen Supply Agreement.  Unless terminated pursuant to the relevant terms and conditions, the E-Teen Supply Agreement shall forthwith terminate being in full force and effect on the date Tina ceases to be beneficially entitled to any Shares in the Company.

6.2.   Jay, Dimitri and the Company acknowledge and accept Tina's material interest in E-Teen Market Ltd and in the E-Teen Supply Agreement and that Tina has resolved to enter into this Agreement and accepted to provide the Tina Credit Facilities in reliance of Jay and Dimitri accepting that the Company shall grant E-Teen Market Ltd with the right of first refusal in respect to the manufacture and product development of the Styleline Studios Products in accordance with the terms and conditions under the E-Teen Supply Agreement.

6.3.   To the extent not recorded in the E-Teen Supply Agreement, the terms and conditions under which the Styleline Studios Products manufactured by E-Teen Market Ltd shall be at all times negotiated by the Company on a commercially fair and reasonable basis.

## 7.   ADDITIONAL LOAN FINANCE

7.1.   In addition to the Tina Credit Facilities, the Shareholders shall use each of their respective reasonable endeavours to procure that the requirements of the Company Group for working capital to finance the Business, as indicated in the Business Plan, are met as far as practicable by borrowings from banks and other similar sources on the basis that there shall be no recourse to the Shareholders and otherwise on the most favourable terms which could reasonably be expected to be obtainable in the open market, provided always that no lender or prospective lender shall be given a right to participate in the subscription of share capital of the Company Group and provided further that nothing shall oblige any Shareholder to provide any guarantee or security in respect of the Company Group's borrowings or provide any finance to the Company Group.

7.2.   If the Board of the Company resolves at any time throughout the term of duration of the Business Plan, that additional working capital is required under and according to the Business Plan (the "**Additional Required Working Capital**") and that borrowing from banks, whether at the Company or at the JV Operating Company level, is not available for such Additional Required Working Capital, then each Shareholder shall agree on and, subject to Clause 7.8, subscribe in cash an increase of share capital of the Company for an amount equal to the

Additional Required Working Capital (the "**Loan Shares**"). The maximum aggregate amount of Loan Shares liable to be subscribed to by each Shareholder, in one or several allotments within the term of duration of the Business Plan, is set out in the Business Plan.

7.3.    The number of Loan Shares to be issued and allotted from time to time shall be determined according to the following formula:

*Additional Required Working Capital / Net Asset Value per each Existing Allotted Share*

*where:*

(a)    the Net Asset Value per each Existing Allotted Share shall be determined according to the following formula:

*Company Net Asset Value /total number of Existing Allotted Shares*

7.4.    The Loan Shares shall be issued and allotted at a subscription price to be determined according to the following formula:

*Additional Required Working Capital/ number of Loan Shares to be allotted*

7.5.    The Company Net Asset Value shall be determined by the Board as at the end of the month previous to the date (the "**Determination Date**") on which the Board resolve in respect of the Additional Required Working Capital.

7.6.    To the extent necessary or appropriate, upon proposal of the Board, the Shareholders shall agree and resolve on any amalgamation or subdivision of Shares and/or Loan Shares, which may be necessary so as to implement the capital increase under the terms and conditions set out therein and to offer the Loan Shares to the Shareholders in proportion to their shareholding.

7.7.    In the event of inability of the Board to determine the Company Net Asset Value and/or the technicalities for implementing the capital increase, including amalgamation or sub-division on Shares and/or Loan Shares, such determination shall be determined by the Auditors, upon request of any Shareholder within the following thirty (30) Business Days of such request. In so certifying, the Auditors shall refer to the terms and conditions set out in this Agreement and shall be considered to be acting as experts and not as arbitrators and their decision shall, in the absence of manifest error, be final and binding on the Shareholders.

7.8.    Any Shareholder refraining to subscribe for any amount of Loan Shares (the "**Non Participating Shareholder**") acknowledges and accepts that its shareholding will be diluted and the other Shareholders shall be entitled (but not required) to pay to the Company in cash the amount due by the Non Participating Shareholder, and the remittance of such amount shall be accompanied by a written notice that the amount in question shall be wholly applied in subscribing for additional Loan Shares.

7.9.    The Shareholders shall agree and implement any action which may be necessary or reasonably required for the purposes of implementing all action under Clause 7, including but not limited to causing and procuring the directors appointed by themselves to comply with the above-mentioned terms and conditions. Without prejudice to the above, the Non Participating Shareholder shall refrain from using his voting rights and any other powers of control in relation to the Company to prevent or delay any necessary action being taken by the Company for the purposes set out in this Clause 7.

8.    <u>**DIRECTORSHIP – RESTRICTION ON THE BOARD POWERS OF MANAGEMENT**</u>

8.1.    At all material times, the Board of the Company and of any JV Operating Company shall consist of three directors.

8.2.    Tina shall for so long as she continues to remain as a Shareholder be entitled to appoint one Director, who may be herself, and shall be entitled at any time to remove or substitute such any Director so appointed.

8.3.    Dimitri shall, for so long as he continues to remain as a Shareholder, be entitled to appoint one Director, who may be himself, and shall be entitled at any time to remove or substitute any Director so appointed.

8.4.    Jay shall, for so long as he continues to remain as a Shareholder, be entitled to appoint one Director, who may be himself, and shall be entitled at any time to remove or substitute any Director so appointed.

8.5.    The chairman of the Board shall be, for the first three years after the date of this Agreement, the Director appointed by Tina, who may Tina herself, and elected by majority vote at a shareholders' quorate meeting thereafter.  At all material times, the chairman may be removed by unanimous vote of all Shareholders.

8.6.    If any Shareholder removes a Director in accordance with its rights to do so pursuant to this Agreement, he or she shall be responsible for and indemnify the other Shareholder and the Company Group against any and all claims by such Director for unfair or wrongful dismissal or other compensation arising out of such removal and against any losses, costs or expenses suffered or reasonably incurred as a result thereof.

8.7.    The quorum of Directors for the transaction of business at any board meeting of the Company Group shall be two.

8.8.    In accordance with the Articles, the Board shall have full powers of management and supervision of the Business of the Company Group, including but not limited to representing and acting for the Company Group in day-to-day business matters pursuant to the Business Plan, subject to the following restrictions on powers of management:-

   (a)    any transaction involving a material change from the Business Plan of up to 15% requires approval from at least two Directors of the Board; and

   (b)    any Reserved Matter as defined under Clause 9 below.

## 9.    RESERVED MATTERS

9.1.    The Shareholders agree that subject to the provisions of the Companies Ordinance, Cap. 622, the following matters are Reserved Matters requiring <u>75% quorate shareholders' meeting of the Company</u>:

   (a)    any transaction of the Company Group exceeding 15% of the expenditure or investment amount referred in the Business Plan;

   (b)    any material amendment to the Business Plan or the renewal of the same;

   (c)    terminating or materially varying the E-Teen Supply Agreement, the Jay Service Agreement and the Dimitri Service Agreement;

   (d)    entering into contractual arrangements with suppliers and/or manufacturers other than E-Teen Market Ltd. for the purposes of sourcing any Styleline Studios Products;

*This means unan*

Execution copy

(e)     acquisition or launching of any Additional Styleline Studios Brands;

(f)     any amendment to the Articles;

(g)     any resolution to be passed in relation to any JV Operating Companies;

(h)     appointment of auditors; and

(i)     any resolution to be adopted by the shareholders' meeting of the JV Operating Companies concerning any matters under Clause 9.1.

## 10.  DIVIDEND POLICY

10.1.  The Shareholders agree that no dividends will be paid as long as there are any outstanding loans, including but not limited to the Tina Credit Facilities or Loan Shares.

## 11.  TRANSFER OF SHARES

11.1.  Until the expiration of 3 (three) years from the date of this Agreement (the "Lock-Up Period"), each Shareholder shall not, without the prior written consent of the other Shareholder, encumber, create or permit to create any Encumbrances over his or her Shares, sell, transfer or otherwise dispose of any of such Shares (or any interest therein (including any voting rights)).

11.2.  If a Shareholder (hereinafter referred to as the "Transferring Shareholder") wishes to Transfer any of his or her Shares that Transferring Shareholder shall first offer in writing those Shares to be transferred by the Transferring Shareholder to the other Shareholders in proportion (as nearly as may be) to the number of Shares held by them inter se respectively at a price determined by the Transferring Shareholder (the "Offer") and on such terms and conditions as set out in the Offer.

11.3.  The Offer may be accepted by the other Shareholders as to all of the Shares comprised in the Offer within 14 (fourteen) Business Days from the date of the Offer and failing such acceptance shall be deemed to be declined, following which the Transferring Shareholder may offer the same Shares to third parties not being Shareholders.

11.4.  Any third parties wishing to accept the Offer and subscribe to Shares in the Company shall be required to enter into the Deed of Adherence in the form set out under Schedule 9 (or in such other form as the other Shareholders may reasonably require) signifying his consent to be bound by the duties, obligations and limitations affecting the Shares as set out in this Agreement, as may be required by the other Shareholders.

## 12.  DEADLOCK

12.1.  A deadlock ("Deadlock") is deemed to have arisen where the Shareholders cannot pass a resolution at the shareholders' meeting (including, in respect of a new Business Plan following the expiration of the first Business Plan) and have not resolved their difference in relation to such resolution within 30 (thirty) Business Days.

12.2.  In the event of a Deadlock, each Shareholder shall have an option to buy the Shares of the other Shareholders at price to be offered by the respective Shareholder, by sending a deadlock notice (the "Deadlock Notice") to the other Shareholders and the Company at any time during a period of 60 (sixty) Business Days commencing on 31st (thirty first) Business Day of the arising of the Deadlock as per Clause 12.1 (the "Deadlock Period").



12.3. Failure to deliver the Deadlock Notice before the expiration of the Deadlock Period will result in the relevant Shareholder forfeiting any and all rights to buy out the Shares of the other Shareholders and to be regarded as Shareholders delivering a Commanding Deadlock Notice, although he or she will still be subject to Clause 12.5.

12.4. If by the expiration of the Deadlock Period, only one Deadlock Notice is received, then such Deadlock Notice shall be regarded as the **"Commanding Deadlock Notice"**. If by the expiration of the Deadlock Period, several Deadlock Notices are received, then the Deadlock Notice having the highest price for the Shares shall be regarded as Commanding Deadlock Notice. If the offer price for the Shares as stated in the Deadlock Notices received from the Shareholders are the same, the auditors of the Company shall resolve the Deadlock by blind draw. The first Deadlock Notice drawn out by the auditors shall be treated as the Commanding Deadlock Notice for the purpose of Clause 12.5.

12.5. Upon receipt of the Commanding Deadlock Notice, the other Shareholders shall within 30 (thirty) Business Days of the expiration of the Deadlock Period:-

(a)   either accept the offer under the Commanding Deadlock Notice and therefore transfer all their Shares, free of any Encumbrances to that offering Shareholder under the same price offered under that Deadlock Notice; or

(b)   buy out the Shares held by the Shareholder delivering the Commanding Deadlock Notice, under the same price offered by him or her, such Shares to be offered to the Shareholders on a pro rata basis.

## 13. RESTRICTIVE COVENANTS

13.1. Each Shareholder (each of them is referred to in this Section as the **"Covenantor"**) covenants with each other and separately with each of the Company and the JV Operating Companies that the Covenantor (whether alone or jointly with any other person, and whether directly or indirectly, and whether as shareholder, participator, partner, promoter, director, officer, agent, manager, employee or consultant of, in or to any other person) shall not at any time during the term of this Agreement act in a way that is knowingly and materially detrimental to the Company Group and/or the Business and/or the J/Slides Brand and/or the Additional Styleline Studios Brands.

## 14. JV OPERATING COMPANIES

14.1. The Board of any JV Operating Companies shall be appointed and operated according to Clause 8.

14.2. The corporate governance rules of any such JV Operating Company shall be consistent with the principle terms and conditions applicable to the Company, as agreed among the Shareholders.

14.3. Without prejudice to the generality of Clause 14.2:

(a)   the Board of the Company shall act in respect of that apportionment of the Business Plan to the respective JV Operating Companies, and the Board of such JV Operating Company shall act in respect of that portion, pursuant and according to Clause 8; and

(b)   any matter at the JV Operating Company level falling within the definition of a Reserved Matter according to this Agreement shall be previously discussed and approved by Shareholders' meetings of the Company as described under Clause 9.1.

## 15. TERMINATION

15.1   This Agreement shall terminate forthwith if the Company is put into liquidation, whether voluntary or compulsory.

15.2   This Agreement shall continue in force without limit in point of time until terminated by agreement of all Shareholders in writing.

15.3   Upon any of the Shareholders ceasing to be a shareholder or a Party to this Agreement for any reason, the provisions of this Agreement will cease to be applicable to such Shareholder as if it were not a Party to this Agreement, save for such rights, benefits and obligations as have accrued to it at the date of its ceasing to be a Shareholder or a Party to this Agreement and save further that the right of any Shareholder to claim damages or any other remedies by reason of any breach of this Agreement by any other Shareholder which has accrued prior to any Shareholder so ceasing will not be affected.

## 16    WARRANTIES

16.1   Each Party enters into this Agreement on the basis of, and in reliance on, the following representations and warranties made by each Party:

(a)   it has full power and authority to enter into this Agreement, and to carry out the transactions contemplated by this Agreement, to carry on its business as now being conducted;

(b)   all proceedings or action required to be taken by it relating to the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby shall have been taken at or prior to its execution; and

(c)   neither the execution, delivery nor performance of this Agreement by it will, with or without the giving of notice or the passage of time, or both, conflict with, result in a default, right to accelerate or loss of rights under, or result in the creation of any lien, charge or encumbrance pursuant to any franchisee, mortgage, Agreement of trust, lease, license, agreement, understanding, law, ordinance, rule or regulation or any order, judgment or decree to which it is a Party or by which it may be bound or affected.

16.2   Without prejudice to the generality of the foregoing and in consideration of the amount payable under Clause 3.2 and 3.3 and other valuable consideration, the receipt of which it is hereby acknowledged, Jay shall ensure that JSL Studios Int LLC complies with all obligations under the Asset Transfer Agreements. Jay hereby unconditionally and irrevocably guarantees the due and punctual performance and observance by JSL Studios Int LLC of all its obligations, commitments, undertakings, warranties, indemnities and covenants under or pursuant to each Asset Transfer Agreement. The liability of Jay under this Clause 16.2 shall not be discharged or impaired by any amendment to or variation of each Asset Transfer Agreement, any release of or granting of time or other indulgence to JSL Studio Int LLC or any third party or any other act, event or omission which but for this clause would operate to impair or discharge the liability of Jay under this Clause 16.2.

## 17    PROVISIONS RELATING TO THIS AGREEMENT

17.1   This Agreement shall be binding upon and inure to the benefit of the permitted successors of the Parties.

Execution copy

17.2 Unless otherwise agreed in writing by the Shareholders in accordance with Clause 11, none of the Parties shall be entitled to assign this Agreement or any of its rights and obligations hereunder except to a transferee of that Party's Shares permitted by Clause 11.

17.3 The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

17.4 In the event of any conflict between the provisions of this Agreement and the Articles, the provisions of this Agreement shall prevail and the Shareholders shall, where possible, forthwith cause such necessary alterations to be made to the Articles as are required so as to remove such conflict.

## 18    CONFIDENTIALITY

18.1 The Shareholders acknowledge that any oral or written information exchanged among them with respect to this Agreement is confidential information. Each Shareholder shall maintain the confidentiality of all such information, and without obtaining the written consent of other Shareholders, it shall not disclose any relevant information to any third parties, except in the following circumstances: (a) such information is or will be in the public domain (provided that this is not the result of a public disclosure by the receiving Party); (b) information disclosed as required by applicable laws or rules or regulations of any stock exchange; or (c) information required to be disclosed by any Party to its legal counsel or financial advisor regarding the transaction contemplated hereunder, and such legal counsel or financial advisor are also bound by confidentiality duties similar to the duties in this Section. Disclosure of any confidential information by the staff members or agency hired by any Party shall be deemed disclosure of such confidential information by such Party, which Party shall be held liable for breach of this Agreement. This Section shall survive until the third anniversary of the termination of this Agreement.

18.2 The Shareholders shall (and shall procure that its agents and where applicable its officers and employees shall) at all times use all reasonable endeavours to keep confidential any Confidential Information which it may acquire in relation to the Company Group or in relation to the clients, business or affairs of any other Party or of any company of the Company Group and shall not use or disclose such information to any other person except with the consent of that other Party or in accordance with the order of a court of competent jurisdiction or of any governmental or regulatory authority (whether in the Hong Kong or elsewhere), and in the case of information relating to the Company Group, for the advancement of the Business of the Company Group.

18.3 Notwithstanding Clause 18.2, the confidentiality obligation shall not apply to:

(a) any information obtained from any Party hereto which becomes generally known to the public, other than by reason of any wilful or negligent act or omission of any Party hereto or any of their agents, advisers, directors, officers, employees or representatives;

(b) any information which is required to be disclosed pursuant to any applicable laws or to any competent governmental or statutory authority or pursuant to rules or regulations of any relevant regulatory, administrative or supervisory body (including, without limitation, any relevant stock exchange or securities council);

(c) any information disclosed by any of the Parties to their respective bankers, financial advisers, consultants and legal or other advisers for the purpose of this Agreement; and

18.4 The Shareholders shall procure that the Company shall use all reasonable endeavours to procure that its subsidiaries (if any) shall and the officers, employees of its subsidiaries (if any) shall observe a similar obligation of confidence in favour of the Shareholders.

18.5 No Shareholder may disclose Confidential Information to any potential purchaser of any of the Shares held by it at the relevant time without the approval of the other Shareholder, such approval not to be unreasonably withheld. Any potential purchaser shall be required to sign a confidentiality undertaking on terms which are reasonable for the protection of the interests of the Company Group. The other Shareholder shall take all steps to procure that the Company and its subsidiaries and their respective directors, officers, employees, agents and representatives provide the necessary assistance to the potential purchaser and its advisers in the conduct of any due diligence exercise proposed to be undertaken by the potential purchaser in connection with the sale and purchase of the relevant Shares.

18.6 The obligations contained in this Clause shall endure, notwithstanding the termination of this Agreement, without limit in point of time except and until any confidential information enters the public domain as set out above.

19 **SEVERAL OBLIGATIONS**

19.1 All covenants, undertakings and other obligations given or entered into by the Parties hereto are given or entered into severally unless the context otherwise requires.

20 **WAIVER OF RIGHTS, ETC.**

20.1 No failure on the part of any Party to this Agreement to exercise, and no delay on its part in exercising, any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

20.2 Any Party may release or compromise the liability hereunder of any other Party hereto or grant to any such Party time or other indulgence without affecting the liability of any other Party hereunder.

21 **NO PARTNERSHIP**

21.1 Nothing in this Agreement shall be deemed to constitute a partnership between the Shareholders nor constitute any Party the agent of any other Party for any purpose.

22 **COSTS – LEGAL ADVISORS**

22.1 Each Party to this Agreement shall bear its own legal and other professional costs and expenses in connection with the negotiation, preparation and implementation of this Agreement.

22.2 The Parties acknowledge that Messrs. Winston & Strawn is acting on behalf of Tina in the preparation, negotiation and execution of this Agreement and that other Parties to this Agreement have been advised to seek independent legal advice and have been given ample opportunity to do so.

23 **NOTICES**

23.1 Any notice or other communication given under this Agreement shall be in writing and shall be served by delivering it personally or sending it by pre-paid recorded delivery or registered post

or registered airmail (if posted to a country other than where the serving Party is located) or fax to the address and for the attention of the relevant Party (or as otherwise notified by that Party hereunder). Any such notice shall be deemed to have been received:

(a)    if delivered personally, at the time of delivery;

(b)    in the case of pre-paid recorded delivery or registered post, 48 hours from the date of posting;

(c)    in the case of registered airmail, five days from the date of posting;

(d)    in the case of fax, at the time of transmission.

23.2    Provided that if deemed receipt occurs before 9 am on a Business Day the notice shall be deemed to have been received at 9 am on that day, and if deemed receipt occurs after 5 pm on a Business Day, or on a day which is not a Business Day, the notice shall be deemed to have been received at 9 am on the next Business Day.

23.3    The addresses and fax numbers of the Parties for the purposes of Clause 23.1 are as set out in Schedule 1 or such other address or facsimile number as may be notified in writing from time to time by the relevant Party to the other Party.

23.4    In proving such service it shall be sufficient to prove that the envelope containing such notice was addressed to the address of the relevant Party set out in Clause 23.2 (or as otherwise notified by that Party hereunder) and delivered either to that address or into the custody of the postal authorities as a pre-paid recorded delivery, registered post or airmail letter, or that the notice was transmitted by fax to the fax number, or emailed to the email address of the relevant Party set out in Clause 23.2 (or as otherwise notified by that Party hereunder).

24    SPIRIT OF AGREEMENT AND INTENTION

24.1    In entering into this Agreement, the Parties recognise that it is impractical to make provision for every contingency that may arise in the course of the observance or performance thereof. Accordingly, the Shareholders hereby declare it to be a cardinal principle of this Agreement and it to be their common intention that this Agreement shall operate between them with fairness and without detriment to the interests of any of them and if in the course of the performance of this Agreement unfairness to a Party hereto is disclosed or anticipated then the Shareholders shall use their best endeavours to agree upon such action as may be necessary and equitable to remove the cause or causes of the same.

25    ENTIRE AGREEMENT

25.1    This Agreement, and the documents referred to in it, constitute the entire agreement and understanding of the Parties relating to the subject matter of this Agreement and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking of any other Party which is not set out or referred to in this Agreement. The Parties hereto agree that no variations or modifications shall be made to this Agreement unless agreed to by the Parties hereto in writing. Nothing in this Clause 25 shall however operate to limit or exclude any liability for fraud.

26    COUNTERPARTS

26.1    This Agreement may be signed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any Party may enter into this Agreement by signing any such counterpart and each counterpart may be signed and executed by the Parties and

transmitted by facsimile transmission and shall be valid and effectual as if executed as an original.

## 27    GOVERNING LAW

27.1    This Agreement shall be governed by and construed in accordance with the laws of Hong Kong.

27.2    Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.  The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

27.3    The Parties appoint Brilliant Yield Consultants Limited, Room  M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of the Company from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Clause 27.2.  If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, the Company shall promptly appoint a successor agent in Hong Kong and notify the other Parties, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the purposes of this clause.  The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong.  The Parties agree that the shareholders commencing arbitration proceedings against either Jay or Dimitri shall send a copy of the notice in respect of the same to Wexler Lehrer & Kaufman PLLC by electronic mail and registered post and the shareholders commencing arbitration proceedings against Tina shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.

**IN WITNESS** of which the Parties or their duly authorized representatives have executed this Agreement.

Signed by                                     )
**Tina Ey-Vean Liu**                          )
in the presence of:                           )
                                              )
                                              )
                                              )

Witness name:
Witness address:


Signed by                                     )
**Jay Steven Litvack**                        )
in the presence of:                           )
                                              )
                                              )

Witness name:
Witness address:


Signed by                                     )
**Dimitrios Mavridakis**                      )
in the presence of:                           )
                                              )
                                              )
                                              )

Witness name:
Witness address:


Signed by                                     )
For and on behalf of                          )
**Styleline Studios International Limited**    )
in the presence of:                           )
                                              )
                                              )

Witness name:
Witness address:

## SCHEDULE 1

### DETAILS OF SHAREHOLDERS

| Shareholder | Address | Number of Shares Held | Percentage of Shareholding |
|---|---|---|---|
| Tina | 36A, Aster Sky, The Cullinan, 1 Austin Road, Kowloon, Hong Kong | 1 | 33.3% |
| Jay | 135 Crescent Lane, Roslyn Heights, New York, 11577 | 1 | 33.3% |
| Dimitri | 2174 Sherbrooke Street West 12, Montreal, Quebec, H3H 167 | 1 | 33.3% |
| **Total Number of Shares** | | 3 | 100% |

### DETAILS OF DIRECTORS

| Director | Address |
|---|---|
| Tina | 36A, Aster Sky, The Cullinan, 1 Austin Road, Kowloon, Hong Kong |
| Jay | 135 Crescent Lane, Roslyn Heights, New York, 11577 |
| Dimitri | 2174 Sherbrooke Street West 12, Montreal, Quebec, H3H 167 |

### DETAILS OF THE CHAIRMAN OF THE BOARD

| Director | Address |
|---|---|
| Tina | 36A, Aster Sky, The Cullinan, 1 Austin Road, Kowloon, Hong Kong |

## SCHEDULE 2

### BUSINESS PLAN

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| **Revenues** | | | |
| Regular Sales | 3,300,000 | 5,550,000 | 16,000,000 |
| Commission Revenue | 150,000 | 350,000 | 960,000 |
| Returns | - | - | - |
| Markdowns | - | - | - |
| **Net Sales** | 3,450,000 | 5,900,000 | 16,960,000 |
| **Cost of Sales** | 1,657,850 | 2,958,421 | 8,528,780 |
| **Gross Profit** | 1,792,150 | 2,941,579 | 8,431,220 |
| **Gross Profit Percentage** | 51.95% | 49.86% | 49.71% |
| **Operating Expense** | | | |
| General & Administrative | 921,000 | 1,040,000 | 1,405,000 |
| Warehousing/Distribution | 50,000 | 50,000 | 50,000 |
| Product Development | 80,000 | 90,000 | 300,000 |
| Selling | 538,000 | 572,000 | 1,635,000 |
| Depreciation | | | |
| Amortization Start up Costs | | | |
| **Total Operating Expense** | 1,589,000 | 1,752,000 | 3,390,000 |
| **% Of Sales** | | | |
| **Income (Loss) from Operations** | 203,150 | 1,189,579 | 5,041,220 |
| **Other Income/(Expense)** | | | |
| Misc Income/(Expense) | - | - | - |
| Interest Income/(Expense) | - | - | - |
| **Total Other Income (Expense)** | - | - | - |
| **Income (Loss) before Income Taxes** | 203,150 | 1,189,579 | 5,041,220 |
| **Income Taxes** | - | - | - |
| **Income/(Loss) before Extraord Item** | 203,150 | 1,189,579 | 5,041,220 |
| **Extraordinary Gain/(Loss)** | - | - | - |
| **Net Income/(Loss)** | 203,150 | 1,189,579 | 5,041,220 |

LOAN SHARES (as per Section 7.2 of the Shareholders' Agreement)
as many shares as for a total subscription price (including premium) equal to US$ 900,000



| Cost of Sales | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Shoe Manufacturing Costs | 1,320,000 | $2,368,902 | $6,829,268 |
| Import Duty 10% | 132,000 | 236,890 | 682,927 |
| Freight $.75/pr | 125,330 | 208,125 | 600,000 |
| Agency Fees 6% | 79,200 | 142,134 | 409,756 |
| Broker Fees .1% | 1,320 | 2,369 | 6,829 |
| | | | |
| Total Cost of Sales | 1,657,850 | 2,958,421 | 8,528,780 |

2015 projected yearly expenses

| | | Yr 1 | Yr 2 | Yr 3 |
|---|---|---|---|---|
| OFFICE RENT | | $21,000 | 100,000 | $150,000 |
| FFANY | 4 SHOWS | $30,000 | 0 | |
| Platform | 2 SHOWS | $45,000 | 60,000 | $75,000 |
| Atlanta | 2 SHOWS | $3,000 | 5000 | $10,000 |
| Miami | 1 SHOW | $2,000 | 2,000 | |
| SOLE c | 2 SHOWS | $38,000 | 45,000 | $50,000 |
| Garda | 1 SHOW | $25,000 | 25,000 | $100,000 |
| Micam | 1 SHOW | $25,000 | 25,000 | $100,000 |
| Travel | Dim@ Jay | $185,000 | 185,000 | $300,000 |
| | | | | |
| Original Shoes | | $50,000 | 60,000 | $150,000 |
| Payroll: | | | | |
| customer service | | $85,000 | 85,000 | $125,000 |
| Sales | | $335,000 | $360,000 | $1,000,000 |
| agents | | | | |
| | | | | |
| Salary | Jay | $260,000 | 260,000 | $260,000 |
| Salary | Dimitri | 260,000 | $260,000 | $260,000 |
| miscellaneous | | $20,000 | 40,000 | $60,000 |
| Graphic designer | | $30,000 | 30,000 | $150,000 |
| fedex | | $20,000 | 30,000 | $50,000 |
| MARKETING/WEB | | $35,000 | 50,000 | 75,000 |
| Accounting | | $30,000 | 35,000 | 75,000 |
| health insurance | | $40,000 | $45,000 | 60,000 |
| | | | | |
| TOTAL | | $1,589,000 | | |
| | | | | |
| Monthly | | $132,416 | | |



| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| **General & Administrative Expense** | | | |
| Salary - CEO | 260,000 | 260,000 | 260,000 |
| Salary - Exec V.P./ Sales Manager | 260,000 | 260,000 | 260,000 |
| Office Salaries | 85,000 | 85,000 | 125,000 |
| Med & Corp Ins, & Pr Taxes | 40,000 | 45,000 | 100,000 |
| Professional Fees | 30,000 | 35,000 | 100,000 |
| Travel | 185,000 | 185,000 | 300,000 |
| Telephone & Utilities | | | |
| Postage & Courier & Supplies | 20,000 | 30,000 | 50,000 |
| Bank and Factor Fees | | | |
| Rent - Headquarters | 21,000 | 100,000 | 150,000 |
| Bad Debt Expense | | | |
| Other Office Expense | 20,000 | 40,000 | 60,000 |
| Total Administrative Expense | 921,000 | 1,040,000 | 1,405,000 |
| | | | |
| **Product Development Expense** | | | |
| Designers | 30,000 | 30,000 | 150,000 |
| Samples-Retail | 50,000 | 60,000 | 150,000 |
| Samples-Prototype | | | |
| Total Product Development Expense | 80,000 | 90,000 | 300,000 |
| | | | |
| **Selling Expense** | | | |
| Commissions and Draws | 335,000 | 360,000 | 1,000,000 |
| Customer/Salesmen Samples | | | |
| Show Expense | 168,000 | 162,000 | 335,000 |
| Royalties | | | |
| Advertising Royalties | | | |
| Advertising - Institutional | 35,000 | 50,000 | 150,000 |
| Advertising - Co-Operative | | | 150,000 |
| Total Selling Expense | 538,000 | 572,000 | 1,635,000 |

Execution copy

## SCHEDULE 3

## DETAILS OF ASSETS

Inventory

| | Item | Value (as at 1 April 2015, subject to daily change) |
|---|---|---|
| 1. | Inventory | US$ 400,000 |
| 2. | N/A | |

Purchase Orders

| | Order | Value (as at 1 April 2015, subject to daily change) |
|---|---|---|
| 1. | Purchaser Orders | US$ 900,000 |
| 2. | N/A | |

## SCHEDULE 4

### INTELLECTUAL PROPERTY RIGHTS TRANSFER AGREEMENT

Execution copy

Dated this 2<sup>nd</sup> day of April 2015

between

(1)  JSL STUDIO INTL. LLC

and

(2)  STYLELINE STUDIOS INTERNATIONAL LIMITED

and

(3)  JAY STEVEN LITVACK

---

## INTELLECTUAL PROPERTY RIGHTS TRANSFER AGREEMENT

---

**This Agreement** is made on 2nd day April 2015.

**BETWEEN:**

(1)     **JSL STUDIO INTL. LLC**, a New York limited liability company whose registered office is at 55 Lumber Road #201, Roslyn, New York 11576, United States (the "**Assignor**");

(2)     **Styleline Studios International Limited**, a company incorporated under the laws of Hong Kong with company number 2194884 whose registered office is at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong (the "**Assignee**"); and

(3)     **Jay Steven Litvack**, a citizen of the United States of America (American passport no. 513438398), of 135 Crescent Lane, Roslyn Heights, New York, 11577 (the "**Guarantor**").

together referred to as the "**Parties**" or singly as a "**Party**"

**RECITALS:**

(A)     The Assignor owns the Intellectual Property Rights to the Trade Mark and is the applicant of the US Trademark Application.

(B)     The Guarantor is the sole legal and beneficial owner of the Assignor.

(C)     The Assignee is a company limited by shares incorporated on 22 January 2015 under the laws of Hong Kong.

(D)     With the agreement and cooperation of the Guarantor, the Assignor wishes to assign and the Assignee wishes to purchase the entire beneficial and legal rights of all Intellectual Property Rights subsisting in the Trade Mark and the US Trademark Application on the terms and conditions as set out in this Agreement.

**IT IS HEREBY AGREED** as follows:

1.     <u>DEFINITIONS AND INTERPRETATION</u>

1.1.    Unless otherwise provided herein, the terms below shall have the following meanings:

(a)     "**Assigned Rights**" has the meaning ascribed under Clause 2.1.

(b)     "**Business Day**" means a day other than a Saturday or Sunday on which banks are open for business in Hong Kong.

(c)     "**Company Group**" means collectively the Company and any of its subsidiaries as may be incorporated and/or held by the Company from time to time.

(d)     "**Consideration**" has the meaning ascribed under Clause 2.1.

(e)     "**Hong Kong**" means the Hong Kong Special Administrative Region of the People's Republic of China.

(f)     "**Intellectual Property Rights**" means any trademark, pending trademark application, patent, pending patent application, know-how, registered and unregistered design,

copyright, trade secrets, licences relating to any of the above or other similar industrial or commercial rights owned and possessed by the Company, including the Trade Mark.

(g) **"Joint Venture and Shareholders' Agreement"** means the Joint Venture and Shareholders' Agreement entered into between the Assignee, the Guarantor, Dimitri Mavridakis and Tina Ey-Vean Liu on even date.

(h) **"Trade Mark"** means the J/Slides trademark owned by the Assignor and is the subject of the US Trademark Application.

(i) **"US"** means the United States of America.

(j) **"US Trademark Application"** means the US Trademark Application No. 86384358 for the mark "J/Slides" filed by JSL Studio Intl, LLC and approved by the US Patent and Trademark Office for publication as at 23 January 2015, with Trademark Snap Shot Publication Stylesheet appended under Schedule 1 hereto.

1.2. Any reference in this Agreement to a statutory provision shall include that provision and any regulations made in pursuance thereof as from time to time modified or re-enacted, whether before or after the date of this Agreement.

1.3. The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

(a) Any reference in this Agreement to **"this Agreement"** includes all amendments, additions, and variations thereto agreed between the Parties hereto.

(b) Unless the context otherwise requires, words importing the singular shall include the plural and vice versa; words importing a specific gender shall include the other genders (male, female or neuter), and **"person"** shall include an individual, corporation, company, partnership, firm, trustee, trust, executor, administrator or other legal personal representative, unincorporated association, joint venture, syndicate or other business enterprise, any governmental, administrative or regulatory authority or agency (notwithstanding that **"person"** may be sometimes used herein in conjunction with some of such words), and their respective successors, legal personal representatives and assigns, as the case may be, and pronouns shall have a similarly extended meaning.

## 2. ASSIGNMENT

2.1. In consideration of the sum of US$ 150,000 (the **"Consideration"**) to be paid in the manner as described under Clause 2.3, the Assignor shall assign to the Assignee within ten (10) Business Days from the date of signing of this Agreement absolutely with full title guarantee, all its right, title and interest in and to the Trade Mark and the US Trademark Application (the **"Assigned Rights"**) which subsists or will subsist now or in the future in the US, including:

(a) rights in get-up and trade dress, goodwill and the right to sue for passing off or unfair competition attaching to the Trade Mark and in respect of the Business relating to the Styleline Studios Products where the Trade Mark shall be used;

(b) all rights to apply for and be granted registrations, renewals or extensions of, and rights to claim priority from, the Trade Mark anywhere in the world;

(c) all similar or equivalent rights or forms of protection under statutes or common law; and

(d)    the right to bring, make, oppose, defend and appeal proceedings, claims or actions and obtain relief (and to retain any damages recovered) in respect of any infringement, or any other cause of action arising from ownership, of the Trade Mark whether occurring before, on or after the date of this Agreement.

2.2.    Within the same period as stated under Clause 2.1, the Assignor shall instruct the US Attorney of Record for the US Trademark Application to file all forms for the recording of the assignment of the full ownership of the US Trademark Application to the Assignee as required by the US Patent and Trademark Office.

2.3.    The Assignee shall pay the Consideration to the Assignor within five (5) Business Days from the date on which the Assignor provides all documentary proof evidencing the complete assignment and transfer of the Assigned Rights to the Assignee in compliance with the terms and conditions of this Agreement to the satisfaction of the Assignee.

## 3.    REPRESENTATIONS AND WARRANTIES

3.1.    The Assignor represents and warrants that:

(a)    the Assignor is the sole legal and beneficial owner of, and owns all the rights and interests in, the Assigned Rights;

(b)    the Assignor has not licensed or assigned any of the Assigned Rights;

(c)    the Assigned Rights are free from any security interest, option, mortgage, charge or lien;

(d)    the Assignor is unaware of any infringement or likely infringement of any of the Assigned Rights;

(e)    so far as the Assignor is aware, all the Assigned Rights are valid and subsisting and there are and have been no claims, challenges, disputes or proceedings, pending or threatened, in relation to the ownership, validity or use of any of the Assigned Rights;

(f)    exploitation of the Assigned Rights will not infringe the rights of any third party;

(g)    the Assignor has not, prior to or as of the date of this Agreement, made any application for the registration of the Trade Mark anywhere in the world other than the US Trademark Application and that if he has, in breach of this representation, made any such application or obtained any registered trademark pursuant to such application anywhere in the world other than the US, the Guarantor shall, in addition to being liable for any remedy for the breach of this Clause 3(g), promptly at his own expense cause and procure the Assignor to assign to the Assignee such trade mark application and/or registered trade mark, including performing (or procuring the performance of) all further acts and things, and executing and delivering (or procuring the execution or delivery of) all further documents required to vest in the Assignee the full benefit of the right, title and interest of such application and registered trade mark.

## 4.    GUARANTEE AND INDEMNITY

4.1.    The Assignor agrees to indemnify and keep indemnified the Assignee against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses)

suffered or incurred by the Assignee arising out of or in connection with any breach of the representations and warranties contained in Clause 3 or in connection with any failure of the Assignor to perform or discharge any of its obligation or liabilities in respect of the Assigned Rights. The Guarantor unconditionally guarantees the full and prompt payment of all of the indemnification obligations of the Assignor owed to the Assignee solely related to the breach by the Assignor of its representations and warranties contained in Clause 3. This guarantee shall not cover amounts for which the Assignor may be liable in connection with any other breach. The Guarantor's guarantee is a guarantee of payment and not a guarantee of performance.

4.2. This indemnity shall apply whether or not the Assignee has been negligent or at fault.

4.3. If a payment due from the Assignor under this clause is subject to tax (whether by way of direct assessment or withholding at its source), the Assignee shall be entitled to receive from the Guarantor such amounts as shall ensure that the net receipt, after tax, to the Assignee in respect of the payment is the same as it would have been were the payment not subject to tax.

5. **FURTHER ASSURANCE**

5.1. The Assignor shall perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution or delivery of) all further documents, required by law or which the Assignee requests, to vest in the Assignee the full benefit of the right, title and interest assigned to the Assignee under this Agreement, including:

    (a)    registration of the Assignee as applicant or (as applicable) proprietor of the Assigned Rights; and

    (b)    assisting the Assignee in obtaining, defending and enforcing the Assigned Rights.

5.2. The Assignor shall irrevocably appoint the Assignee to be its attorney in its name and on its behalf to execute documents, use the Assignor's name and do all things which are necessary or desirable for the Assignee to obtain for itself or its nominee the full benefit of this clause. A certificate in writing, signed by any director or the secretary of the Assignee or by any person appointed in accordance with Clause 5.4(c) that any instrument or act falls within the authority conferred by this Agreement shall be conclusive evidence that such is the case so far as any third party is concerned.

5.3. This power of attorney is irrevocable as long as any of the Assignor's obligations under this Agreement remain undischarged.

5.4. Without prejudice to Clause 5.2, the attorney may, in any way it thinks fit and in the name and on behalf of the Assignor:

    (a)    take any action that this Agreement requires the Assignor to take;

    (b)    exercise any rights which this Agreement gives to the Assignor; and

    (c)    appoint and remove one or more substitute attorneys with full power as the Assignor's attorney on terms that the attorney thinks fit.

5.5. The Assignor must ratify and confirm everything that the attorney and any substitute attorney does or arranges using the powers granted under this clause.

5.6. The Assignor shall not, unless with the written consent of, or in the course of a business association with, the Assignee, use the Trade Mark in any industry or commerce concerned wholly or partly with the goods manufactured, marketed and distributed by the Company Group,

whether directly or indirectly, and on his own behalf or on behalf of, or in conjunction with, any firm, company or person.

5.7.  For the avoidance of doubt and without prejudice to the generality of the assignment contained in Clause 2, the Assignor agrees and acknowledges that the Assignee shall have the right to use the Trade Mark on their own or in combination with any other words, characters, signs, or figurative elements, and in any form, style or variation.

6.  **WAIVER**

6.1.  No failure or delay by a Party to exercise any right or remedy provided under this Agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

7.  **ENTIRE AGREEMENT**

7.1.  Other than those terms and conditions agreed under the Joint Venture and Shareholders' Agreement, this Agreement constitutes the entire agreement between the Parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

7.2.  Other than those terms and conditions agreed under the Joint Venture and Shareholders' Agreement , each Party agrees that it shall have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement. Each Party agrees that it shall have no claim for innocent or negligent misrepresentation or negligent misstatement based on any statement in this Agreement.

8.  **VARIATION**

This Agreement may be amended, and any provision hereof may be waived, only by written agreement executed or signed by and between the Parties hereto.

9.  **SEVERANCE**

9.1.  If any provision or part thereof of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part thereof shall be deemed deleted. Any modification to or deletion of a provision or part thereof under this clause shall not affect the validity and enforceability of the rest of this Agreement.

9.2.  If one Party gives notice to the other of the possibility that any provision or part thereof of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to amend such provision if necessary so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

10.  **COUNTERPARTS**

10.1.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts shall together constitute the one Agreement.

11.  **THIRD PARTY RIGHTS**

11.1. No one other than a Party to this Agreement, their successors and permitted assignees, shall have any right to enforce any of its terms.

## 12.    NOTICES

12.1. All notices and communications or legal process hereunder shall be in writing and addressed to the other Party hereto at the address hereinbefore in this Agreement set out or at such other address as shall be so notified in writing to the other by such Party that is giving notice of its change of address. All notices, communications or legal processes hereunder shall be deemed to be received upon delivery or, if mailed by prepaid postage, registered or double registered (air mail if international), seven (7) days after deposit in the mail. Any notice or communication may be given or made by by facsimile transmission and, subject to confirmation of transmission, shall be deemed to have been received when despatched.

## 13.    MISCELLANEOUS PROVISIONS

13.1. Neither this Agreement, nor any of the rights or obligations hereunder, shall be assigned or delegated by either Party hereto without the prior written consent of the other Party.

13.2. In the event of any conflict between the provisions of this Agreement and the Joint Venture and Shareholders Agreement, so far as the sale, assignment and transfer of the Assigned Rights are concerned, the provisions of this Agreement shall prevail.

13.3. Each Party to this Agreement shall bear its own legal and other professional costs and expenses in connection with the negotiation, preparation and implementation of this Agreement. The Parties acknowledge that Messrs. Winston & Strawn is acting on behalf of the Assignee in the preparation, negotiation and execution of this Agreement and that the Assignor and the Guarantor have been advised to seek independent legal advice and have been given ample opportunity to do so.

## 14.    GOVERNING LAW

14.1. This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of Hong Kong.

## 15.    JURISDICTION

15.1. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

15.2. The Parties appoint Brilliant Yield Consultants Limited, Room M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of the Company from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Clause 15.1. If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, the Assignee shall promptly appoint a successor agent in Hong Kong and notify the other Parties, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the

Execution copy

purposes of this clause. The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong. The Parties agree that the parties commencing arbitration proceedings against either the Assignor or the Guarantor shall send a copy of the notice in respect of the same to Wexler Lehrer & Kaufman PLLC by electronic mail and registered post and the parties commencing arbitration proceedings against the Assignee shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.

This document has been executed as an Agreement and is delivered and takes effect on the date stated at the beginning of it.

*[The rest of this page is intentionally left blank.]*

IN WITNESS of which the Parties or their duly authorized representatives have executed this Agreement.

Signed by                                    )
For and on behalf of                         )
**JSL Studio Intl LLC**                      )
in the presence of:                          )
                                             )
                                             )

Witness name:
Witness address:


Signed by                                    )
**Jay Steven Litvack**                       )
in the presence of:                          )
                                             )
                                             )
                                             )

Witness name:
Witness address:


Signed by                                    )
For and on behalf of                         )
**Styleline Studios International Limited**  )
in the presence of:                          )
                                             )
                                             )

Witness name:
Witness address:

Execution copy

**SCHEDULE 1**

**TRADEMARK SNAP SHOT PUBLICATION STYLESHEET**

## Trademark Snap Shot Publication Stylesheet
(Table presents the data on Publication Approval)

### OVERVIEW

| | | | |
|---|---|---|---|
| SERIAL NUMBER | 86384358 | FILING DATE | 09/03/2014 |
| REG NUMBER | 0000000 | REG DATE | N/A |
| REGISTER | PRINCIPAL | MARK TYPE | TRADEMARK |
| INTL REG # | N/A | INTL REG DATE | N/A |
| TM ATTORNEY | SPARER, ZACHARY R | L.O. ASSIGNED | 115 |

### PUB INFORMATION

| | |
|---|---|
| RUN DATE | 01/24/2015 |
| PUB DATE | N/A |
| STATUS | 680-APPROVED FOR PUBLICATON |
| STATUS DATE | 01/23/2015 |
| LITERAL MARK ELEMENT | J/SLIDES |

| | | | |
|---|---|---|---|
| DATE ABANDONED | N/A | DATE CANCELLED | N/A |
| SECTION 2F | NO | SECTION 2F IN PART | NO |
| SECTION 8 | NO | SECTION 8 IN PART | NO |
| SECTION 15 | NO | REPUB 12C | N/A |
| RENEWAL FILED | NO | RENEWAL DATE | N/A |
| DATE AMEND REG | N/A | | |

### FILING BASIS

| FILED BASIS | | CURRENT BASIS | | AMENDED BASIS | |
|---|---|---|---|---|---|
| 1 (a) | YES | 1 (a) | YES | 1 (a) | NO |
| 1 (b) | NO | 1 (b) | NO | 1 (b) | NO |
| 44D | NO | 44D | NO | 44D | NO |
| 44E | NO | 44E | NO | 44E | NO |
| 66A | NO | 66A | NO | | |
| NO BASIS | NO | NO BASIS | NO | | |

### MARK DATA

| | |
|---|---|
| STANDARD CHARACTER MARK | YES |
| LITERAL MARK ELEMENT | J/SLIDES |



| MARK DRAWING CODE | 4-STANDARD CHARACTER MARK |
|---|---|
| COLOR DRAWING FLAG | NO |

## CURRENT OWNER INFORMATION

| PARTY TYPE | 10-ORIGINAL APPLICANT |
|---|---|
| NAME | JSL STUDIO INTL, LLC |
| ADDRESS | 55 Lumber Road #201<br>Roslyn, NY 11576 |
| ENTITY | 16-LTD LIAB CO |
| CITIZENSHIP | New York |

## GOODS AND SERVICES

| INTERNATIONAL CLASS | 025 |
|---|---|
| DESCRIPTION TEXT | Footwear |

## GOODS AND SERVICES CLASSIFICATION

| INTERNATIONAL CLASS | 025 | FIRST USE DATE | 09/00/2012 | FIRST USE IN COMMERCE DATE | 09/00/2012 | CLASS STATUS | 6-ACTIVE |
|---|---|---|---|---|---|---|---|

## MISCELLANEOUS INFORMATION/STATEMENTS

| CHANGE IN REGISTRATION | NO |
|---|---|

## PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM |
|---|---|---|---|---|
| 01/23/2015 | CNSA | O | APPROVED FOR PUB - PRINCIPAL REGISTER | 011 |
| 01/22/2015 | XAEC | I | EXAMINER'S AMENDMENT ENTERED | 010 |
| 01/22/2015 | GNEN | O | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | 009 |
| 01/22/2015 | GNEA | O | EXAMINERS AMENDMENT E-MAILED | 008 |
| 01/22/2015 | CNEA | R | EXAMINERS AMENDMENT -WRITTEN | 007 |
| 12/16/2014 | GNRN | O | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 006 |
| 12/16/2014 | GNRT | F | NON-FINAL ACTION E-MAILED | 005 |
| 12/16/2014 | CNRT | R | NON-FINAL ACTION WRITTEN | 004 |
| 12/15/2014 | DOCK | D | ASSIGNED TO EXAMINER | 003 |
| 09/13/2014 | NWOS | I | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED IN TRAM | 002 |



| 09/06/2014 | NWAP | I | NEW APPLICATION ENTERED IN TRAM | 001 |

## CURRENT CORRESPONDENCE INFORMATION

| ATTORNEY | Erik M. Pelton |
|---|---|
| CORRESPONDENCE ADDRESS | ERIK M. PELTON<br>ERIK M. PELTON & ASSOCIATES, PLLC<br>PO BOX 100637<br>ARLINGTON, VA 22210-3637 |
| DOMESTIC REPRESENTATIVE | NONE |

# J/SLIDES

## SCHEDULE 5

ASSET PURCHASE AGREEMENT

Execution copy

Dated this  2ⁿᵈ day of April 2015

between

(1)  JSL STUDIO INT. LLC

and

(2)  STYLELINE STUDIOS LLC

and

(3)  JAY STEVEN LITVACK

---

**ASSET PURCHASE AGREEMENT**

---

Execution copy

This ASSET PURCHASE AGREEMENT (this "**APA**"), dated as of 2nd day April, 2015, is made by and between

(1)   **JSL STUDIO INTL. LLC**, a New York limited liability company whose registered office is at 55 Lumber Road #201, Roslyn, New York 11576, United States (the "**Seller**");

(2)   **Styleline Studios LLC**, a New York limited liability company whose registered office is at 10 Cutter Mill Road, Grat Neck, New York 11021 (the "**Purchaser**"); and

(3)   **Jay Steven Litvack**, a citizen of the United States of America (American passport no. 513438398), of 135 Crescent Lane, Roslyn Heights, New York, 11577 (the "**Guarantor**").

together referred to as the "**Parties**" or singly as a "**Party**".

**RECITALS:**

(A)   The Purchaser owns the Purchased Assets (as defined hereunder).

(B)   The Guarantor is the sole legal and beneficial owner of the Seller.

(C)   The Purchaser is a limited liability company incorporated under the laws of New York.

(D)   With the agreement and cooperation of the Guarantor, the Seller wishes to assign to the Purchaser and the Purchaser wishes to be assigned the Seller's entire legal and beneficial title in respect of inventory, purchase orders and goodwill associated to its clients.

**NOW IT IS HEREBY AGREED** as follows:

1.     <u>**DEFINITIONS AND INTERPRETATION**</u>

1.1.   Capitalized words and expressions used but not defined in this APA shall have the same meanings ascribed thereto in the Joint Venture and Shareholders' Agreement.

1.2.   In this APA, the following expressions shall (unless the context otherwise requires) have the following meanings:-

(a)   "<u>**Business Day**</u>" means a day other than a Saturday, Sunday or other day on which banks located in Hong Kong are authorized or required by law to close.

(b)   "<u>**Closing**</u>" has the meaning set forth in Section 3.1.

(c)   "<u>**Closing Date**</u>" has the meaning set forth in Section 3.1.

(d)   "<u>**Consent**</u>" has the meaning set forth in Section 4.1.3(b)

(e)   "<u>**Effective Time**</u>" has the meaning set forth in Section 4.

(f)   "<u>**Fundamental Representations**</u>" has the meaning set forth in Section 5.1.

(g)   "<u>**GAAP**</u>" means generally accepted accounting principles.

2



(h)  "**Governmental Entity**" means any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of the United States federal, state or local government or foreign, international, multinational or other government, including any department, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof.

(i)  "**Inventory**" means all of the Seller's inventories of raw materials, in process inventory and finished and packaged products listed in **Schedule A**.

(j)  "**Joint Venture and Shareholders' Agreement**" means the Joint Venture and Shareholders' Agreement entered into between Styleline Studios International Limited, the Guarantor, Dimitri Mavridakis and Tina Ey-Vean Liu on even date.

(k)  "**Law**" means any applicable statute, law, constitution, treaty, code, ordinance, rule or regulation or Order of any Governmental Entity.

(l)  "**Lien**" means any mortgage, lien, pledge, charge, security interest or other encumbrance.

(m)  "**Losses**" has the meaning set forth in Section 5.2.

(n)  "**Order**" means any and all pending orders for Products placed by Purchaser's customers listed in **Schedule A**.

(o)  "**Overlap Period**" means any taxable year or other taxable period beginning on or before the Closing Date and ending after the Closing Date.

(p)  "**Pre-Closing Period**" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any Overlap Period, the portion of such Overlap Period ending on and including the Closing Date.

(q)  "**Products**" means the products currently sold by the Seller, including without limitation those products listed and defined in **Schedule B**.

(r)  "**Purchase Price**" has the meaning ascribed under Section 2.1.

(s)  "**Purchased Assets**" has the meaning ascribed under Section 2.2 and means the assets assigned in favor of the Purchaser as listed in **Schedule A**.

(t)  "**Styleline Studios International Limited**" is a private limited company incorporated in Hong Kong with registered address at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong.

(u)  "**Successor Liability Taxes**" has the meaning set forth in Section 4.1.4(a).

(v)  "**Tax**" or "**Taxes**" means all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a

3

member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(w)   "Tax Returns" has the meaning set forth in Section 4.1.4(a).

(x)   "Taxing Authority" means any Governmental Entity having jurisdiction with respect to any Tax.

(y)   "Transactions" means the transactions contemplated by this APA.

(z)   "Transfer Taxes" has the meaning set forth in Section 6.1.

1.3.   Headings used in this APA are for convenience only and shall not affect the construction or interpretation of this APA.

1.4.   Words denoting the singular include the plural and vice versa, words denoting a gender include every gender.

1.5.   Reference to Sections and Sub-Sections are to Sections and sub-Sections of this APA. The Schedules shall form integral parts of this APA.

1.6.   References to person shall include individuals, sole traders, firms, partnerships, companies, and bodies corporate or unincorporated.

## 2.   SALE OF ASSETS

2.1.   In consideration of the sum of US$ 150,000 (the "**Purchase Price**"), to be paid in the manner as described under Section 3.2, the Seller shall sell, convey, assign, transfer and deliver to the Purchaser all of the Seller's right, title and interest in and to the Purchased Assets owned by the Seller.

2.2.   For the purposes of this APA, "**Purchased Assets**" means all of the assets, properties, contractual rights, goodwill, going concern value, rights owned by the Seller as at the date of this APA wherever situated and of whatever kind and nature, tangible or intangible. The list of Purchased Assets is detailed in **Schedule A.**

## 3.   CLOSING

3.1.   The closing of the Transactions (the "**Closing**") shall take place at the offices of within ten (10) Business Days from the date of the valid execution and delivery of this APA, or at such other location as the Parties may mutually agree in writing (the actual date being herein called the "**Closing Date**"). The Closing may be conducted remotely by facsimile or other electronic exchange of signed documents, with original signatures exchanged promptly following the Closing.

3.2.   As consideration for the sale, conveyance, assignment, transfer and delivery of the Purchased Assets, the Purchaser shall pay to the Seller the Purchase Price within five (5) Business Days from the date on which the Seller provide all documentary proof evidencing the complete assignment and transfer of the Purchased Assets to the Purchaser in compliance with the terms and conditions of this APA to the satisfaction of the Purchaser.

3.3.   At the Closing, all of the Transactions shall be deemed by the Parties to occur simultaneously and become effective on the Closing Date (the "**Effective Time**").

## 4.   REPRESENTATIONS AND WARRANTIES RELATING TO THE SELLER

4.1.    The Seller represents and warrants to the Purchaser as follows:

    4.1.1    <u>Organization and Good Standing</u>.  The Seller (i) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York; (ii) is in good standing under the laws of the State of New York; and (iii) has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted; and (iv) is duly qualified and in good standing to transact business in each jurisdiction where such qualification is required, except in any such jurisdiction where the failure to be so qualified or in good standing would not reasonably be expected to have a material adverse effect on the Seller's business or operations.  The Seller is not in material default under or in violation of any provision of its organizational documents.

    4.1.2    <u>Authority and Enforceability</u>.  The Seller has all necessary corporate power and authority to (a) execute and deliver this APA, (b) perform its obligations hereunder; and (c) consummate the Transactions.  The execution and delivery by the Seller of this APA has been, and its performance hereunder and the consummation of the Transactions will be at Closing, duly and validly authorized by all necessary corporate action on the part of the Seller.  This APA has been duly executed and delivered by the Seller and, assuming due execution and delivery by the Purchaser, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and similar laws affecting creditors' rights and remedies generally, and subject to, as to enforceability, general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

    4.1.3    <u>No Conflicts; Consents</u>.

        (a)    Neither the execution and delivery of this APA by the Seller, nor the performance by the Seller of its obligations hereunder, nor the consummation of the Transactions will: (a) violate any provision of the organizational documents of the Seller; (b) violate or constitute a breach of or default under (with or without notice or lapse of time, or both), permit termination, modification or acceleration under, or result in the loss of any benefit or incurrence of any obligation under, any contract by which the Seller is otherwise bound; (c) violate any Law, rule or regulation of any Governmental Entity applicable to the Seller; (d) result in the imposition or creation of any Lien upon or with respect to any of the Purchased Assets.

        (b)    No material consent, approval, or authorization (a "**Consent**") of, or designation, declaration or filing with, any Governmental Entity is required on the part of the Seller in connection with the Seller's execution, delivery, and performance of this APA; provided however that the Parties hereby agree that, if it is possible to correct a failure to obtain a Consent without affecting the validity or enforceability of the transactions contemplated in this APA, the Purchaser shall allow the Seller a reasonable cure period to obtain any Consent of which the Seller was not in good faith aware of at the date of this APA.

    4.1.4    <u>Taxes</u>

        (a)    As at the date of this APA, the Seller has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate Taxing Authorities all required tax returns, statements, forms and reports (including



elections, declarations, disclosures, schedules, estimates and information tax returns) for Taxes for which Purchaser could be liable under Law as a result of acquiring the Purchased Assets (such Taxes referred to herein as "**Successor Liability Taxes**", and such tax returns, "**Tax Returns**") that are required to be filed in connection with the Purchased Assets and/or the Seller's business on or prior to the Closing Date. The Tax Returns have accurately reflected all liability for Successor Liability Taxes relating to the Purchased Assets and/or the Seller's business for the periods covered thereby.

    (b)    All Successor Liability Taxes and Successor Liability Tax liabilities due by or with respect to the Purchased Assets and/or the Seller's business for all Pre-Closing Periods have been timely paid or will be timely paid in full on at the Closing or accrued and adequately disclosed and fully provided for in accordance with generally accepted accounting principles.

4.1.5    <u>Title to and Sufficiency of Assets</u>.  The Seller has full and good title to the Purchased Assets, except as reflected in Schedule A of this APA, free and clear of any Liens.  All of the tangible Purchased Assets are in good condition and in a state of good maintenance and repair (ordinary wear and tear excepted) and are suitable for the purposes presently used.).  There has not occurred and there is not expected to occur any circumstance or event that would cause any Purchased Asset to cease to be owned by the Seller immediately prior to the Closing or cease to be owned by the Purchaser immediately after the Closing.

4.1.6    <u>Orders</u>.  The Seller has performed and is performing in all material respects all of its obligations in connection with each Order and is not in material default under or in material breach of any Orders. Each other party to each Orders has performed and is performing all of its material obligations in connection with each respective Order and is not in default under or in breach of any Order. Each Order is in full force and effect and is a valid and binding obligation of, and is enforceable against, the Seller. The Seller has provided the Purchaser with or made available to it a true and complete copy of each written Order (all of which are disclosed on **Schedule A**).

4.1.7    <u>Inventory</u>.  **Schedule A** sets forth the Inventory existing on the Balance Sheet Date, including the number of units, cost to the Seller per unit, and total cost of goods per type of Inventory.  All items of Inventory are determined and valued in accordance with GAAP at the lower of cost or market using the "first in first out" method of accounting.

4.1.8    <u>No Misrepresentation</u>.  Neither this APA (after taking into account the Schedules hereto) contains, with respect to the Seller or the Purchased Assets, any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading.

## 5.    <u>GUARANTEE AND INDEMNIFICATION</u>

5.1.    <u>Survival</u>. The representations and warranties of the Seller contained in this APA shall survive the Closing and remain in full force and effect until the date that is 18 months after the Closing Date, except for (a) the representations and warranties contained in Section 4.1.4 (Taxes), which shall survive until one month following the expiration of the applicable statute of limitations (including any valid extensions, whether automatic or permissive) for the matter giving rise to a claim hereunder and (b) the representations and warranties contained in Section 4.1.1 (Organization and Good Standing), Section 4.1.2 (Authority and Enforceability), Section 4.1.3 (No Conflicts; Consents), Section 4.1.5 (Title to and Sufficiency of Assets), (collectively, the "**Fundamental Representations**"), each of which shall survive the Closing indefinitely.



Execution copy

5.2.  Indemnification by the Seller.  The Seller agrees to indemnify and keep indemnified the Purchaser and shall hold the Purchaser harmless from, any loss, Liability, claim, cost, charge, action, suit, proceeding, assessed interest, penalty, damage or Tax (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation) (collectively, "**Losses**") actually sustained by such Purchaser resulting from, arising out of, or incurred by the Purchaser in connection with (a) any breach of any representation and warranty contained in Section 4; (b) any breach of any covenant or agreement of the Seller contained in this APA; (c) any failure of the Seller to perform or discharge any of its obligation or liabilities in respect of the Purchased Assets contemplated in this APA . This indemnity shall apply whether or not the Purchaser has been negligent or at fault. If a payment is due from the Seller under this Section is subject to tax (whether by way of direct assessment or withholding at its source), the Purchaser shall be entitled to receive from the Seller such amounts as shall ensure that the net receipt, after tax, to the Purchaser in respect of the payment is the same as it would have been were the payment not subject to tax.  The Purchaser may make a claim for indemnification hereunder for a period of [twelve months] from the date of this APA and the aggregate amount of the claim for indemnification by the Purchaser shall not exceed the Purchase Price.  The Guarantor unconditionally guarantees the full and prompt payment of all of the indemnification obligations of the Seller owed to the Purchaser solely related to the breach by the Seller of its representations and warranties contained in Section 4.  This guarantee shall not cover amounts for which the Seller may be liable in connection with any other breach.  The Guarantor's guarantee is a guarantee of payment and not a guarantee of performance.

6.   **TAX MATTERS**

6.1.  Transfer Taxes.  All transfer, sales and use, value added, registration, documentary, stamp and similar Taxes imposed in connection with the transactions contemplated by this APA shall be borne by the Seller.  The Purchaser shall cooperate and assist the Seller in obtaining a lower tax rate or any exemptions as may be available for such Transfer Taxes, to the extent possible or admissible under the applicable requirements of Law.

7.   **NOTICES**

7.1.  All notices and communications or legal process hereunder shall be in writing and addressed to the other Party hereto at the address hereinbefore in this APA set out or at such other address as shall be so notified in writing to the other by such Party that is giving notice of its change of address.   All notices, communications or legal processes hereunder shall be deemed to be received upon delivery or, if mailed by prepaid postage, registered or double registered (air mail if international), seven (7) days after deposit in the mail.  Any notice or communication may be given by facsimile transmission and, subject to confirmation of transmission, shall be deemed to have been received when despatched.

8.   **WAIVER**

8.1.  No failure or delay by a Party to exercise any right or remedy provided under this APA or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.  The waiver  by any Party hereto of a breach of any provision of this APA shall not operate or be construed as a waiver of any subsequent breach by any Party.

9.   **ENTIRE AGREEMENT**

9.1.  Other than those terms and conditions agreed under the Joint Venture and Shareholders' Agreement, this APA constitutes the entire agreement between the Parties and supersedes and extinguishes all previous



agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

**10.    VARIATION**

This APA may be amended, and any provision hereof may be waived, only by written agreement executed or signed by and between the Parties hereto.

**11.    SEVERANCE**

11.1.    If any one or more of the provisions of this APA or any document executed in connection with this APA shall be invalid, illegal and/or unenforceable in any respect under any applicable law, then that provision shall be separated from this APA and the validity, legality and enforceability of the remaining provisions contained in this APA shall not in any way be affected or impaired.

**12.    COUNTERPARTS**

12.1.    This APA may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts shall together constitute the one APA.

**13.    THIRD PARTY RIGHTS**

13.1.    No one other than a Party to this APA, their successors and permitted assignees, shall have any right to enforce any of its terms.

**14.    MISCELLANEOUS**

14.1.    Neither this APA, nor any of the rights or obligations hereunder, shall be assigned or delegated by any Party hereto without the prior written consent of the other Parties.

14.2.    In the event of any conflict between the provisions of this APA and the Joint Venture and Shareholders Agreement, so far as the sale, assignment and transfer of the Purchased Assets are concerned, the provisions of this APA shall prevail.

**15.    GOVERNING LAW**

15.1.    This APA and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of Hong Kong.

**16.    JURISDICTION**

16.1.    Any dispute, controversy, difference or claim arising out of or relating to this APA, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

16.2.   The Parties appoint Brilliant Yield Consultants Limited, Room  M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of Styleline Studios International Limited from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Section 16.1.  If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, Styleline Studios International Limited shall promptly appoint a successor agent in Hong Kong and notify the Parties, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the purposes of this Section.  The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong.  The Parties agree that the parties commencing arbitration proceedings against either the Seller or the Guarantor shall send a copy of the notice in respect of the same to Wexler Lehrer & Kaufman PLLC by electronic mail and registered post and the parties commencing arbitration proceedings against the Purchaser shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.

*[The rest of this page has been intentionally left blank]*

9



**IN WITNESS WHEREOF,** the Parties have caused this APA to be executed by their duly authorized signatories effective as of the date first written above.

Signed by                                    )
For and on behalf of                         )
**JSL Studio Int LLC**                        )
in the presence of:                          )
                                             )
                                             )

Witness name:
Witness address:


Signed by                                    )
For and on behalf of                         )
**Styleline Studios LLC**                     )
in the presence of:                          )
                                             )
                                             )

Witness name:
Witness address:


Signed by                                    )
**Jay Steven Litvack**                        )
in the presence of:                          )
                                             )
                                             )
                                             )

Witness name:
Witness address:

10

SCHEDULE A

PURCHASED ASSETS

**Inventory**

|     | Item | Value (as at 1 April 2015, subject to daily change) |
| --- | --- | --- |
| 1.  | Inventory | US$ 400,000 |
| 2.  | N/A | |

**Purchase Orders**

|     | Order | Value (as at 1 April 2015, subject to daily change) |
| --- | --- | --- |
| 1.  | Purchaser Orders | US$ 900,000 |
| 2.  | N/A | |

SCHEDULE B

PRODUCTS

All shoes/current inventory as of the date hereof.

<u>FORM OF GENERAL ASSIGNMENT AND BILL OF SALE</u>

## GENERAL ASSIGNMENT AND BILL OF SALE

This General Assignment and Bill of Sale ("**Assignment and Bill of Sale**") dated as of _____ April, 2015 by and between **Styleline Studios LLC**, a New York limited liability company whose registered office is at 10 Cutter Mill Road, Grat Neck, New York 11021 ("**Purchaser**"), and **JSL STUDIO INTL. LLC**, a New York limited liability company whose registered office is at 55 Lumber Road #201, Roslyn, New York 11576, United States ("**Seller**").

## PRELIMINARY STATEMENT

Pursuant to that certain Asset Purchase Agreement dated as of _____, April 2015 (the "**Asset Purchase Agreement**") between Purchaser and Seller, Seller has agreed to sell, transfer and assign to Purchaser, and Purchaser has agreed to purchase and accept, the Purchased Assets, on the terms of, and subject to the conditions set forth in the Asset Purchase Agreement. Terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which Seller acknowledges:

1.    <u>Transfer of Assets</u>.  Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser and Purchaser hereby purchases, acquires and accepts from Seller all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens.

2.    <u>Representations and Warranties; Conflict with Asset Purchase Agreement</u>.  This Assignment and Bill of Sale is subject to the representations, warranties, covenants and agreements contained in the Asset Purchase Agreement. Nothing contained in this Assignment and Bill of Sale shall be deemed to supersede, diminish, enlarge on or modify any provision of, any of the obligations, agreements, covenants or representations and warranties of Seller contained in the Asset Purchase Agreement (all of which survive the execution and delivery of this Assignment and Bill of Sale as provided, and subject to the limitations set forth, in the Asset Purchase Agreement). If any conflict or inconsistency exists between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3.    <u>Assignment</u>.  This Assignment and Bill of Sale shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Assignment and Bill of Sale shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Assignment and Bill of Sale.

4.     Governing Law.  This Assignment and Bill of Sale shall be construed, performed and enforced in accordance with the laws of the State of New York without regard to the principles of the conflicts of laws thereof.

5.     Severability.  Whenever possible, each provision of this Assignment and Bill of Sale shall be interpreted in such manner as to be effective and valid, but if any provision of this Assignment and Bill of Sale is held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not render invalid or unenforceable any other provision of this Assignment and Bill of Sale.

6.     Further Assurances.  The parties shall from time to time after the date hereof at the request of the other, and without further consideration, execute and deliver to the other such additional instruments of assignment or assumption and other related documents in addition to this Assignment and Bill of Sale as the parties shall reasonably request to evidence more fully the assignment to Purchaser of the Purchased Assets.

7.     Counterparts.  This Assignment and Bill of Sale may be executed in two or more counterparts, all of which shall constitute one and the same instrument.

8.     Facsimile Signatures.  This Assignment and Bill of Sale and any other document or agreement executed in connection herewith may be executed by delivery of a facsimile copy of an executed signature page with the same force and effect as the delivery of an originally executed signature page.


IN WITNESS WHEREOF, the parties have executed this Assignment and Bill of Sale on _____, 2015.

For and on behalf of the Purchaser


By:_____
Name:
Title:


For and on behalf of the Seller


By:_____
Name:
Title:

Execution copy

## SCHEDULE 6

### JAY SERVICE AGREEMENT

Execution copy

Dated this 2ⁿᵈ day of April 2015


between


(1)  JAY STEVEN LITVACK

and

(2)  STYLELINE STUDIOS INTERNATIONAL LIMITED


---

SERVICE AGREEMENT

---

THIS AGREEMENT is made on 2ⁿᵈ day April 2015.

BETWEEN:

(1)    **Jay Steven Litvack**, a citizen of the United States of America (American passport no. 513438398), of 135 Crescent Lane, Roslyn Heights, New York, 11577 ("**Jay**"); and

(2)    **Styleline Studios International Limited**, a company incorporated under the laws of Hong Kong with company number 2194884 whose registered office is at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong (the "**Company**").

together referred to as the "**Parties**" or singly as a "**Party**"

RECITALS:

(A)    The Company is in the business of the manufacture, marketing and distribution of footwear and related accessories bearing the J/Slides Brand and any Additional Styleline Studios Brands and the development and enhancement of the J/Slides Brand and any Additional Styleline Studios Brands.  As at the date of this Agreement, Jay holds 1 ordinary share in the Company.

(B)    Pursuant to the Joint Venture and Shareholders' Agreement entered into by the Parties, the Company wishes to engage Jay, and Jay wishes to provide to the Company, the Services (as hereinafter defined), for and on behalf of the Company Group and under the terms and conditions set out in this Agreement

(C)    As a preliminary step, the Parties agree to enter into this Agreement and the Parties shall, in due course, enter into further and more specifically detailed agreements with any JV Operating Companies as may be directed by the Company.

1.    <u>DEFINITIONS AND INTERPRETATION</u>

1.1.    Unless otherwise provided herein, the terms below shall have the following meanings:

(a)    "**Additional Styleline Studios Brands**" means any brands other than the J/Slides Brand which may be registered by the Company upon Shareholders' resolution for the purposes of bearing, marketing and distributing the Styleline Studios Products.

(b)    "**Board**" means the board of directors of the Company.

(c)    "**Business Plan**" means the business plan for the first three years of Business operations of the Company Group.

(d)    "**Company Group**" means collectively the Company, Styleline Studios LLC and any other JV Operating Companies.

(e)    "**Confidential Information**" means any information which is proprietary and confidential to a Party including but not limited to the terms and conditions of this Agreement, information concerning or relating in any way whatsoever to its distributorship, franchise or other arrangements, principals, any of the trade secrets or confidential operations, processes or inventions carried on or used by a Party, any information concerning the organisation, business, finances, transactions or affairs of a Party, dealings of a Party, secret or confidential information which relates to the business or Party or any of its principals', clients or customers' transactions or affairs, any Party's technology, designs, documentation, manuals, budgets, financial

Execution copy

statements or information, accounts, dealers' lists, customer lists, marketing studies, drawings, notes, memoranda and the information contained therein, any information therein in respect of trade secrets, technology and technical or other information relating to the development, manufacture, clinical testing, analysis, marketing, sale or supply or proposed development, manufacture, clinical testing, analysis, marketing, sale or supply of any products or services by a Party, and plans for the development or marketing of such products or services and information and material which is either marked confidential or is by its nature intended to be exclusively for the knowledge of the recipient alone;

(f)  "**Joint Venture and Shareholders' Agreement**" means the Joint Venture and Shareholders' Agreement entered into by Jay, Dimitri Mavridakis, Tina Ey-Vean Liu and the Company on even date.

(g)  "**JV Operating Companies**" means any subsidiary of the Company as may be incorporated and/or held by the Company from time to time for the purposes of the business of the Company.

(h)  "**Monthly Fee**" means the gross and all inclusive amount to be paid to Jay as consideration for Jay providing the Services to the Company according to the Business Plan.

(i)  "**Services**" has the meaning ascribed under Schedule 1.

(j)  "**Share**" or "**Shares**" means any issued shares from time to time in the share capital of the Company or any of them.

(k)  "**Styleline Studios Products**" means footwear and any other goods bearing the J/Slides Brand or any other brands as decided by the shareholders of the Company which will be manufactured for the Company Group by E-Teen Market Limited or subject to Clause 6.4 of the Joint Venture and Shareholders' Agreement by any other third party suppliers.

(l)  "**J/Slides Brand**" means the trade name, symbol and all related intellectual property rights uniquely associated with the goods sold under the J/Slides mark and under which goodwill and reputation has been established.

(m)  "**Term**" has the meaning ascribed under Clause 2.1.

(n)  "**Termination Date**" means the date upon which this Agreement terminates in accordance with its terms.

(o)  "**Visa**" has the meaning ascribed under Clause 5.1.

1.2.  Any reference in this Agreement to a statutory provision shall include that provision and any regulations made in pursuance thereof as from time to time modified or re-enacted, whether before or after the date of this Agreement.

1.3.  The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

(a)  Any reference in this Agreement to "**this Agreement**" includes all amendments, additions, and variations thereto agreed between the Parties hereto.

(b)    Unless the context otherwise requires, words importing the singular shall include the plural and vice versa; words importing a specific gender shall include the other genders (male, female or neuter), and **"person"** shall include an individual, corporation, company, partnership, firm, trustee, trust, executor, administrator or other legal personal representative, unincorporated association, joint venture, syndicate or other business enterprise, any governmental, administrative or regulatory authority or agency (notwithstanding that **"person"** may be sometimes used herein in conjunction with some of such words), and their respective successors, legal personal representatives and assigns, as the case may be, and pronouns shall have a similarly extended meaning.

## 2.    TERM

2.1.    This Agreement shall commence, and shall be deemed to have commenced, as at the date of this Agreement and shall continue in force and effect until the third anniversary of the date of this Agreement, subject to the provisions for earlier termination of this Agreement as set out under Clause 6.

2.2.    The Term of this Agreement may be extended on such terms and conditions and for such further period as the Company and Jay may agree in writing.

## 3.    SERVICES

3.1.    Jay shall provide the Services to the Company during the Term provided that the Company is not in material breach of its obligations under this Agreement.

3.2.    At the direction of the Company, Jay shall negotiate in a manner consistent with this Agreement and enter into any and all additional mutually acceptable agreements with any JV Operating Company as may be required in light of the business needs of the Company Group in relation to the sales, supervision and attendance to any matters incidental to or relating to the Styleline Studios Products.

## 4.    REMUNERATION, EXPENSES AND TAXES

4.1.    In consideration of Jay agreeing to provide the Services, the Company shall, during the Term, on or before the last day of each calendar month, pay to Jay the Monthly Fee. The first and last Monthly Fee payable by the Company to Jay shall be prorated according to the number of days during which this Agreement is in force in the first and last calendar months of the Term respectively.

4.2.    For the purpose of performing the Services to the Company as set out in this Agreement, Jay may be required to travel on behalf of the Company and will not receive any additional remuneration for doing so. The Company shall reimburse Jay all travelling expenses incurred by Jay whilst travelling in the proper performance of his duties and responsibilities (and this shall include provision for reasonable accommodation and out pocket expenses) provided always that such expenses are duly evidenced by appropriate supporting receipts and vouchers.

4.3.    The Company shall reimburse Jay any and all reasonable expenses incurred by Jay in relation to or incidental to the performance of the Services to the Company pursuant to this Agreement, provided always that such expenses are duly evidenced by appropriate supporting receipts and vouchers and the aggregate sum being within the annual budget approved each year by the Board.

4.4.  Jay shall be solely responsible for the payment of his own tax liability in Hong Kong and in any and all other parts of the world.

5.  **VISA**

5.1.  At all times during the term of this Agreement Jay shall use his reasonable efforts to possess a valid employment visa in Hong Kong or anywhere else in the world (the "**Visa**") as may be required in accordance to the applicable requirements of laws in order for Jay to perform the Services.

5.2.  The Company shall and the Company shall cause and procure the JV Operating Companies to support and assist Jay in his application for a Visa, as may be required in accordance to the applicable requirements of laws in order for Jay to perform the Services.

6.  **TERMINATION**

6.1.  Notwithstanding anything in this Agreement contained, the Company shall be entitled (but not obliged) to terminate this Agreement any time during the Term forthwith by written notice (but without prejudice to the rights and remedies of either Party for any antecedent breach of this Agreement) in any of the following events:-

    (a)  If Jay commits any continuing or material breach of his obligations under this Agreement and, in the case of a breach which is capable of remedy, fails to remedy the same within thirty (30) days after receipt of a written notice specifying such breach and what action is required to remedy the breach; or

    (b)  If Jay is guilty of grave misconduct, or persistent and wilful neglect in the discharge of his duties; or

    (c)  If Jay conducts himself or is guilty of conduct tending to bring himself or the Company Group into disrepute; or

    (d)  If Jay commits an act of bankruptcy or compounds with his creditors generally; or

    (e)  If Jay becomes of unsound mind or physically or mentally incapable of performing his duties or managing his affairs; or

    (f)  If Jay is convicted of a criminal offence; or

    (g)  If Jay divulges any confidential information acquired during the course of the performance of the Services to unauthorised persons; or

    (h)  If Jay cease to be the beneficially entitled to any Shares in the Company; or

    (i)  If Jay ceases, at any time, to hold a valid Visa permitting him to reside and/or continue to work anywhere as required by the Company Group or is prevented at any time from being lawfully engaged by the Company Group as a result of the introduction or operation of any applicable law, rule or regulation.

7.  **CONFIDENTIALITY**

7.1.  Jay hereby agrees with and undertakes that he will not during the Term or at any time after the Termination Date use any Confidential Information or disclose or divulge any such Confidential Information to any person and that he shall use his commercially reasonable endeavours to

prevent such use or publication or disclosure of any such Confidential Information by any other person.

7.2.    Each Party hereby undertakes that it shall not:-

(a)    during the Term or at any time after the Termination Date, use or procure the use of the name of the other Company or any colourable imitation thereof, whether or not in connection with its own or any other name, or in relation to any Company or business controlled by it; or

(b)    during the Term or at any time after the Termination Date, use any of the J/Slides Brand or the Additional Styleline Studios Brands or any other trademark, name, logo or word or phrase which is similar to or likely to be confused with the J/Slides Brand and Additional Styleline Studios Brands, in any manner whatsoever.

7.3.    The restrictions set out in Clause 7.1 shall not apply to the disclosure of any information made by each Party under compulsion of law or in respect of information which has come into the public domain other than through an unauthorised disclosure by either Party.

7.4.    Jay shall, forthwith upon the termination, for whatsoever reason, of this Agreement, immediately upon the Company's written request and at the Company's expense, deliver up to the Company all correspondence, documents, specifications, papers, records, samples of goods and all other property belonging to the Company Group, which may be in the possession or under the control of Jay.

## 8.    CONTINUATION OF TERMS AND CONDITIONS OF TERMINATION

8.1.    The termination of this Agreement, howsoever caused or arising, shall not affect the provisions hereof which are expressed or implied or are deemed to operate or have effect after the termination of this Agreement and shall be without prejudice to any right of action already accrued to any Party in respect of any breach of this Agreement by any other Party.

## 9.    ALL TERMS AND CONDITIONS/VALIDITY

9.1.    Notwithstanding the Joint Venture and Shareholders' Agreement, this Agreement constitutes the only and entire agreement between the Parties hereto in respect of the subject matter hereof and it supersedes all prior agreements whether verbal or written expressed or implied between the Parties hereto.  There are no warranties, representation, covenants or agreements between the Parties hereto (other than those which may be implied by law) which are not contained and set out in full in this Agreement.

9.2.    If any one or more of the provisions of this Agreement or any document executed in connection with this Agreement shall be invalid, illegal and/or unenforceable in any respect under any applicable law, then that provision shall be separated from this Agreement and the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired.

## 10.    MISCELLANEOUS PROVISIONS

10.1.    Neither this Agreement, nor any of the rights or obligations hereunder, shall be assigned or delegated by either Party hereto without the prior written consent of the other Party.

10.2.    In the event of any conflict between the provisions of this Agreement and the Joint Venture and Shareholders Agreement, so far as the rendering of services by Jay for the Company is concerned, the provisions of this Agreement shall prevail.

10.3. This Agreement may be amended, and any provision hereof may be waived, only by written agreement executed or signed by and between the Parties hereto. The waiver by either Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by either Party. The failure by a Party to enforce at any time or for any period any one or more of the terms or conditions of this Agreement shall not be a waiver of them or of the right at any time subsequently to enforce all or any of the terms and conditions of this Agreement.

10.4. This Agreement may be signed in any number of counterparts. Any single counterpart or a set of counterparts signed in either case by the Parties hereto shall constitute a full and original agreement for all purposes.

10.5. Notwithstanding anything contained herein to the contrary, it is hereby expressly agreed and declared that Jay shall not be or be deemed to be an agent or partner of the Company.

10.6. Each Party to this Agreement shall bear its own legal and other professional costs and expenses in connection with the negotiation, preparation and implementation of this Agreement. The Parties acknowledge that Messrs. Winston & Strawn is acting on behalf of the Company in the preparation, negotiation and execution of this Agreement and that Jay has been advised to seek independent legal advice and has been given ample opportunity to do so.

10.7. All notices and communications or legal process hereunder shall be in writing and addressed to the other Party hereto at the address hereinbefore in this Agreement set out or at such other address as shall be so notified in writing to the other by such Party that is giving notice of its change of address. All notices, communications or legal processes hereunder shall be deemed to be received upon delivery or, if mailed by prepaid postage, registered or double registered (air mail if international), seven (7) days after deposit in the mail. Any notice or communication may be given or made by facsimile transmission and, subject to confirmation of transmission, shall be deemed to have been received when despatched.

10.8. This Agreement shall be governed by, construed and interpreted in accordance with, the laws for the time being in force in Hong Kong.

10.9. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

10.10. The Parties appoint Brilliant Yield Consultants Limited, Room M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of the Company from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Clause 10.9. If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, the Company shall promptly appoint a successor agent in Hong Kong and notify the other Party, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the purposes of this clause. The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong. The Parties agree that the Company commencing arbitration proceedings against Jay shall send a copy of the notice in respect of the same to Wexler Lehrer & Kaufman PLLC by electronic mail and registered post and Jay commencing arbitration proceedings against the

Company shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.

**IN WITNESS** of which the Parties or their duly authorized representatives have executed this Agreement.

Signed by                                                    )
**Jay Steven Litvack**                                       )
in the presence of:                                          )
                                                             )
                                                             )
                                                             )

Witness name:
Witness address:

Signed by                                                    )
For and on behalf of                                         )
**Styleline Studios International Limited**                   )
in the presence of:                                          )
                                                             )
                                                             )

Witness name:
Witness address:

## SCHEDULE 1

### SERVICES

1.  Unless and until the Company decides otherwise, Jay shall:-

    (a)  Use his commercially reasonable efforts to start, organise, promote and develop the business and the activities of the Company Group pursuant to the Business Plan;

    (b)  Elaborate and define the commercial strategies (in respect in particular of marketing, sales and pricing, distribution, product improvement, product development, sourcing and purchases) to be developed by the Company Group implement the same after approval of the Board;

    (c)  As and when required by the Board from time to time, provide the Company with market surveys and market analyses relating to the business of the Company Group and of the business and activity of the competitors and potential competitors of the Company Group;

    (d)  Use his commercially reasonable efforts to increase the sales of the Styleline Studios Products manufactured and/or offered for sale by the Company Group anywhere in the world as the Board may, from time to time, specify;

    (e)  Co-ordinate the promotion, sales and distribution of the Styleline Studios Products;

    (f)  Use his commercially reasonable efforts to increase the number of customers and potential customers (including sole traders, bodies corporate, unincorporated associations, partnerships and other entities) of the Company Group;

    (g)  Provide after-sales services to the customers of the Company Group for the Styleline Studios Products sold or otherwise distributed;

    (h)  Supervise and monitor the activities of the agents, suppliers and distributors of the Company Group;

    (i)  Assist, liaise with and visit agents, suppliers, distributors and customers of the Company Group;

    (j)  Locate companies, businesses or other entities (the "**Candidates**") suitable for the Company Group to, with the view of entering into an agreement with one or more of the Candidates to manufacture and/or develop the Styleline Studios Products;

    (k)  Provide the Board with information to assist him/them assessing the suitability of the Candidates;

    (l)  On receiving instructions from the Board, enter into negotiations with such Candidates with the view of effecting, as the case may be, a manufacturing and/or any appropriate commercial agreement; and

    (m)  Liaise with and assist the Company Group in attending to all formalities relating to the transportation of and logistic operations for the Styleline Studios Products.

Execution copy

## SCHEDULE 7

### DIMITRI SERVICE AGREEMENT

Execution copy

<u>Dated this 2<sup>nd</sup> day of April 2015</u>

between

(1)  DIMITRIOS MAVRIDAKIS

and

(2)  STYLELINE STUDIOS INTERNATIONAL LIMITED

**SERVICE AGREEMENT**

**THIS AGREEMENT** is made on 2nd day April 2015.

**BETWEEN:**

(1)   **Dimitrios Mavridakis**, a citizen of Canada (Canadian passport no. GJ303407), of 2174 Sherbrooke Street West 12, Montreal, Quebec, H3H 167 ("**Dimitri**"); and

(2)   **Styleline Studios International Limited**, a company incorporated under the laws of Hong Kong with company number 2194884 whose registered office is at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong (the "**Company**").

together referred to as the "**Parties**" or singly as a "**Party**"

**RECITALS:**

(A)   The Company is in the business of the manufacture, marketing and distribution of footwear and related accessories bearing the J/Slides Brand and any Additional Styleline Studios Brands and the development and enhancement of the J/Slides Brand and any Additional Styleline Studios Brands. As at the date of this Agreement, Dimitri holds 1 ordinary share in the Company.

(B)   Pursuant to the Joint Venture and Shareholders' Agreement entered into by the Parties, the Company wishes to engage Dimitri, and Dimitri wishes to provide to the Company, the Services (as hereinafter defined), for and on behalf of the Company Group and under the terms and conditions set out in this Agreement

(C)   As a preliminary step, the Parties agree to enter into this Agreement and the Parties shall, in due course, enter into further and more specifically detailed agreements with any JV Operating Companies as may be directed by the Company.

1.   <u>DEFINITIONS AND INTERPRETATION</u>

1.1.   Unless otherwise provided herein, the terms below shall have the following meanings:

(a)   "**Additional Styleline Studios Brands**" means any brands other than the J/Slides Brand which may be registered by the Company upon Shareholders' resolution for the purposes of bearing, marketing and distributing the Styleline Studios Products.

(b)   "**Board**" means the board of directors of the Company.

(c)   "**Business Plan**" means the business plan for the first three years of Business operations of the Company Group.

(d)   "**Company Group**" means collectively the Company, Styleline Studios LLC and any other JV Operating Companies.

(e)   "**Confidential Information**" means any information which is proprietary and confidential to a Party including but not limited to the terms and conditions of this Agreement, information concerning or relating in any way whatsoever to its distributorship, franchise or other arrangements, principals, any of the trade secrets or confidential operations, processes or inventions carried on or used by a Party, any information concerning the organisation, business, finances, transactions or affairs of a Party, dealings of a Party, secret or confidential information which relates to the business or Party or any of its principals', clients or customers' transactions or affairs, any Party's technology, designs, documentation, manuals, budgets, financial

statements or information, accounts, dealers' lists, customer lists, marketing studies, drawings, notes, memoranda and the information contained therein, any information therein in respect of trade secrets, technology and technical or other information relating to the development, manufacture, clinical testing, analysis, marketing, sale or supply or proposed development, manufacture, clinical testing, analysis, marketing, sale or supply of any products or services by a Party, and plans for the development or marketing of such products or services and information and material which is either marked confidential or is by its nature intended to be exclusively for the knowledge of the recipient alone;

(f) "**Joint Venture and Shareholders' Agreement**" means the Joint Venture and Shareholders' Agreement entered into by Jay Steven Litvack, Dimitri, Tina Ey-Vean Liu and the Company on even date.

(g) "**JV Operating Companies**" means any subsidiary of the Company as may be incorporated and/or held by the Company from time to time for the purposes of the business of the Company.

(h) "**Monthly Fee**" means the gross and all inclusive amount to be paid to Dimitri as consideration for Dimitri providing the Services to the Company, according to the Business Plan.

(i) "**Services**" has the meaning ascribed under Schedule 1.

(j) "**Share**" or "**Shares**" means any issued shares from time to time in the share capital of the Company or any of them.

(k) "**Styleline Studios Products**" means footwear and any other goods bearing the J/Slides Brand or any other brands as decided by the shareholders of the Company which will be manufactured for the Company Group by E-Teen Market Limited or subject to Clause 6.4 of the Joint Venture and Shareholders' Agreement by any other third Party suppliers.

(l) "**J/Slides Brand**" means the trade name, symbol and all related intellectual property rights uniquely associated with the goods sold under the J/Slides mark and under which goodwill and reputation has been established.

(m) "**Term**" has the meaning ascribed under Clause 2.1.

(n) "**Termination Date**" means the date upon which this Agreement terminates in accordance with its terms.

(o) "**Visa**" has the meaning ascribed under Clause 5.1.

1.2.  Any reference in this Agreement to a statutory provision shall include that provision and any regulations made in pursuance thereof as from time to time modified or re-enacted, whether before or after the date of this Agreement.

1.3.  The headings in this Agreement are inserted for convenience only and shall not affect the construction of this Agreement.

(a)  Any reference in this Agreement to "**this Agreement**" includes all amendments, additions, and variations thereto agreed between the Parties hereto.

(b) Unless the context otherwise requires, words importing the singular shall include the plural and vice versa; words importing a specific gender shall include the other genders (male, female or neuter), and **"person"** shall include an individual, corporation, company, partnership, firm, trustee, trust, executor, administrator or other legal personal representative, unincorporated association, joint venture, syndicate or other business enterprise, any governmental, administrative or regulatory authority or agency (notwithstanding that "person" may be sometimes used herein in conjunction with some of such words), and their respective successors, legal personal representatives and assigns, as the case may be, and pronouns shall have a similarly extended meaning.

## 2. TERM

2.1. This Agreement shall commence, and shall be deemed to have commenced, as at the date of this Agreement and shall continue in force and effect until the third anniversary of the date of this Agreement, subject to the provisions for earlier termination of this Agreement as set out under Clause 6.

2.2. The Term of this Agreement may be extended on such terms and conditions and for such further period as the Company and Dimitri may agree in writing.

## 3. SERVICES

3.1. Dimitri shall provide the Services to the Company during the Term provided that the Company is not in material breach of its obligations under this Agreement..

3.2. At the direction of the Company, Dimitri shall negotiate in a manner consistent with this Agreement and enter into any and all additional mutually acceptable agreements with any JV Operating Company as may be required in light of the business needs of the Company Group in relation to the sales, supervision and attendance to any matters incidental to or relating to the Styleline Studios Products.

## 4. REMUNERATION, EXPENSES AND TAXES

4.1. In consideration of Dimitri agreeing to provide the Services, the Company shall, during the Term, on or before the last day of each calendar month, pay to Dimitri the Monthly Fee. The first and last Monthly Fee payable by the Company to Dimitri shall be prorated according to the number of days during which this Agreement is in force in the first and last calendar months of the Term respectively.

4.2. For the purpose of performing the Services to the Company as set out in this Agreement, Dimitri may be required to travel on behalf of the Company and will not receive any additional remuneration for doing so. The Company shall reimburse Dimitri all travelling expenses incurred by Dimitri whilst travelling in the proper performance of his duties and responsibilities (and this shall include provision for reasonable accommodation and out pocket expenses) provided always that such expenses are duly evidenced by appropriate supporting receipts and vouchers.

4.3. The Company shall reimburse Dimitri any and all reasonable expenses incurred by Dimitri in relation to or incidental to the performance of the Services to the Company pursuant to this Agreement, provided always that such expenses are duly evidenced by appropriate supporting receipts and vouchers and the aggregate sum being within the annual budget approved each year by the Board.

4.4.  Dimitri shall be solely responsible for the payment of his own tax liability in Hong Kong and in any and all other parts of the world.

5.  **VISA**

5.1.  At all times during the term of this Agreement Dimitri shall use his reasonable efforts to possess a valid employment visa in Hong Kong or anywhere else in the world (the "Visa") as may be required in accordance to the applicable requirements of laws in order for Dimitri to perform the Services.

5.2.  The Company shall and the Company shall cause and procure the JV Operating Companies to support and assist Dimitri in his application for a Visa, as may be required in accordance to the applicable requirements of laws in order for Dimitri to perform the Services.

6.  **TERMINATION**

6.1.  Notwithstanding anything in this Agreement contained, the Company shall be entitled (but not obliged) to terminate this Agreement any time during the Term forthwith by written notice (but without prejudice to the rights and remedies of either Party for any antecedent breach of this Agreement) in any of the following events:-.

(a)  If Dimitri commits any continuing or material breach of his obligations under this Agreement and, in the case of a breach which is capable of remedy, fails to remedy the same within thirty (30) days after receipt of a written notice specifying such breach and what action is required to remedy the breach; or

(b)  If Dimitri is guilty of grave misconduct, or persistent and wilful neglect in the discharge of his duties; or

(c)  If Dimitri conducts himself or is guilty of conduct tending to bring himself or the Company Group into disrepute; or

(d)  If Dimitri commits an act of bankruptcy or compounds with his creditors generally; or

(e)  If Dimitri becomes of unsound mind or physically or mentally incapable of performing his duties or managing his affairs; or

(f)  If Dimitri is convicted of a criminal offence; or

(g)  If Dimitri divulges any confidential information acquired during the course of the performance of the Services to unauthorised persons; or

(h)  If Dimitri cease to be the beneficially entitled to any Shares in the Company; or

(i)  If Dimitri ceases, at any time, to hold a valid Visa permitting him to reside and/or continue to work anywhere as required by the Company Group or is prevented at any time from being lawfully engaged by the Company Group as a result of the introduction or operation of any applicable law, rule or regulation.

7.  **CONFIDENTIALITY**

7.1.  Dimitri hereby agrees with and undertakes that he will not during the Term or at any time after the Termination Date use any Confidential Information or disclose or divulge any such Confidential Information to any person and that he shall use his commercially reasonable

endeavours to prevent such use or publication or disclosure of any such Confidential Information by any other person.

7.2.    Each Party hereby undertakes that it shall not:-

    (a)    during the Term or at any time after the Termination Date, use or procure the use of the name of the other Company or any colourable imitation thereof, whether or not in connection with its own or any other name, or in relation to any Company or business controlled by it; or

    (b)    during the Term or at any time after the Termination Date, use any of the J/Slides Brand or the Additional Styleline Studios Brands or any other trademark, name, logo or word or phrase which is similar to or likely to be confused with the J/Slides Brand and Additional Styleline Studios Brands, in any manner whatsoever.

7.3.    The restrictions set out in Clause 7.1 shall not apply to the disclosure of any information made by each Party under compulsion of law or in respect of information which has come into the public domain other than through an unauthorised disclosure by either Party.

7.4.    Dimitri shall, forthwith upon the termination, for whatsoever reason, of this Agreement, immediately upon the Company's written request and at the Company's expense, deliver up to the Company all correspondence, documents, specifications, papers, records, samples of goods and all other property belonging to the Company Group, which may be in the possession or under the control of Dimitri.

**8.    CONTINUATION OF TERMS AND CONDITIONS OF TERMINATION**

8.1.    The termination of this Agreement, howsoever caused or arising, shall not affect the provisions hereof which are expressed or implied or are deemed to operate or have effect after the termination of this Agreement and shall be without prejudice to any right of action already accrued to any Party in respect of any breach of this Agreement by any other Party.

**9.    ALL TERMS AND CONDITIONS/VALIDITY**

9.1.    Notwithstanding the Joint Venture and Shareholders' Agreement, this Agreement constitutes the only and entire agreement between the Parties hereto in respect of the subject matter hereof and it supersedes all prior agreements whether verbal or written expressed or implied between the Parties hereto.  There are no warranties, representation, covenants or agreements between the Parties hereto (other than those which may be implied by law) which are not contained and set out in full in this Agreement.

9.2.    If any one or more of the provisions of this Agreement or any document executed in connection with this Agreement shall be invalid, illegal and/or unenforceable in any respect under any applicable law, then that provision shall be separated from this Agreement and the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired.

**10.    MISCELLANEOUS PROVISIONS**

10.1.    Neither this Agreement, nor any of the rights or obligations hereunder, shall be assigned or delegated by either Party hereto without the prior written consent of the other Party.

10.2.    In the event of any conflict between the provisions of this Agreement and the Joint Venture and Shareholders Agreement, so far as the rendering of services by Dimitri for the Company is concerned, the provisions of this Agreement shall prevail.

10.3.  This Agreement may be amended, and any provision hereof may be waived, only by written agreement executed or signed by and between the Parties hereto.  The waiver by either Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by either Party.  The failure by a Party to enforce at any time or for any period any one or more of the terms or conditions of this Agreement shall not be a waiver of them or of the right at any time subsequently to enforce all or any of the terms and conditions of this Agreement.

10.4.  This Agreement may be signed in any number of counterparts.  Any single counterpart or a set of counterparts signed in either case by the Parties hereto shall constitute a full and original agreement for all purposes.

10.5.  Notwithstanding anything contained herein to the contrary, it is hereby expressly agreed and declared that Dimitri shall not be or be deemed to be an agent or partner of the Company.

10.6.  Each Party to this Agreement shall bear its own legal and other professional costs and expenses in connection with the negotiation, preparation and implementation of this Agreement.  The Parties acknowledge that Messrs. Winston & Strawn is acting on behalf of the Company in the preparation, negotiation and execution of this Agreement and that Dimitri has been advised to seek independent legal advice and has been given ample opportunity to do so.

10.7.  All notices and communications or legal process hereunder shall be in writing and addressed to the other Party hereto at the address hereinbefore in this Agreement set out or at such other address as shall be so notified in writing to the other by such Party that is giving notice of its change of address.  All notices, communications or legal processes hereunder shall be deemed to be received upon delivery or, if mailed by prepaid postage, registered or double registered (air mail if international), seven (7) days after deposit in the mail.  Any notice or communication may be given or made by facsimile transmission and, subject to confirmation of transmission, shall be deemed to have been received when despatched.

10.8.  This Agreement shall be governed by, construed and interpreted in accordance with, the laws for the time being in force in Hong Kong.

10.9.  Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.  The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

10.10.  The Parties appoint Brilliant Yield Consultants Limited, Room  M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of the Company from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Clause 10.9.  If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, the Company shall promptly appoint a successor agent in Hong Kong and notify the other Party, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the purposes of this clause.  The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong.  The Parties agree that the Company commencing arbitration proceedings against Dimitri shall send a copy of the notice in respect of the same to Wexler Lehrer & Kaufman PLLC by electronic mail and registered post and Dimitri commencing arbitration proceedings against the

Company shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.

**IN WITNESS** of which the Parties or their duly authorized representatives have executed this Agreement.

Signed by                                              )
**Dimitrios Mavridakis**                               )
in the presence of:                                    )
                                                       )
                                                       )
                                                       )

Witness name:
Witness address:

Signed by                                              )
For and on behalf of                                   )
**Styleline Studios International Limited**             )
in the presence of:                                    )
                                                       )
                                                       )

Witness name:
Witness address:

## SCHEDULE 1

## SERVICES

1. Unless and until the Company decides otherwise, Dimitri shall:-

   (a) Use his commercially reasonable efforts to promote, develop and enhance the J/Slides Brand and the Additional Styleline Studios Brands pursuant to the Business Plan;

   (b) On receiving instructions from the Company Group, timely produce and present to the Board design collections of footwear and any other goods as may be requested by the Company Group, in line with the image and reputation created and/or to be developed by the Company after the approval of the Board;

   (c) Co-ordinate and liaise with Tina Ey-Vean Liu, E-Teen Market Limited and/or any third Party suppliers of the Styleline Studios Products in respect of all matters incidental to or in relation to the design and manufacture of the Styleline Studios Products;

   (d) Attend to and monitor any and all matters as may be required by Tina Ey-Vean, E-Teen Market Limited and/or any third Party suppliers of the Styleline Studios Products;

   (e) Provide the Board with information to assist them in assessing the suitability of the design collections for the Styleline Studios Products; and

   (f) Liaise with and assist the Company Group in attending to all formalities relating to the design, manufacture and logistic operations for the Styleline Studios Products.



## SCHEDULE 8

### E-TEEN SUPPLY AGREEMENT

Execution copy

Dated this 2nd day of March 2015

between

(1)  STYLELINE STUDIOS INTERNATIONAL LIMITED

and

(2)  E-TEEN MARKET LIMITED

SUPPLY AGREEMENT

Execution copy

THIS SUPPLY AGREEMENT (the "Supply Agreement") is made on 2nd April 2015.

BETWEEN:

(1)    **Styleline Studios International Limited**, a company incorporated under the laws of Hong Kong with company number 2194884 whose registered office is at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong (the "**Company**"); and

(2)    **E-Teen Market Ltd.**, a limited liability company incorporated under the laws of the British Virgin Islands with an office at 6/F., No. 467, Section 6, Zhongxiao East Road, Nangang District, Taipei City 115, Taiwan (the "**Manufacturer**" or "**E-Teen**").

together referred to as the "**Parties**" or singly as a "**Party**"

WHEREAS:

(A)    The Company wishes to appoint E-Teen as a non-exclusive manufacturer and grants it with a right of first refusal for the manufacture, development and supply of the Styleline Studios Products in any part of the world and E-Teen wishes to manufacture and supply the Styleline Studios Products on the terms of this Supply Agreement.

NOW IT IS HEREBY AGREED as follows:

1.    <u>DEFINITIONS AND INTERPRETATION</u>

1.1    Capitalized words and expressions used but not defined in this Supply Agreement shall have the same meanings ascribed thereto in the Joint Venture and Shareholders' Agreement.

1.2    In this Supply Agreement, the following expressions shall (unless the context otherwise requires) have the following meanings:-

(a)    "**Acceptance**" has the meaning ascribed under Clause 2.2.

(b)    "**Business Days**" means a day other than Saturday or Sunday on which banks are open for business in Hong Kong.

(c)    "**Candidates**" has the meaning ascribed under Clause 2.2.

(d)    "**Confidential Information**" means any information which is proprietary and confidential to a party including but not limited to the terms and conditions of this Supply Agreement, information concerning or relating in any way whatsoever to its distributorship, franchise or other arrangements, principals, any of the trade secrets or confidential operations, processes or inventions carried on or used by a party, any information concerning the organisation, business, finances, transactions or affairs of a party, dealings of a party, secret or confidential information which relates to the business or party or any of its principals', clients or customers' transactions or affairs, any party's technology, designs, documentation, manuals, budgets, financial statements or information, accounts, dealers' lists, customer lists, marketing studies, drawings, notes, memoranda and the information contained therein, any information therein in respect of trade secrets, technology and technical or other information relating to the development, manufacture, clinical testing, analysis, marketing, sale or supply or proposed development, manufacture, clinical testing, analysis, marketing, sale or supply of any products or services by a party, and plans for the development or marketing of such products or services and information and material which is either marked confidential or is by its nature intended to be exclusively for the knowledge of the recipient alone;

2



(c) "**Joint Venture and Shareholders' Agreement**" entered into between the Company, Tina Ey-Vean Liu, Jay Steven Litvack, and Dimitrios Mavridakis.

(d) "**Offer**" has the meaning ascribed under Clause 2.2.

(e) "**Order**" or "**Orders**" means any and all orders for Styleline Studios Products placed, from time to time, by the Company with the Manufacturer pursuant to Clause 6;

(f) "**Purchase Price**" means the purchase price for the Styleline Studios Products which shall be agreed from time to time by the Company and Manufacturer in writing and specified in the relevant Order.

(g) "**Quality Control Obligations**" means the quality control parameters, specifications and standards of quality in relation to the manufacture of the Styleline Studios Products, the materials used, workmanship and design, packing and storage and related data as the Company may from time to time specify in writing to the Manufacturer.

(h) "**Styleline Studios Products**" means footwear and any other goods bearing the J/Slides brand or any other brands as decided by the shareholders of the Company.

1.3 Headings used in this Supply Agreement are for convenience only and shall not affect the construction or interpretation of this Supply Agreement.

1.4 Words denoting the singular include the plural and vice versa, words denoting a gender include every gender.

1.5 Reference to Clauses and Sub-Clauses are to clauses and sub-clauses of this Supply Agreement.

1.6 References to person shall include individuals, sole traders, firms, partnerships, companies, and bodies corporate or unincorporated.

## 2. RIGHT OF FIRST REFUSAL TO MANUFACTURE

2.1. Subject to the terms and conditions of this Supply Agreement, the Company hereby appoints the Manufacturer as a non-exclusive manufacturer and irrevocably grants the Manufacturer with the right of first refusal in respect of the manufacture and product development of the Styleline Studios Products in the manner described under Clause 2.2.

2.2. At all material times during the subsistence of this Supply Agreement, the Company shall be entitled to solicit bids from any third party manufacturers, factories or suppliers (the "**Candidates**") for the production and product development of the Styleline Studios Products. The Company shall present such bids in writing to E-Teen stating (i) the quantity of items to be produced and/or developed; (ii) the delivery date and delivery terms of the products; and (ii) the price (the "**Offer**"). E-Teen shall provide a written notice (the "**Acceptance**") to the Company within five (5) Business Days of receiving the Offer stating its unequivocal acceptance of the Offer to manufacture the Styleline Studios Products on the same terms and conditions as stated in the Offer. If E-Teen fails to serve an Acceptance to the Company within the aforementioned time frame, the Company shall have the option to enter into an agreement with any Candidate on the same terms and conditions as stated in the Offer.

## 3. SAMPLE STYLELINE STUDIOS PRODUCTS

3.1. The Manufacturer shall manufacture and supply to the Company the Styleline Studios Products as may, from time to time, be required according to the designs furnished by the Company.



3.2.    No product, or range of products, shall be deemed to qualify as Styleline Studios Products unless samples of those products, submitted in the quantity and ranges as shall be agreed in writing between the Manufacturer and the Company have first been approved by the Company in writing. The Manufacturer shall not undertake any production in respect of any of the Styleline Studios Products unless and until samples of the products to be produced have been inspected and approved by the Company.

### 4.    PURCHASE PRICE AND PAYMENT

4.1.    The Purchase Price for the Styleline Studios Products shall be as specified in the relevant Order which price shall be inclusive of all costs to the Manufacturer of manufacturing, producing, packing and delivering the Styleline Studios Products (F.O.B.).

4.2.    Payment of the Purchase Price for the Styleline Studios Products ordered and delivered shall be effected by the Company to the Manufacturer in United States Dollars by telegraphic transfer which shall be payable by the Company to the Manufacturer in the manner set out in the Order within 30 (thirty) days of delivery.

### 5.    RISK – RETENTION OF TITLE

5.1.    Risk in the Styleline Studios Products shall pass to the Company at the time when the Styleline Studios Products are handed to the first carrier for transmission to the Company to the delivery point as specified by the Company in the relevant Order as described under Clause 7.1.

5.2.    Title to the Styleline Studios Products shall not pass to the Company until the Manufacturer receives payment in full (in cash or cleared funds) for such Style Studios Products, in which case title to such Styleline Studios Products shall pass at the time of payment of all such sums.

5.3.    Until title to the Styleline Studios Products has passed to the Company, the Company shall:

(a)    store such Styleline Studios Products separately from all other goods held by the Company so that they remain readily identifiable as the Manufacturer's property;

(b)    not remove, deface or obscure any identifying mark or packaging on or relating to such Styleline Studios Products; and

(c)    maintain such Styleline Studios Products in satisfactory condition and keep them insured on the Manufacturer's behalf for their full price against all risk with an insurer that is reasonably acceptable to the Manufacturer. The Company shall obtain an endorsement of the Manufacturer's interest in the Styleline Studios Products on its insurance policy, subject to the insurer being willing to make the endorsement. On request, the Company shall allow the Manufacturer to inspect such Styleline Studios Products and the insurance policy.

### 6.    ORDERS AND RELATED MATTERS

6.1.    For each purchase Styleline Studios Products, the Company, after having agreed the relevant Purchase Price with the Manufacturer, shall send an Order to the Manufacturer at least 90 (ninety) days prior to the requested delivery date.

6.2.    All Orders, placed by the Company and accepted in accordance with Clause 6.3 by the Manufacturer, are subject to this Supply Agreement and shall be deemed to incorporate the terms and conditions of this Supply Agreement. All Orders shall contain the information necessary for the Manufacturer to fulfil it. Such information shall include the address to which the Styleline Studios Products are to be delivered, the address to which the Manufacturer's invoices are to be sent, the availability date, and a description including specification and quantity of the Styleline Studios Products.



6.3.    The Manufacturer shall give the Company a confirmation of receipt of the Order within two (2) working days and of acceptance of the Order within five (5) working days of the Order date. In the event the Manufacturer does not give the Company such acceptance notice within five (5) working days of the Order date, the Order shall be regarded as accepted by the Manufacturer. All Order acknowledgements shall confirm the data and conditions of the Order.

## 7.    DELIVERY

7.1.    At such time as the Company places an Order it shall, inter alia, notify the Manufacturer the date on which the Manufacturer is required to deliver the Styleline Studios Products, specified in the relevant Order, to the delivery point or points specified in the relevant Order.

7.2.    The Manufacturer shall, at its own cost, deliver the number of units of the Styleline Studios Products specified in the relevant Order (not more or less and not earlier or later than the times specified in the relevant Order) to the delivery point or points specified in the relevant Order.

## 8.    WARRANTIES AND UNDERTAKINGS BY THE MANUFACTURER

8.1.    The Manufacturer warrants, represents and undertakes to the Company that it:

(a)    will ensure that the Styleline Studios Products shall be of merchantable quality and free from all defects (including latent defects) and shall conform with the relevant Quality Control Obligations;

(b)    will ensure that the retail packaging of the Styleline Studios Products shall fully conform with the designs, specifications and quality standards which may from time to time be notified by the Company to the Manufacturer;

(c)    will promptly bring to the notice of the Company any information which may be prejudicial to the sale of the Styleline Studios Products by the Company;

(d)    will, at its cost and expense, provide the Company with such documents, certificates or approvals as are required to export the Styleline Studios Products and/or the sample products (as the case may be) from the place of manufacture to the European Union, the United States of America and/or such other countries or places as may be specified in the relevant Order; and

(e)    will use the Confidential Information solely for the purpose contemplated by this Supply Agreement and will not, whether directly or indirectly during the term of this Supply Agreement, and thereafter without limit in point of time, use or otherwise take any steps (whether acts or omissions) to benefit from any Confidential Information made available to the Manufacturer hereunder or disclose or permit to be disclosed any Confidential Information to any third party.

## 9.    TERM AND TERMINATION

9.1.    Unless terminated as provided in Clauses 9.2 and 9.3 below or at any time during its duration by mutual written consent, this Supply Agreement shall continue in full force and effect for a period of three years from the date of this Supply Agreement. At the end of said period, the Company and the Manufacturer shall negotiate in good faith the renewal of the this Supply Agreement, being understood that such renewal shall be executed in writing between the Company and the Manufacturer.

9.2.    The Company may, without prejudice to any other rights which it may have, forthwith upon giving notice terminate this Supply Agreement in any of the following events:

(a)    if the Manufacturer fails to observe or perform any of the terms or conditions of this Supply Agreement and such default or breach (if capable of remedy) continues for thirty (30) days after notice from the Company specifying the breach or default and requiring the same to be remedied;



(b)    the Manufacturer ceases or threatens to cease to carry on its business or a substantial part of such business or disposes or threatens to dispose of the whole or a substantial part of its undertaking, property or assets or stops or threatens to stop payment of its debts;

(c)    the Manufacturer makes a proposal for a composition in satisfaction of its debts or a scheme of arrangement of its affairs or is unable to pay its debts;

(d)    a petition is presented or resolution is passed for the winding-up of the Manufacturer and/or petition is presented for an administration order to be made in relation to the Manufacturer or a receiver or manager or administrative receiver or like person is appointed of the whole or any material part of the property, undertaking or assets of the Manufacturer;

(e)    the Manufacturer is declared bankrupt.

9.3.    The Company and Manufacturer acknowledge that the Supply Agreement shall forthwith terminate being in full force and effect on the date Tina Ey-Vean Liu ceases to be beneficially entitled to any shares in the Company.

## 10.    MISCELLANEOUS

10.1.    The terms and conditions set out in an Order shall be binding upon the Company and the Manufacturer save insofar as they are inconsistent with the terms and conditions herein contained.

10.2.    This Supply Agreement constitutes the only and entire agreement between the Parties hereto in respect of the subject matter hereof and it supersedes all prior agreements whether verbal or written expressed or implied between the Parties hereto. There are no warranties, representation, covenants or agreements between the Parties hereto (other than those which may be implied by law) which are not contained and set out in full in this Supply Agreement.

10.3.    Neither this Supply Agreement, nor any of the rights or obligations hereunder, shall be assigned or delegated by either Party hereto without the prior written consent of the other Party.

10.4.    In the event of any conflict between the provisions of this Supply Agreement on one hand and the Joint Venture and Shareholders Agreement on the other, so far as the terms and conditions of the supply of the Styleline Studios Products by E-Teen are concerned, the provisions of this Supply Agreement shall prevail.

10.5.    This Supply Agreement may be amended, and any provision hereof may be waived, only by written agreement executed or signed by and between the Parties hereto. The waiver by either Party of a breach of any provision of this Supply Agreement shall not operate or be construed as a waiver of any subsequent breach by either Party. The failure by a Party to enforce at any time or for any period any one or more of the terms or conditions of this Supply Agreement shall not be a waiver of them or of the right at any time subsequently to enforce all or any of the terms and conditions of this Supply Agreement.

10.6.    All rights granted to each of the Company and the Manufacturer shall be cumulative and no exercise by any of them of any right under this Supply Agreement shall restrict or prejudice the exercise of any other right granted or otherwise available to it.

10.7.    Any obligation contained in this Supply Agreement, whether expressed to apply during this Supply Agreement or after the termination of this Supply Agreement, shall unless the context otherwise provides be deemed to constitute a separate and independently enforceable obligation which shall be enforceable notwithstanding the termination or expiry of this Supply Agreement.



Execution copy

10.8. This Supply Agreement may be executed in any one or more number of counterparts each of which, when executed by one or more of the parties, shall together be deemed to form part of and constitute this Supply Agreement.

10.9. All notices and communications or legal process hereunder shall be in writing and addressed to the other Party hereto at the address hereinbefore in this Supply Agreement set out or at such other address as shall be so notified in writing to the other by such Party that is giving notice of its change of address. All notices, communications or legal processes hereunder shall be deemed to be received upon delivery or, if mailed by prepaid postage, registered or double registered (air mail if international), seven (7) days after deposit in the mail. Any notice or communication may be given by facsimile transmission and, subject to confirmation of transmission, shall be deemed to have been received when dispatched.

## 11.    GOVERNING LAW AND JURISDICTION

11.1. This Supply Agreement shall be governed by and construed in accordance with the laws of Hong Kong.

11.2. Any dispute, controversy, difference or claim arising out of or relating to this Supply Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The arbitration shall be conducted in Hong Kong before a single arbitrator in the English language.

11.3. The Parties appoint Brilliant Yield Consultants Limited, Room M202, Haleson Building, 1 Jubilee Street, Central, Hong Kong (or any individual or corporate entity which is acting as the company secretary of the Company from time to time), to accept service on their behalf of any arbitration proceedings which may be commenced by any Party pursuant to Clause 11.2. If for any reason the agent named above (or its successor) no longer serves as agent of the Parties for this purpose, the Company shall promptly appoint a successor agent in Hong Kong and notify the other Party, provided that until the Parties receives such notification, they shall be entitled to treat the agent named above (or its said successor) as the agent of the Parties for the purposes of this clause. The Parties agrees that any such legal process shall be sufficiently served on it if delivered to such agent for service at his address for the time being in Hong Kong. The Parties agree that any Party commencing arbitration proceedings against the other Party shall send a copy of the notice in respect of the same to Messrs. Winston & Strawn by electronic mail and registered post.



**IN WITNESS** of which the Parties or their duly authorized representatives have executed this Supply Agreement.

Signed by                                                    )
**E-Teen Market Limited**                                    )
in the presence of:                                          )
                                                             )
                                                             )
                                                             )

Witness name:
Witness address:


Signed by                                                    )
For and on behalf of                                         )
**Styleline Studios International Limited**                  )
in the presence of:                                          )
                                                             )
                                                             )

Witness name:
Witness address:

8

## SCHEDULE 9

## DEED OF ADHERENCE

By this Deed I/we of/whose registered office is at [                ] who intend(s) to become the holder(s) of [         ] Ordinary Shares of [    ] each in the capital of Styleline Studios International Limited (the "**Company**") **HEREBY AGREE** that as and with effect from [            ] I/we will observe perform and be fully bound by and assume the benefit of the provisions of a Shareholders' Agreement dated [            ] and made between the Tina Ey-Vean Liu, Jay Steven Litvack, Dimitrios Mavridakis and the Company (a copy of which is attached to this Deed and has been initialled by me/us for identification purposes) in all respects as if I/we was/were an original Party to the Shareholders Agreement and was/were referred therein as a Shareholder.

**IN WITNESS** whereof this Deed has been executed on the [date]

| | |
|---|---|
| Signed by | ) |
| For and on behalf of | ) |
| [ • ] | ) |
| in the presence of: | ) |
| | ) |
| | ) |

| | | |
|---|---|---|
| Name: | Name: | Name: |
| Director | Director | Director |

900320280    03/31/2015

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM336812

| SUBMISSION TYPE: | CORRECTIVE ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | Corrective Assignment to correct the name and address of assignee previously recorded on Reel 005482 Frame 0823. Assignor(s) hereby confirms the "...and Styleline Studios, LLC, a Limited Liability Company with an address at ...("Assignee").". |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| JSL Studio Intl, LLC | | 03/20/2015 | LIMITED LIABILITY COMPANY: NEW YORK |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Styleline Studios International Ltd. |
| Street Address: | 42/F, Bank of China Tower |
| Internal Address: | 1 Garden Road, Central |
| City: | Hong Kong |
| State/Country: | HONG KONG |
| Entity Type: | Limited Company: HONG KONG |

## PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 86384358 | J/SLIDES |

## CORRESPONDENCE DATA

Fax Number:          7033912901

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

Phone:               7033912900
Email:               swertheim@marburylaw.com
Correspondent Name:  Shauna M. Wertheim
Address Line 1:      11800 Sunrise Valley Drive
Address Line 4:      Reston, VIRGINIA 20191

| ATTORNEY DOCKET NUMBER: | LITVAK |
|---|---|
| NAME OF SUBMITTER: | Shauna M. Wertheim |
| SIGNATURE: | /Shauna M. Wertheim/ |
| DATE SIGNED: | 03/31/2015 |

Total Attachments: 5
source=assignment-tm-5482-0823_coversheet_20 MAR 2015#page1.tif
source=assignment-tm-5482-0823_coversheet_20 MAR 2015#page2.tif

CH $40.00    86384358

900320280

TRADEMARK
REEL: 005489 FRAME: 0115

source=assignment-tm-5482-0823_coversheet_20 MAR 2015#page3.tif
source=31 MAR 2015_Assignment_Corrective#page1.tif
source=31 MAR 2015_Assignment_Corrective#page2.tif

**TRADEMARK**
**REEL: 005489 FRAME: 0116**

900319294   03/20/2015

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM335797

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| JSL Studio Intl, LLC | | 03/20/2015 | LIMITED LIABILITY COMPANY: NEW YORK |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Styleline Studios, LLC |
| Street Address: | 55 Lumber Road |
| Internal Address: | Suite 6 |
| City: | Roslyn |
| State/Country: | NEW YORK |
| Postal Code: | 11576 |
| Entity Type: | LIMITED LIABILITY COMPANY: NEW YORK |

### PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 86384358 | J/SLIDES |

### CORRESPONDENCE DATA

**Fax Number:**            7033912901

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 7033912900 |
| Email: | swertheim@marburylaw.com |
| Correspondent Name: | Shauna M. Wertheim |
| Address Line 1: | 11800 Sunrise Valley Drive |
| Address Line 2: | 15th Floor |
| Address Line 4: | Reston, VIRGINIA 20191 |

| ATTORNEY DOCKET NUMBER: | JSL-TMK |
|---|---|
| NAME OF SUBMITTER: | Shauna M. Wertheim |
| SIGNATURE: | /Shauna M. Wertheim/ |
| DATE SIGNED: | 03/20/2015 |

**Total Attachments: 2**
source=JSlides Assign_20 MAR 2015#page1.tif
source=JSlides Assign_20 MAR 2015#page2.tif

*(vertical text in right margin: 86384358   CH $40.00)*

TRADEMARK
REEL: 005482 FRAME: 0823

900319294

# CORRECTIVE

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT, (the "Assignment") is made as of the 20th day of March, 2015, by JSL Studio Intl, LLC, a New York Limited Liability Company with an address at 55 Lumber Road, #6, Roslyn, New York 11576 ("Assignor"), and Styleline Studios International Ltd., a Hong Kong company, with an address at 42/F, Bank of China Tower, 1 Garden Road, Central, Hong Kong ("Assignee").

WHEREAS, Assignor owns the following U.S. mark (collectively, "the Marks"):

**J/SLIDES**, U.S. Ser. No. 86384358

and

WHEREAS, Assignee desires to acquire the Mark, and any and all U.S. and international applications and registrations based thereon, together with the goodwill associated therewith.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

Assignment. Assignor hereby grants, bargains, transfers, sells, assigns, conveys and delivers to Assignee its entire right, title and interest in and to the Marks, including any pending applications in the U.S. or abroad, and all goodwill appurtenant therewith, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment and sale had not been made, together with all claims for damages by reason of past, present or future infringement or other unauthorized use of the Marks, with the right to sue for damages, and collect the same for its own use and enjoyment and for the use and enjoyment of its successors, assigns, or other legal representatives.

Assignor hereby covenants and agrees that, at any time and from time to time forthwith upon the written request of Assignee, it will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, each and all of such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required by Assignee in order to assign, transfer, set over, convey, assure and confirm unto and vest in Assignee, its successors and assigns, title to the assets sold, conveyed, transferred and delivered by this Agreement.

1

This Assignment is being executed and delivered by Assignor as of this 30 day of _____ MARCH , 2015.

ISL STUDIO INTL, LLC

By: _____

Jay Litvack

2

900319294 03/20/2015

## TRADEMARK ASSIGNMENT COVER SHEET

ETAS ID: TM335797

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| JSL Studio Intl, LLC | | 03/20/2015 | LIMITED LIABILITY COMPANY: NEW YORK |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Styleline Studios, LLC |
| Street Address: | 55 Lumber Road |
| Internal Address: | Suite 6 |
| City: | Roslyn |
| State/Country: | NEW YORK |
| Postal Code: | 11576 |
| Entity Type: | LIMITED LIABILITY COMPANY: NEW YORK |

### PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Serial Number: | 86384358 | J/SLIDES |

### CORRESPONDENCE DATA

Fax Number:          7033912901

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

Phone:                7033912900
Email:                swertheim@marburylaw.com
Correspondent Name:   Shauna M. Wertheim
Address Line 1:       11800 Sunrise Valley Drive
Address Line 2:       15th Floor
Address Line 4:       Reston, VIRGINIA 20191

| ATTORNEY DOCKET NUMBER: | JSL-TMK |
|---|---|
| NAME OF SUBMITTER: | Shauna M. Wertheim |
| SIGNATURE: | /Shauna M. Wertheim/ |
| DATE SIGNED: | 03/20/2015 |

Total Attachments: 2
source=JSlides Assign_20 MAR 2015#page1.tif
source=JSlides Assign_20 MAR 2015#page2.tif

CH $40.00  86384358

TRADEMARK
REEL: 005482 FRAME: 0823

900319294

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT, (the "Assignment") is made as of the 20th day of March, 2015, by JSL Studio Intl, LLC, a New York limited liability company with an address at 55 Lumber Road, #6, Roslyn, New York 11576 ("Assignor"), and Styleline Studios, LLC, a Limited Liability Company with an address at 55 Lumber Road, Roslyn, NY 11576, suite6 ("Assignee").

WHEREAS, Assignor owns the following U.S. mark (collectively, "the Marks"):

### J/SLIDES, U.S. Ser. No. 86384358

and

WHEREAS, Assignee is desires to acquire the Mark, and any and all U.S. and international applications and registrations based thereon, together with the goodwill associated therewith.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

Assignment. Assignor hereby grants, bargains, transfers, sells, assigns, conveys and delivers to Assignee its entire right, title and interest in and to the Marks, including any pending applications in the U.S. or abroad, and all goodwill appurtenant therewith, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives as fully and entirely as the same would have been held and enjoyed by the Assignor if this assignment and sale had not been made, together with all claims for damages by reason of past, present or future infringement or other unauthorized use of the Marks, with the right to sue for damages, and collect the same for its own use and enjoyment and for the use and enjoyment of its successors, assigns, or other legal representatives.

Assignor hereby covenants and agrees that, at any time and from time to time forthwith upon the written request of Assignee, it will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, each and all of such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may reasonably be required by Assignee in order to assign, transfer, set over, convey, assure and confirm unto and vest in Assignee, its successors and assigns, title to the assets sold, conveyed, transferred and delivered by this Agreement.

1

**TRADEMARK**
**REEL: 005482 FRAME: 0824**

This Assignment is being executed and delivered by Assignor as of this 20 day of _____ March, 2015.

JSL STUDIO INT'L, LLC

By: _____

Jay Lifrogli

2

TRADEMARK
REEL: 005482 FRAME: 0825

900728430    10/27/2022

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1                                                     ETAS ID: TM764017
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | DISCOUNT FACTORING AGREEMENT (GRANT OF SECURITY INTEREST IN TRADEMARKS) |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| STYLELINE STUDIOS, LLC | | 01/26/2016 | Limited Liability Company: NEW YORK |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | HILLDUN CORPORATION |
| Street Address: | 36 E 31st Street |
| Internal Address: | 12th Floor |
| City: | New York |
| State/Country: | NEW YORK |
| Postal Code: | 10001 |
| Entity Type: | Corporation: NEW YORK |

## PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4746857 | J/SLIDES |

## CORRESPONDENCE DATA

| | |
|---|---|
| Fax Number: | 9735972400 |

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 9735972500 |
| Email: | lstrademark@lowenstein.com |
| Correspondent Name: | Matthew P. Hintz, Esq. |
| Address Line 1: | Lowenstein Sandler LLP |
| Address Line 2: | One Lowenstein Drive |
| Address Line 4: | Roseland, NEW JERSEY 07068 |

| ATTORNEY DOCKET NUMBER: | 15948.1 |
|---|---|
| NAME OF SUBMITTER: | Matthew P. Hintz, Esq. |
| SIGNATURE: | /Matthew P. Hintz/ |
| DATE SIGNED: | 10/27/2022 |

Total Attachments: 13
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page1.tif

CH $40.00    4746857

**TRADEMARK**
**REEL: 007889 FRAME: 0559**

900728430

source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page2.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page3.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page4.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page5.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page6.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page7.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page8.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page9.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page10.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page11.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page12.tif
source=STYLELINE STUDIOS, LLC to HILLDUN CORPORATION Discount Factoring Agreement#page13.tif

## DISCOUNT FACTORING AGREEMENT

Dated: June 12, 2015
New York, NY

Hilldun Corporation
225 West 35th Street
New York, NY 10001

Styleline Studios, LLC
55 Lumber Road
Roslyn, NY 11576

**THIS FACTORING AGREEMENT** is entered into between **STYLELINE STUDIOS, LLC** ("Client"), and **HILLDUN CORPORATION**, a New York factoring corporation ("Hilldun"). Client hereby requests Hilldun to act as Client's sole factor upon the following terms and conditions, namely:



STYLELINE STUDIOS, LLC Agreement 4.0 R2

1



## 2.3 POWER OF ATTORNEY

Client appoints Hilldun or Hilldun's designee, including the Re-Factor, as Client's attorney-in-fact: to endorse Client's name on any checks including, without limitation, checks from Client's customers, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Hilldun's possession or the possession of the Re-Factor; and to sign Client's name on and/or file in any public office or otherwise any invoice or bill of lading relating to any Receivables and on drafts against customers, schedules and assignments for Receivables, notices of assignment, financing statements and other public records, verifications of accounts and notices to customers and to direct all mail to be delivered to Hilldun's office with full authority to open same and effectuate Hilldun's rights under this Agreement. Client ratifies and approves all acts of the attorney-in-fact in accordance with this Agreement. This power, being coupled with an interest, is irrevocable until all Obligations (as hereinafter defined) have been fully satisfied.



STYLELINE STUDIOS, LLC Agreement 4.0 R2

TRADEMARK
REEL: 007889 FRAME: 0562



STYLELINE STUDIOS, LLC Agreement  4.0 R2

3



STYLELINE STUDIOS, LLC Agreement 4.0 R2

4

TRADEMARK
REEL: 007889 FRAME: 0564



STYLELINE STUDIOS, LLC Agreement  4.0 R2                5



STYLELINE STUDIOS, LLC Agreement 4.0 R2



## 9. SECURITY INTERESTS IN COLLATERAL TO SECURE OBLIGATIONS

a. As security for all Obligations at any time owing by Client to Hilldun, Client hereby assigns to Hilldun and grants to Hilldun a security interest in and lien upon all present and future assets of the undersigned, whether now owned or hereafter acquired, wherever located, and all the direct and indirect proceeds thereof, including but not limited to (i) all Client's accounts, instruments, contract rights, chattel paper, documents, general intangibles (including without limitation all trademarks), and all returned, reclaimed or repossessed goods, and all books and records pertaining to the foregoing, and (ii) all inventory including without limitation all materials, finished goods and work in process. Client hereby authorizes and ratifies any and all Uniform Commercial Code filings by Hilldun with respect to any of Client's assets. As further security for said Obligations Client grants Hilldun a security interest in and lien upon, and Hilldun shall be entitled to hold and retain possession of, all sums standing to Client's credit with Hilldun and all

**TRADEMARK**
**REEL: 007889 FRAME: 0567**

Client's property of any kind at any time in Hilldun's possession.   As used in this Agreement, the term "Obligations" means and includes, all loans, advances, debts, liabilities, obligations, debit balances, covenants and duties, of every kind and description, owing by Client to Hilldun, under this Agreement or otherwise (whether or not evidenced by any note or other instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including, without limitation, any debt, liability or obligation owing from Client to others which Hilldun may have obtained by assignment or otherwise, and further including, without limitation, all letters of guarantee or credit opened by Hilldun, all advances and over-advances at any time made by Hilldun to or for Client and irrespective of the amount, if any, of any collateral therefor or percentage advance referred to in paragraph 6(b) above, all other financial accommodations made by Hilldun to or for Client and  all interest, fees, charges,  expenses and reasonable attorneys' fees for which Client are obligated hereunder.

        **b.** Client shall execute and deliver to Hilldun all financing statements and other documents and instruments that Hilldun and/or the Re-Factor may request to perfect, protect, or establish the security interest(s).  Recourse to security shall not be required and Client shall at all times remain liable for the repayment on demand of all Client's indebtedness arising hereunder and for all Obligations.



## 13. RIGHTS IN SECURED PROPERTY

        Subject to all of Hilldun's rights in this Agreement, if Client shall fail to pay, when due, any Obligation owing from Client to Hilldun or to make any remittance required by this Agreement, or commit any breach of this Agreement or any present or future supplement thereto, or any other agreement between Client, or upon the occurrence of an event of default listed in Paragraph 14 hereof, Hilldun and/or the Re-Factor shall have, with respect to all property in which Hilldun and/or the Re-Factor have a security interest and in addition to all other rights provided herein, all the rights and remedies of a secured party under the

STYLELINE STUDIOS, LLC Agreement  4.0 R2

8

Uniform Commercial Code. Hilldun and/or the Re-Factor may, without demand and without advertisement or notice, all of which Client waives (except as may be required by law), at any time or times, sell and deliver any or all security and collateral held by or for Hilldun at public or private sale, for cash, upon credit or otherwise, at such prices and upon such terms as Hilldun deems advisable, in Hilldun's sole discretion. Any requirement of reasonable notice shall be met if such notice is mailed postage prepaid to Client at Client's address as set forth herein at least five (5) days before the time of sale or other disposition. Hilldun and/or the Re-Factor may be the purchaser at any such sale, if it is public, free from any right of redemption, which Client also waives. Proceeds of sale shall be applied first to all costs and expenses of sale, including the fees and disbursements of Hilldun's counsel and/or counsel to the Re-Factor, and second to the payment (in whatever order Hilldun elects) of all Obligations. Hilldun will return any excess to Client, and Client shall remain liable to Hilldun for any deficiency.

## 14. TERM OF AGREEMENT; TERMINATION; DEFAULT

a. This Agreement shall continue in effect until terminated as hereinafter provided. Hilldun shall have the right to terminate this Agreement at any time upon written notice. Client shall have the right to terminate this Agreement any time at the end of the then next succeeding Contract Half upon written notice received by Hilldun during the Contract Half preceding the Contract Half specified in such notice. Any notice of termination shall be given by registered or certified mail, return receipt requested. In addition, Hilldun shall have the right to terminate this Agreement at any time without notice in the event that Client shall fail to pay when due any Obligation, or shall commit any breach of this Agreement as amended or supplemented or any other agreement between Hilldun and Client; or if any event shall occur which might have a material adverse effect on Client's financial or business condition, operations or prospects, any of the foregoing circumstances in this sentence constitutes an event of default.

b. Upon the effective date of termination, all of Client's Obligations, whether incurred under this Agreement or any amendment or supplement thereto or otherwise, shall become immediately due and payable without notice or demand. Notwithstanding any termination, until all Client's Obligations of every nature whatsoever shall have been fully paid and satisfied, Hilldun and/or the Re-Factor shall retain a security interest in and title to all existing and future Receivables and other collateral held by Hilldun and/or the Re-Factor hereunder, and Client shall continue to assign Receivables to Hilldun and/or the Re-Factor and turn over all collections to Hilldun and/or the Re-Factor, and Hilldun shall be under no obligation to make any advances with respect thereto. Upon the effective date of termination, all credit approvals are revoked, except for Receivables with respect to which goods have been delivered or services rendered. If at any time after the termination of this Agreement, an event occurs (including without limitation any claim against Hilldun on the grounds of preference) which would, but for the termination of this Agreement, result in the creation of an Obligation to Hilldun from Client, then, notwithstanding the prior termination of this Agreement, Client shall be obligated to Hilldun with respect to such Obligation as if such termination shall not have occurred, and all of Hilldun's rights, including without limitation all of Hilldun's security interests, under this Agreement and all related Guaranties, shall continue with respect to such Obligation until all such Obligations to Hilldun shall have been satisfied in full.

TRADEMARK
REEL: 007889 FRAME: 0569



**16. APPLICABLE LAW; JURISDICTION; VENUE; NOTICES; WAIVER OF JURY TRIAL**

a. This Agreement is made in the State of New York and shall be governed by and construed in accordance with the laws of said State, without regard to conflict of laws and principles.

b. Each of the parties to this Agreement hereto agrees that all actions and proceedings based upon, or arising out of or relating to this Agreement and the transactions herein contemplated shall be litigated exclusively in the Supreme Court of the State of New York, in the County of New York or to the jurisdiction of the United States District Court for the Southern District of New York. Each of the parties to this Agreement hereby waives personal service of any summons or complaint or other process in any such controversy, and hereby agrees that such service may be made by registered or certified mail to the other party at the address appearing herein; failure on the part of either party to appear or answer within thirty (30) days after such mailing shall constitute a default entitling the other party to enter a judgment or order as demanded.

c. No failure or delay by Hilldun in exercising any of its powers or rights hereunder, or under any present or future supplement hereto or under any other agreement between Client, shall operate as a waiver thereof; nor shall any single or partial exercise of any such power or right preclude other or further exercise thereof or the exercise of any other right or power. Hilldun's rights, remedies and benefits hereunder are cumulative and not exclusive of any other rights, remedies or benefits which Hilldun may have. This Agreement may only be modified in writing signed by the party sought to be charged therewith and no waiver by Hilldun will be effective unless in writing and signed by Hilldun and then only to the extent specifically stated.

d. Hilldun shall have the right to assign this Agreement and all of Hilldun's rights hereunder shall inure to the benefit of Hilldun's successors and assigns. Client shall have the right to assign this Agreement only with Hilldun's prior written consent. This Agreement shall inure to the benefit of Hilldun's successors and assigns and our permitted assigns and shall bind Client's respective successors and assigns. This Agreement constitutes the entire agreement between Client and Hilldun with respect to the subject matter hereof.

STYLELINE STUDIOS, LLC Agreement 4.0 R2

10

**TRADEMARK**
**REEL: 007889 FRAME: 0570**

e. CLIENT AND HILLDUN DO HEREBY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.



### 19. EXECUTION

a. This Discount Factoring Agreement, when signed by a party and delivered to the other party by fax, PDF copy, or other electronic means, shall be deemed executed and delivered and shall be deemed to be a document containing the original signature(s) of the transmitting party and shall be fully enforceable against the transmitting party. If reasonably requested, each party shall provide the other party with a copy of this Contract bearing the original signature(s) of the party upon whom such request has been made.

b. By signing below, Client is presenting this Agreement to Hilldun for acceptance. It is understood and agreed that this Agreement shall not be effective until accepted by Hilldun, by Hilldun's signing of same, in the State of New York.

STYLELINE STUDIOS, LLC Agreement 4.0 R2

11

## 20. LIMITED LIABILITY COMPANY

Anything contained herein to the contrary notwithstanding, Client is a Limited Liability Company and any references to corporation, board of directors or officers shall be deemed to refer to limited liability company, members and/or managers as appropriate.

STYLELINE STUDIOS, LLC

By: _____
Jay Litvack
Manager & Member

STATE OF *New York* )
                              ) ss.:
COUNTY OF *Nassau* )

On the 26 day of *January* in the year 2016 before me, the undersigned, personally appeared Jay Litvack, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument in _____ [city, state].

_____
Notary Public

ACCEPTED:

RALPH G QUIOCHO
Notary Public - State of New York
NO. 01QU617422
Qualified in Queens
My Commission Expires Dec 8, 2019

HILLDUN CORPORATION

By: _____
Joshua W. Kapelman
Executive Vice President

TRADEMARK
REEL: 007889 FRAME: 0572





TRADEMARK
REEL: 007889 FRAME: 0573

RECORDED: 10/27/2022

THIS DEED is dated 1st April 2018

**Parties**

(1)   **Styleline Studios International Limited,** incorporated and registered in Hong Kong with CR Number 2194884 whose registered office is at Suite 1701, 17th Floor, Tower 1, Silvercord, 30 Canton Road, Tsimshatsui, Kowloon, Hong Kong (**Assignor**).

(2)   **Styleline Studio, LLC,** a New York limited liability company, with registration Number 423990, whose registered office is at 27 West 27th St, Suite 800 New York, NY 10010 (**Assignee**).

**Background**

(A)   Assignor is the owner of the Trademark J/SLIDES and all common law rights therein and all applications and registrations therefore, including those listed in Exhibit A attached hereto (the "Trademark").

(B)   Assignee wishes to purchase, and Assignor is willing to sell, assign, convey and transfer to Assignee, all right, title and interest in and to the Trademark, trademark applications and trademark registrations listed in <u>Exhibit A</u>, all goodwill associated therewith and all related and corresponding rights in any jurisdiction in the world, on the following terms and conditions.

**Agreed terms**

1.     **Interpretation**

       The following definitions and rules of interpretation apply in this Deed.

1.1    **Definitions:**

       **Business Day:** a day other than a Saturday, Sunday or public holiday in Hong Kong when banks in Hong Kong are open for business.

       **Encumbrance:** any claim, mortgage, charge, pledge, lien, restriction, assignment, power of sale, hypothecation, security interest, title retention, trust arrangement, subordination arrangement, contractual right of set-off or any other agreement or arrangement the effect of which is the creation of security, or any other interest, equity or other right or claim of any person (including any right to acquire, option, right of first refusal or right of pre-emption), or any agreement, arrangement or obligation to create any of the same.

       **Hong Kong:** the Hong Kong Special Administrative Region of the People's Republic of China.

1

**Trademark:** the trademark J/SLIDES, all common law rights therein, and all worldwide registrations and applications therefore, short particulars of which are set out in Annex 1.

1.2     Clause, Annex and paragraph headings shall not affect the interpretation of this Deed.

1.3     A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.4     The Annex forms part of this Deed and shall have effect as if set out in full in the body of this Deed. Any reference to this Deed includes the Schedule. References to clauses and Schedule are to the clauses and Schedule of this Deed.

1.5     Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular. A reference to one gender shall include a reference to the other genders.

1.6     This Deed shall be binding on, and ensure to the benefit of, the parties to this Deed and their respective successors and permitted assigns, and references to any party shall include that party's successors and permitted assigns.

1.7     A reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time. A reference to a statute or statutory provision shall include all subordinate legislation made from time to time under that statute or statutory provision.

1.8     Any words following the terms **including, include, in particular, for example** or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

2.     **Assignment**

In consideration of the sum of US$ 150,000 and other valuable consideration (the receipt and sufficiency of which the Assignor expressly acknowledges), the Assignor hereby assigns to the Assignee absolutely free from all Encumbrance all its worldwide right, title and interest in and to the Trademark, including:

(a)     the absolute entitlement to any registered trademarks granted pursuant to any of the applications comprised in the Trademark; and

2

(b)  all statutory and common law rights attaching to the Trademark, together with the goodwill of the business relating to the goods or services in respect of which the Trademark are registered or used; and

(c)  the right, both at law and in equity, to maintain and enforce any rights subsisting in the Trademark, including but not limited to bring, make, oppose, defend or appeal proceedings, claims or actions, and obtain relief (and to retain any damages recovered) in respect of any infringement, or any other cause of action (including passing off) arising from ownership or use, of the Trademark whether occurring before, on or after the date of this Deed.

3.    **Representations and Warranties**

The Assignor represents and warrants that:

(a)  it is the sole legal and beneficial owner of, and owns all the rights and interests in, the Trademark;

(b)  the Trademark is free from any security interest, option, mortgage, charge or lien;

(c)  it has not acquiesced in the unauthorised use of the Trademark;

(d)  the Trademark is valid and subsisting and is not subject to, or likely to be subject to, amendment, challenge to validity, removal or surrender, and there are and have been no claims, challenges, disputes or proceedings pending or threatened, in relation to the ownership, validity or use of the Trademark;

(e)  it is unaware of any infringement or likely infringement of the Trademark;

(f)  so far as it is aware, exploitation of the Trademark will not infringe the rights of any third party.

4.    **Indemnity**

4.1  The Assignor shall indemnify the Assignee against all liabilities, costs, expenses, damages or losses (including any direct or indirect consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses including attorneys' fees) suffered or incurred by the Assignee arising out of or in connection with:

(a)  any breach by the Assignor of the warranties in clause 3 above; or

(b)  the enforcement of this Deed.

3

4.2     At the request of the Assignee and at the Assignor's own expense, it shall provide all reasonable assistance to enable the Assignee to resist any claim, action or proceedings brought against the Assignee as a consequence of that breach.

4.3     Subject to clause 4.5 below, this indemnity shall apply whether or not the Assignee has been negligent or at fault.

4.4     If a payment due from the Assignor under this clause is subject to tax (whether by way of direct assessment or withholding at its source), the Assignee shall be entitled to receive from the Assignor such amounts as shall ensure that the net receipt, after tax, to the Assignee in respect of the payment is the same as it would have been were the payment not subject to tax.

4.5     Nothing in this Clause shall restrict or limit the Assignee's general obligation at law to mitigate a loss it may suffer or incur as a result of an event that may give rise to a claim under this indemnity.

5.     **Further assurance**

5.1     The Assignor shall, at the Assignee's cost, perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution or delivery of) all further documents, required by law or which the Assignee requests, to vest in the Assignee the full benefit of the right, title and interest assigned to the Assignee under this Deed, including registration of the Assignee as registered proprietor of the Trademark registrations listed in Annex 1.

5.2     The Assignor shall do the following at the Assignee's cost and direction, pending formal registration or recordal of the assignment of the Trademark registrations listed in Annex I to the Assignee:

(a)     if legally required to do so, pay all applicable application, filing, registration, renewal and other fees as they fall due;

(b)     provide the Assignee with all information and other assistance required to enable the Assignee to prepare, file or prosecute applications for registration of the Trademark (including producing, in the appropriate form, any evidence of its use of the Trademark);

(c)     ensure that copies of all correspondence that it, or its agents, receive (including any renewal advice or other notification received from any relevant registry) are promptly delivered to the Assignee; and

(d)     provide the Assignee with all information and other assistance required by the Assignee to conduct, defend or settle any relevant claims, actions or proceedings (including, if requested by the Assignee, bringing

4

proceedings in its own name or lending its name to any proceedings brought by the Assignee).

5.3   The Assignor shall deliver to the Assignee (or the Assignee's nominated representative) on the date of this Deed all deeds, documents of title, certificates and other files and records (including those of its agents) relating to the Trademark.

5.4   The Assignor appoints the Assignee to be its attorney in its name and on its behalf to execute documents, use the Assignor's name and do all things which are necessary or desirable for the Assignee to obtain for itself or its nominee the full benefit of this Deed. This power of attorney is irrevocable and is given by way of security to secure the performance of the Assignor's obligations under this Deed and the proprietary interest of the Assignee in the Trademark and so long as such obligations of the Assignor remain undischarged, or the Assignee has such interest, the power may not be revoked by the Assignor, save with the consent of the Assignee.

5.5   Without prejudice to clause 5.4, the Assignee may, in any way it thinks fit and in the name and on behalf of the Assignor:

   (a)   take any action that this Deed requires the Assignor to take;

   (b)   exercise any rights which this Deed gives to the Assignor; and

   (c)   appoint one or more persons to act as substitute attorney(s) for the Assignor and to exercise such of the powers conferred by this power of attorney as the Assignee thinks fit and revoke such appointment.

5.6   The Assignor undertakes to ratify and confirm everything that the Assignee and any substitute attorney does or arranges or purports to do or arrange in good faith in exercise of any power granted under this clause.

6.   **Waiver**

No failure or delay by a party to exercise any right or remedy provided under this Deed or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

7.   **Entire agreement**

This Deed constitutes the entire agreement between the parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties,

5

representations and understandings between them, whether written or oral, relating to its subject matter.

8.    **Variation**

No variation of this Deed shall be effective unless it is in writing and signed by the parties (or their authorised representatives).

9.    **Severance**

9.1    If any provision or part-provision of this Deed is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Deed.

9.2    If any provision or part-provision of this Deed is invalid, illegal or unenforceable, the parties shall negotiate in good faith to amend such provision so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

10.    **Counterparts**

This Deed may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement. No counterpart shall be effective until each party has executed at least one counterpart.

11.    **Third party rights**

No one other than a party to this Deed, their successors and permitted assignees, shall have any right to enforce any of its terms.

12.    **Notices**

12.1    Any notice given to a party under or in connection with this Deed shall be in writing and shall be delivered by hand or by pre-paid first-class post or other next working day delivery service at its registered office or its principal place of business.

12.2    Any notice shall be deemed to have been received:

6

(a)    if delivered by hand, on signature of a delivery receipt;

(b)    if sent by pre-paid first-class post or other next working day delivery service, at 9.00 am on the second Business Day after posting.

12.3    This clause does not apply to the service of any proceedings or other documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

## 13.    Governing law and Jurisdiction

13.1    This Deed and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of Hong Kong.

13.2    Each party irrevocably agrees that the courts of Hong Kong shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Deed or its subject matter or formation.

*[The rest of this page is intentionally left blank]*

7

Annex 1 Trademark

| Trade Mark | Country | Application No. | File Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 8/2/2016 | REGISTERED |
| J/SLIDES | Japan | 2015-043608 | 5/8/2015 | 5802609 | 10/30/2015 | REGISTERED |
| J/SLIDES | Korea | 40-2015-0037156 | 5/20/2015 | 40-1150538 | 12/23/2015 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | China | 16749476 | 4/20/2015 | 16749476 | 6/7/2016 | REGISTERED |
| J/SLIDES | UK | 3104508 | 4/17/2015 | 3104508 | 4/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |

8

IN WITNESS whereof this Deed has been executed by the parties as a deed on the date first above written.

Executed as a deed by                )
                                     )
for and on behalf of                 )
Styleline Studios International Limited )
in the presence of:                  )



Executed as a deed by                )
                                     )
for and on behalf of                 )
Styleline Studios, LLC               )
in the presence of:                  )

9

900535296  02/12/2020

# TRADEMARK ASSIGNMENT COVER SHEET

ETAS ID: TM561828

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | RESUBMISSION |
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |
| RESUBMIT DOCUMENT ID: | 900532745 |

## CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Styleline Studios International Limited | | 04/01/2018 | Limited Liability Company: HONG KONG |

## RECEIVING PARTY DATA

| | |
|---|---|
| Name: | Styleline Studios, LLC |
| Street Address: | 27 West 27th Street, Suite 800 |
| City: | New York |
| State/Country: | NEW YORK |
| Postal Code: | 10010 |
| Entity Type: | Limited Liability Company: NEW YORK |

## PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4746857 | J/SLIDES |

## CORRESPONDENCE DATA

**Fax Number:** 2486410270

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Phone: | 2486411600 |
| Email: | agrubb@hdp.com |
| Correspondent Name: | Lisabeth H. Coakley |
| Address Line 1: | 5445 Corporate Drive, Suite 200 |
| Address Line 4: | Troy, MICHIGAN 48098 |

| ATTORNEY DOCKET NUMBER: | 17054-200003-US |
| NAME OF SUBMITTER: | Lisabeth H. Coakley |
| SIGNATURE: | /Lisabeth H. Coakley/ |
| DATE SIGNED: | 02/12/2020 |

**Total Attachments: 3**
source=TM Assignment_US#page1.tif
source=TM Assignment_US#page2.tif
source=TM Assignment_US#page3.tif

**TRADEMARK
REEL: 006859 FRAME: 0248**

# TRADEMARK ASSIGNMENT

This Trademark Assignment ("Assignment") is made and entered into effective as of 1st April, 2018 (the "Effective Date"), by and between Styleline Studios International Limited, a Hong Kong limited liability company ("Assignor") and Styleline Studios, LLC, a New York limited liability company ("Assignee").

A.    Assignor is the owner of the trademark J/SLIDES and all common law rights therein and all applications and registrations therefore, including those listed in Exhibit A attached hereto (the "Trademark"); and

B.    Assignee wishes to purchase, and Assignor is willing to sell, assign, convey and transfer to Assignee, all right, title and interest in and to the Trademark and trademark registration listed in Exhibit A, all goodwill associated therewith and all related and corresponding rights in any jurisdiction in the world, on the following terms and conditions.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor and Assignee, the parties agree as follows:

1.    Assignment.  Assignor hereby irrevocably sells, assigns, conveys, transfers and sets over to Assignee, its successors and assigns, the entire worldwide right, title and interest in and to the Trademark, the goodwill of the business symbolized by the Trademark, and all registrations that have been or may be granted thereon, all applications for registrations thereof, and all common law rights and copyright rights in the Trademark worldwide, together with all rights and privileges granted and secured thereby, including all rights to register, renew, defend, and protect interests therein under the applicable laws of all jurisdictions and all claims, demands, income, damages, royalties, payments, accounts and accounts receivable now or hereafter due and/or payable, and rights of action, both statutory and based upon common law, that Assignor has or might have by reason of any past, present or future infringement or other violation of the Trademark prior to, on, or after the date of this Assignment, together with the right to prosecute such claims, demands, and rights of action in Assignee's own name, all of said rights to be held and enjoyed by Assignee, for its own use and benefit and for the use and benefit of its successors, assigns or other legal representatives as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

2.    Authorization.  Assignor authorizes and requests the Commissioner of Patents and Trademarks of the United States to record Assignee as owner of the Trademark, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of Assignee, its successors, assigns or other legal representatives.

1

**TRADEMARK
REEL: 006859 FRAME: 0249**

3.  <u>Further Assurances</u>.  Assignor will promptly execute any additional assignment or other documents reasonably requested by Assignee, its successors and assigns, and do all other lawful acts reasonably necessary to carry out the intent of this Assignment.  The cost of recording and registering ownership rights in the Trademark shall be borne solely by Assignee, its successors and assigns.

4.  <u>Miscellaneous</u>.    This Assignment and the exhibit hereto constitute the entire understanding and agreement of the parties with respect to the Master Deed signed on 1<sup>ST</sup> April 2018.  In the case of conflict with the Master Deed, the terms of the Master Deed will prevail.

Executed by the parties on the date(s) set forth below.

**Styleline Studios International Limited**

By: _____

Name: Tina Liu Ey-Vean

Title:  Director

Date: _____

**Styleline Studios, LLC**

By: _____

Name: Jay Litvack

Title: Director

Date: _____

2

**TRADEMARK**
**REEL: 006859 FRAME: 0250**

**EXHIBIT A**

**TRADEMARK**

| Country | Mark | Trade Mark Serial No. | Trade Mark Reg. No. | Status |
|---------|------|----------------------|---------------------|--------|
| U.S. | J/SLIDES | 86/384,358 | 4,746,857 | Registered |

1

**THIS DEED is dated August 12, 2022**

**Parties**

(1)    **STYLELINE STUDIOS, LLC**, a New York limited liability company, with Department of State ID no. 423990, whose registered office is at 27 West 24 St., Suite 800 New York, NY 10010 (**Assignor**); and

(2)    **STYLELINE STUDIOS INTERNATIONAL LIMITED**, incorporated and registered in Hong Kong with CR Number 2194884 whose registered office is at Unit 7F-15, 7/F., Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R. (**Assignee**).

**Background – Whereas**

(A)    The Assignor is a company engaged in the business of importing, distributing and marketing footwear in the United States of America, bearing the trademark "J/SLIDES".

(B)    The Assignee was the first registror and registered proprietor of the trademark J/SLIDES, including all common law rights therein and all applications and registrations therefore, as listed in Annex 1 attached hereto (the "**Trademarks**").

(C)    By deed dated 1 April 2018 (the "**2018 Deed**"), the Assignee assigned to the Assignor all its worldwide right, title and interest in, and to, the Trademark.

(D)    The Assignor is in breach of the 2018 Deed, by failing to pay the agreed consideration thereunder.

(E)    Further, the Assignor owes the Assignee the amounts set forth in Annex 2 (the "**Existing Debt**"), under terms and conditions covering footwear supply arrangements entered into by and between the Assignee (as supplier) and the Assignor (as customer) (collectively, the "**Commercial Agreements**"), as set forth in Clause 1.

(F)    In light of the Assignor's acknowledgement that it is experiencing cash flow problems, the Assignee has given notice to the Assignor that it treats the 2018 Deed as rescinded by reason of the Assignor's breach of agreement (i.e., non-payment) and/or terminated due to repudiatory breach and has demanded the Assignee to return forthwith the Trademarks. The Assignee has also informed the Assignor that it intends to discontinue the supplies under the Commercial Agreements.

(G)    The Assignor has requested the Assignee not discontinue supplies under the Commercial Agreements and has requested the concurrence and agreement of



the Assignee to the rescheduling of the repayment of the Existing Debt, as hereinafter defined, upon the terms and conditions hereinafter set out.

(H)    The Assignee has agreed to the rescheduling of the Existing Debt and to resuming the supplies under the Commercial Agreements on condition that the Assignor acknowledges and agrees that the Deed is rescinded and/or terminated, returns the Trademark to the Assignee and commits to repay the Existing Debt according to Clause 1.

**Agreed terms**

1.    **Existing Debt acknowledgment – Existing Debt repayment -Resumption of supplies under the Commercial Agreements.**

1.1    The Assignor hereby acknowledges that it owes the Assignee the outstanding amount as specified in Annex 2 (the "**Existing Debt**"), arising out of the Commercial Agreements. The Assignee acknowledges and agrees that the amount of USD 224,996.40 set forth in invoices no. 9000000235 (USD 34,034.40), no. 9000000237 (USD 138,012.00) and no. 9000000239 (USD 52,920.00) has been already paid.

1.2    The Assignor shall pay to the Assignee interest at the rate of 10% (ten per cent) per annum on each invoice under Annex 2, from and including the original payment due date thereof (60 days from shipment) until repayment in full of each such invoice. Said interest shall accrue daily and shall be calculated on the basis of the actual number of days elapsed, based on a 365-day year and shall be compounded and paid every six months on 30 June and 31 December of each year, with the right to prepay without penalty or additional charge or interest.

1.3    In consideration, *inter alia*, of the Assignee's forbearance in relation to seeking immediate repayment of the Existing Debt, resuming the supplies under the Commercial Agreements and rescheduling payment of the same in accordance with the terms of this Deed, the Assignor shall repay to the Assignee the Existing Debt in full and clear fund by and not later 31 October 2022, subject to the notice and cure provision of the escrow agreement which the Parties have entered into on the date hereof (the "**Escrow Agreement**").

1.4    In consideration, *inter alia*, of the Assignor commitments under Clause 1, the Assignee agrees to resume the supplies under the Commercial Agreements. Nothing shall prevent, restrict or refrain the Assignee from discontinuing supplies under the Commercial Agreements, if the Assignor is in material breach of this Deed or defaults the terms and conditions for the payment of the Existing Debt.

**2.** **Rescission and termination of 2018 Deed**

2.1  The Assignor acknowledges and agrees that the 2018 Deed is and shall be deemed to be, rescinded and/or terminated by reason of the Assignor's breach of agreement, effective as from the date hereof.

2.2  As a result of Clause 2.1., the Assignor hereby irrevocably and unconditionally returns and assigns back to the Assignee, absolutely free and clear from all Encumbrance, except for those of U.S. Small Business Administration, the Internal Revenue Service and Hilldun Corporation, all its worldwide right, title and interest in and to the Trademark, including, without limitation:

    (a)  the absolute entitlement to any trademark application, as well as to any registered trademarks granted pursuant to any of the applications comprised in the Trademark; and

    (b)  all statutory and common law rights attaching to the Trademark; and

    (c)  the right, both at law and in equity, to maintain and enforce any rights subsisting in the Trademark, including, but not limited, to apply for Trademarks registrations in other jurisdictions, bring, make, oppose, defend or appeal proceedings, claims or actions, and obtain relief (and to retain any damages recovered) in respect of any infringement, or any other cause of action (including passing off) arising from ownership or use, of the Trademark whether occurring before, on or after the date of this Deed.

2.4  For the purpose of this Deed, "Encumbrance" shall mean any claim, mortgage, charge, pledge, lien, restriction, assignment, power of sale, hypothecation, security interest, title retention, trust arrangement, subordination arrangement, contractual right of set-off or any other agreement or arrangement the effect of which is the creation of security, or any other interest, equity or other right or claim of any person (including any right to acquire, option, right of first refusal or right of pre-emption), or any agreement, arrangement or obligation to create any of the same.

**3.** **Representations and Warranties**

The Assignor represents and warrants, to the best of his knowledge, that:-

    (a)  it is the sole legal and beneficial owner of, and owns all the rights, title and interests in and to the Trademark registrations, which are currently under the Assignor's name;

    (b)  it has not acquiesced in the unauthorised use of the Trademark;

    (c)  the Trademark is valid and subsisting and is not subject to, or likely to be subject to, amendment, challenge to validity, removal or surrender, and there are and have been no claims, challenges, disputes or

proceedings pending or threatened, in relation to the ownership, validity or use of the Trademark;

(d)    it is unaware of any infringement or likely infringement of the Trademark;

(e)    so far as it is aware, exploitation of the Trademark will not infringe the rights of any third party.

## 4.    Indemnity

4.1    Either Party shall indemnify the other Party against all liabilities, costs, expenses, damages or losses (including any direct or indirect consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other reasonable professional costs and expenses including attorneys' fees) suffered or incurred by the Assignee arising out of or in connection with:

(a)    any breach by a Party of the warranties in clause 4 above; or

(b)    the enforcement of this Deed.

## 5.    Further assurance

5.1    The Assignor shall, at the Assignee's reasonable cost, perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution or delivery of) all further documents, required by law or which the Assignee requests, to vest in the Assignee the full benefit of the right, title and interest assigned to the Assignee under this Deed, including registration of the Assignee as registered proprietor of the Trademark registrations listed in Annex 1.

5.2    The Assignor shall do the following at the Assignee's cost and direction, pending formal registration or recordal of the assignment of the Trademark registrations listed in Annex 1 to the Assignee:

(a)    if legally required to do so, pay all applicable application, filing, registration, renewal and other fees as they fall due;

(b)    provide the Assignee with all information and other assistance required to enable the Assignee to prepare, file or prosecute applications for registration of the Trademark (including producing, in the appropriate form, any evidence of its use of the Trademark);

(c)    ensure that copies of all correspondence that it, or its agents, receive (including any renewal advice or other notification received from any relevant registry) are promptly delivered to the Assignee; and

(d)    provide the Assignee with all information and other assistance required by the Assignee to conduct, defend or settle any relevant claims, actions or proceedings (including, if requested by the Assignee, bringing



proceedings in its own name or lending its name to any proceedings brought by the Assignee).

5.3     The Assignor shall deliver to the Assignee (or the Assignee's nominated representative) on the date of this Deed all deeds, documents of title, certificates and other files and records (including those of its agents) relating to the Trademark.

5.4     The Assignor appoints the Assignee to be its attorney in its name and on its behalf to execute documents, use the Assignor's name and do all things which are necessary or desirable for the Assignee to obtain for itself or its nominee the full benefit of this Deed. This power of attorney is irrevocable and is given by way of security to secure the performance of the Assignor's obligations under this Deed and the proprietary interest of the Assignee in the Trademark and so long as such obligations of the Assignor remain undischarged, or the Assignee has such interest, the power may not be revoked by the Assignor, save with the consent of the Assignee.

5.5     Without prejudice to Clause 6.4, the Assignee may, in any way it thinks fit and in the name and on behalf of the Assignor:-

    (a)     take any action that this Deed requires the Assignor to take;

    (b)     exercise any rights which this Deed gives to the Assignor; and

    (c)     appoint one or more persons to act as substitute attorney(s) for the Assignor and to exercise such of the powers conferred by this power of attorney as the Assignee thinks fit and revoke such appointment.

5.6     The Assignor undertakes to ratify and confirm everything that the Assignee and any substitute attorney does or arranges or purports to do or arrange in good faith in exercise of any power granted under this clause.

**6.     License**

6.1     The Assignee hereby grants to the Assignor, from the day hereof to the later of 31 October 2022 or the Extended Due Date, as defined in the Escrow Agreement (the "**License Period**"), an exclusive and royalty free licence to use the Trademark in relation to the manufacture, distribution, sale and marketing of footwear within the United States of America.

6.2     The Assignor shall use the Trademarks in the manner and the form consistent with past practices since the date of 2018 Deed, and the Assignor shall observe all reasonable directions given by the Assignee.

6.3     The licence contained in clause 6.1 is personal to the Assignor and the Assignor shall not have the right to assign such licence nor grant any sub-licence thereunder.

6.4     The Assignor shall cease the use of the Trademark on or before 31 October 2022, unless the transaction under Clause 7 is duly completed.

**7.     Undertaking to Transfer**

7.1     The Assignee shall transfer the Trademark to the Assignor under the same terms and conditions set forth in the 2018 Deed, including the agreed consideration, such that the Trademark shall be owned by the Assignor.

7.2     The terms of Clause 6 (Further Assurances) shall apply mutatis mutandis to such transfer.

7.3     Assignee's undertaking under Clause 7.1 shall be conditional upon the Existing Debt being fully paid according to the terms and conditions set forth in Clause 2 and the Assignor not being in breach or default of such terms and conditions.

7.4     In the event that Existing Debt is not repaid in full by the later of 31 October 2022 or the Extended Due Date, as defined in the Escrow Agreement, then the Assignee shall no longer be obliged to abide by Clause 7.1.

7.5     The Assignee will not further encumber the Trademark by granting a security interest, option, mortgage or lien during the License Period.

**8.     Waiver**

No failure or delay by a party to exercise any right or remedy provided under this Deed or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

**9.     Entire agreement – Confidentiality**

9.1     This Deed constitutes the entire agreement between the parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.



9.2    Save and except in the event of either Party defaults under this Deed or becomes legally compelled (pursuant to any law or regulation or the requirements of any stock exchange or other regulatory organization with whose rules such Party is required to comply) the Parties shall keep strictly confidential the terms and conditions of this Deed for the longest duration permissible under the applicable requirements of law.

## 10.  Variation

No variation of this deed shall be effective unless it is in writing and signed by the parties (or their authorised representatives).

## 11.  Severance

11.1    If any provision or part-provision of this Deed is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Deed.

11.2    If any provision or part-provision of this Deed is invalid, illegal or unenforceable, the parties shall negotiate in good faith to amend such provision so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

## 12.  Counterparts

This Deed may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement. No counterpart shall be effective until each party has executed at least one counterpart.

## 13.  Third party rights

No one other than a party to this Deed, their successors and permitted assignees, shall have any right to enforce any of its terms.

## 14.  Governing law and Jurisdiction

14.1    This Deed and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of New York, save and expect for any matters arising out or in connection with the rescission

or the termination of the 2018 Deed, which shall be governed by and construed in accordance with the law of Hong Kong.

[*The rest of this page is intentionally left blank*]

**Annex 1 Trademark**

| Trade Mark | Country | Application No. | File Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK00914629943 | 9/29/2015 | UK00914629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | UK | UK00915054265 | 1/29/2016 | UK00915054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK00003104508 | 4/17/2015 | UK00003104508 | 7/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |
| J/SLIDES | Japan | 2015- 043608 | 5/8/2015 | 5802609 | 10/30/2015 | REGISTERED |
| J/SLIDES | Korea | 40-2015-0037156 | 5/20/2015 | 40-1150538 | 12/23/2015 | REGISTERED |
| J/SLIDES | China | 16749476 | 4/20/2015 | 16749476 | 6/7/2016 | REGISTERED |



**Annex 2 – Existing Debt**

e invoices

| Invoice | Pairs/Model (PRS) | Amount in USD | Shipment | Payment Original Due Date |
|---|---|---|---|---|
| 9000000235 | 3924 | $34,034.40 | 1/7/2022 | 4/7/2022 |
| 9000000237 | 13020 | $138,012.00 | 1/7/2022 | 4/7/2022 |
| 9000000239 | 8820 | $52,920.00 | 1/15/2022 | 4/15/2022 |
| 9000000240 | 17580 | $105,480.00 | 1/16/2022 | 4/16/2022 |
| 9000000245 | 13548 | $101,892.00 | 1/17/2022 | 4/17/2022 |
| 9000000242 | 12900 | $91,293.60 | 1/17/2022 | 4/17/2022 |
| 9000000259 | 6276 | $51,132.00 | 1/26/2022 | 4/26/2022 |
| 9000000253 | 2544 | $31,555.20 | 2/16/2022 | 5/17/2022 |
| 9000000254 | 5460 | $51,436.80 | 2/16/2022 | 5/17/2022 |
| 9000000261 | 2224 | $15,344.00 | 2/2/2022 | 5/3/2022 |
| 9000000264 | 8400 | $72,120.00 | 2/9/2022 | 5/10/2022 |
| 9000000256 | 3524 | $39,771.20 | 2/12/2022 | 5/13/2022 |
| 9000000265 | 6360 | $41,868.00 | 3/17/2022 | 5/16/2022 |
| 9000000266 | 1200 | $13,200.00 | 3/23/2022 | 5/22/2022 |
| 9000000267 | 3948 | $39,547.20 | 3/23/2022 | 5/22/2022 |
| 9000000268 | 13608 | $83,944.80 | 3/24/2022 | 5/23/2022 |
| 9000000269 | 100 | $2,850.00 | 4/8/2022 | 6/7/2022 |
| 9000000270 | 274 | $3,781.20 | 4/8/2022 | 6/7/2022 |
| 9000000271 | 3000 | $21,300.00 | 4/27/2022 | 6/26/2022 |
| 9000000272 | 2796 | $30,756.00 | 5/11/2022 | 7/10/2022 |
| 9000000273 | 16700 | $188,409.40 | 5/11/2022 | 7/10/2022 |
| 9000000274 | 13367 | $178,939.20 | 5/21/2022 | 7/20/2022 |
| 9000000275 | 6 | $811.75 | 5/23/2022 | 7/22/2022 |
| 9000000277 | 11 | $143.60 | 5/23/2022 | 7/22/2022 |
| Total | 159590 | $1,390,542.35 | | |
| | | | | |

Shipped Out Invoices

| Invoice | Pairs/Model (PRS) | Amount in USD | Shipment | Original Payment Due Date |
|---|---|---|---|---|
| 9000000278 | 8451 | $105,661.00 | 6/5/2022 | 8/4/2022 |
| 9000000279 | 2900 | $47,125.00 | 6/9/2022 | 8/8/2022 |
| 9000000282 | 6 | $100.95 | 6/20/2022 | 8/19/2022 |



| 9000000280 | 2850 | $51,727.50 | 6/23/2022 | 8/22/2022 |
|---|---|---|---|---|
| Total | 14207 | $204,614.45 | | |

To Be Shipped Order (FOB China, payment 60 days from shipment)

| Cust.Style | Cust.Color | CUST.ORDER | To Be Shipped Qty (prs) | P/l Unite.Price (USD) | P/l Amount (USD) |
|---|---|---|---|---|---|
| SOCOOL | WHITE EVA | BE22 1454 | 2,400 | 7.000 | 16,800.00 |
| SOCOOL | SAND EVA | BE22 1454 | 1,920 | 7.000 | 13,440.00 |
| SOCOOL | BLACK EVA | BE22 1454 | 2,040 | 7.000 | 14,280.00 |
| SOCOOL | LT PINK EVA | BE22 1454A | 1,200 | 7.000 | 8,400.00 |
| SOCOOL | ORANGE EVA | BE22 1454A | 480 | 7.000 | 3,360.00 |
| SOCOOL | GREY EVA | BE22 1454A | 1,800 | 7.000 | 12,600.00 |
| ROSALIE | BLACK LUXE | JS22 1610 WEB | 120 | 11.000 | 1,320.00 |
| ROSALIE | SAND LUXE | JS22 1610 WEB | 120 | 11.000 | 1,320.00 |
| ROSALIE | WHITE LUXE | JS22 1610 WEB | 120 | 11.000 | 1,320.00 |
| ROSALIE | GOLD LUXE | JS22 1610 WEB | 120 | 11.000 | 1,320.00 |
| NITA | BLACK LUXE | JS22 1658NORDSTROM | 1,200 | 15.500 | 18,600.00 |
| NITA | SAND FAUX SUEDE | JS22 1658NORDSTROM | 1,000 | 15.500 | 15,500.00 |
| NITA | WHITE LUXE | JS22 1658NORDSTROM | 1,400 | 15.500 | 21,700.00 |
| NITA | WHITE LUXE | JS22 1661NORDSTROM | 250 | 15.500 | 3,875.00 |
| NITA | BLACK LUXE | JS22 1661NORDSTROM | 200 | 15.500 | 3,100.00 |
| NITA | SAND FAUX SUEDE | JS22 1661NORDSTROM | 100 | 15.500 | 1,550.00 |
| NOA | TAN FAUX SUEDE | JS22 1665NOR CANADA | 90 | 16.250 | 1,462.50 |
| NOA | SILVER LUXE | JS22 1665NOR CANADA | 60 | 16.250 | 975.00 |
| NOA | BLACK LUXE | JS22 1665NOR CANADA | 100 | 16.250 | 1,625.00 |
| NONA | BLACK LUXE | JS22 1666NOR CANADA | 100 | 18.150 | 1,815.00 |
| NONA | LT GREY FAUX SUEDE | JS22 1666NOR CANADA | 90 | 18.150 | 1,633.50 |
| NONA | KHAKI FAUX SUEDE | JS22 1666NOR CANADA | 60 | 18.150 | 1,089.00 |
| NITA | WHITE LUXE | JS22 1667NOR CANADA | 100 | 15.500 | 1,550.00 |
| NITA | BLACK LUXE | JS22 1667NOR CANADA | 90 | 15.500 | 1,395.00 |
| NITA | SAND FAUX SUEDE | JS22 1667NOR CANADA | 60 | 15.500 | 930.00 |
| MAYA | BLACK LEATHER | JS22 1668 | 564 | 28.800 | 16,243.20 |
| MAYA | BRONZE METALLIC SUEDE | JS22 1668 | 438 | 29.500 | 12,921.00 |
| MAYA | WHITE LEATHER | JS22 1668 | 324 | 28.800 | 9,331.20 |



| MAYA | CACTUS SUEDE | JS22 1668 | 486 | 26.000 | 12,636.00 |
|------|--------------|-----------|-----|--------|-----------|
| MAYA | BLACK LEATHER | JS22 1669WEB | 180 | 28.800 | 5,184.00 |
| MAYA | DARK GREY SUEDE | JS22 1669WEB | 120 | 26.000 | 3,120.00 |
| MAYA | BLACK SUEDE | JS22 1669WEB | 120 | 26.000 | 3,120.00 |
| MAYA | BRONZE METALLIC SUEDE | JS22 1669WEB | 192 | 29.500 | 5,664.00 |
| MAYA | WHITE LEATHER | JS22 1669WEB | 144 | 28.800 | 4,147.20 |
| MAYA | CACTUS SUEDE | JS22 1669WEB | 180 | 26.000 | 4,680.00 |
| MIKA | BLACK BRUSHED SUEDE | JS22 1670 | 180 | 33.000 | 5,940.00 |
| MIKA | BRONZE BRUSH SUEDE | JS22 1670 | 474 | 33.800 | 16,021.20 |
| MIKA | DK GREY BRUSH SUEDE | JS22 1670 | 360 | 33.800 | 12,168.00 |
| MIKA | BLACK DISTRESS LEATHER | JS22 1670 | 180 | 33.200 | 5,976.00 |
| MIKA | COGNAC LEATHER | JS22 1670 | 360 | 33.200 | 11,952.00 |
| NANCEE | GOLD BRUSH SUEDE | JS22 1672 | 546 | 30.250 | 16,516.50 |
| NANCEE | BLACK LEATHER | JS22 1672 | 717 | 30.500 | 21,868.50 |
| NANCEE | WHITE LEATHER | JS22 1672 | 426 | 30.500 | 12,993.00 |
| NANCEE | GOLD BRUSH SUEDE | JS22 1673WEB | 240 | 30.250 | 7,260.00 |
| NANCEE | BLACK LEATHER | JS22 1673WEB | 180 | 30.500 | 5,490.00 |
| NANCEE | WHITE LEATHER | JS22 1673WEB | 360 | 30.500 | 10,980.00 |
| NOCA | NAVY SUEDE | JS22 1674 | 240 | 28.500 | 6,840.00 |
| NOCA | BLACK SUEDE | JS22 1674 | 726 | 25.000 | 18,150.00 |
| NOCA | BLACK LEATHER | JS22 1674 | 600 | 28.500 | 17,100.00 |
| NOCA | CACTUS SUEDE | JS22 1674 | 240 | 25.000 | 6,000.00 |
| NOCA | WHITE LEATHER | JS22 1674 | 600 | 28.500 | 17,100.00 |
| NOCA | GREY LEATHER | JS22 1674 | 360 | 28.500 | 10,260.00 |
| NOCA | BRONZE METALLIC SUEDE | JS22 1674 | 504 | 29.500 | 14,868.00 |
| NOCA | NAVY SUEDE | JS22 1675WEB | 72 | 28.500 | 2,052.00 |
| NOCA | BLACK SUEDE | JS22 1675WEB | 192 | 25.000 | 4,800.00 |
| NOCA | BLACK LEATHER | JS22 1675WEB | 144 | 28.500 | 4,104.00 |
| NOCA | GREY LEATHER | JS22 1675WEB | 120 | 28.500 | 3,420.00 |
| NOCA | CACTUS SUEDE | JS22 1675WEB | 96 | 25.000 | 2,400.00 |
| NOCA | WHITE LEATHER | JS22 1675WEB | 120 | 28.500 | 3,420.00 |
| NOCA | BRONZE METALLIC SUEDE | JS22 1675WEB | 96 | 29.500 | 2,832.00 |
| MAYA | TAUPE LEATHER | JS22 1676 | 300 | 28.800 | 8,640.00 |
| MAYA | TAUPE LEATHER | JS22 1677WEB | 120 | 28.800 | 3,456.00 |



| | | | | | |
|---|---|---|---|---|---|
| NOEL | DK GREY DISTRESS LEATHER | JS22 1678 | 486 | 28.150 | 13,680.90 |
| NOEL | TAUPE METALLIC LEATHER | JS22 1678 | 486 | 28.150 | 13,680.90 |
| NOEL | NATURAL EMBOSS LEATHER | JS22 1678 | 486 | 28.150 | 13,680.90 |
| NOEL | BLACK DISTRESS LEATHER | JS22 1678 | 600 | 28.150 | 16,890.00 |
| NOEL | DK GREY DISTRESS LEATHER | JS22 1679WEB | 144 | 28.150 | 4,053.60 |
| NOEL | TAUPE METALLIC LEATHER | JS22 1679WEB | 180 | 28.150 | 5,067.00 |
| NOEL | NATURAL EMBOSS LEATHER | JS22 1679WEB | 144 | 28.150 | 4,053.60 |
| NOEL | BLACK DISTRESS LEATHER | JS22 1679WEB | 180 | 28.150 | 5,067.00 |
| NINKA WP | BLACK SUEDE WP | JS22 1680 | 606 | 24.800 | 15,028.80 |
| NINKA WP | TAN SUEDE | JS22 1680 | 360 | 24.800 | 8,928.00 |
| NINKA WP | GOLD BRUSH SUEDE | JS22 1680 | 600 | 24.800 | 14,880.00 |
| NINKA WP | PEWTER SUEDE | JS22 1680 | 357 | 24.800 | 8,853.60 |
| NINKA WP | BLACK SUEDE WP | JS22 1681WEB | 72 | 24.800 | 1,785.60 |
| NINKA WP | TAN SUEDE | JS22 1681WEB | 72 | 24.800 | 1,785.60 |
| NINKA WP | PEWTER SUEDE | JS22 1681WEB | 156 | 24.800 | 3,868.80 |
| MIKA | BLACK BRUSHED SUEDE | JS22 1703WEB | 96 | 33.000 | 3,168.00 |
| MIKA | BRONZE BRUSH SUEDE | JS22 1703WEB | 144 | 33.800 | 4,867.20 |
| MIKA | DK GREY BRUSH SUEDE | JS22 1703WEB | 144 | 33.800 | 4,867.20 |
| MIKA | BLACK DISTRESS LEATHER | JS22 1703WEB | 120 | 33.200 | 3,984.00 |
| MIKA | COGNAC LEATHER | JS22 1703WEB | 156 | 33.200 | 5,179.20 |
| SEAN WP | BLACK SUEDE | JS22 1704 | 606 | 27.450 | 16,634.70 |
| SEAN WP | KHAKI SUEDE | JS22 1704 | 354 | 27.450 | 9,717.30 |
| SEAN WP | TAN SUEDE | JS22 1704 | 606 | 27.450 | 16,634.70 |
| SEAN WP | TAUPE SUEDE | JS22 1704 | 606 | 27.450 | 16,634.70 |
| SEAN WP | BLACK SUEDE | JS22 1705WEB | 180 | 27.450 | 4,941.00 |
| SEAN WP | KHAKI SUEDE | JS22 1705WEB | 96 | 27.450 | 2,635.20 |
| SEAN WP | TAN SUEDE | JS22 1705WEB | 180 | 27.450 | 4,941.00 |
| SILVIE | BLACK SUEDE | JS22 1706 | 600 | 28.900 | 17,340.00 |
| SILVIE | DK GREY SUEDE | JS22 1706 | 369 | 28.900 | 10,664.10 |
| SILVIE | NATURAL EMBOSS | JS22 1706 | 369 | 31.800 | 11,734.20 |



| | | | | | |
|---|---|---|---|---|---|
| SILVIE | BLACK PEWTER METALLIC LEATHER | JS22 1706 | 369 | 31.800 | 11,734.20 |
| SILVIE | TAUPE METALLIC LEATHER | JS22 1706 | 486 | 31.800 | 15,454.80 |
| SILVIE | BLACK SUEDE | JS22 1707WEB | 180 | 28.900 | 5,202.00 |
| SILVIE | DK GREY SUEDE | JS22 1707WEB | 108 | 28.900 | 3,121.20 |
| SILVIE | NATURAL EMBOSS | JS22 1707WEB | 144 | 31.800 | 4,579.20 |
| SILVIE | BLACK PEWTER METALLIC LEATHER | JS22 1707WEB | 120 | 31.800 | 3,816.00 |
| SILVIE | TAUPE METALLIC LEATHER | JS22 1707WEB | 144 | 31.800 | 4,579.20 |
| MAGIC WP | BLACK SUEDE WP | JS22 1708 | 573 | 30.800 | 17,648.40 |
| MAGIC WP | COGNAC SUEDE | JS22 1708 | 210 | 30.800 | 6,468.00 |
| MAGIC WP | LT GOLD METALLIC SUEDE | JS22 1708 | 324 | 30.800 | 9,979.20 |
| MAGIC WP | BLACK SUEDE WP | JS22 1709WEB | 156 | 30.800 | 4,804.80 |
| MAGIC WP | COGNAC SUEDE | JS22 1709WEB | 156 | 30.800 | 4,804.80 |
| MAGIC WP | LT GOLD METALLIC SUEDE | JS22 1709WEB | 156 | 30.800 | 4,804.80 |
| NADA | PEWTER METALLIC SUEDE | JS22 1710 | 444 | 28.750 | 12,765.00 |
| NADA | LT GOLD METALLIC SUEDE | JS22 1710 | 444 | 28.750 | 12,765.00 |
| NADA | PEWTER METALLIC SUEDE | JS22 1711WEB | 168 | 28.750 | 4,830.00 |
| NADA | LT GOLD METALLIC SUEDE | JS22 1711WEB | 156 | 28.750 | 4,485.00 |
| ROBERTA | KHAKI NYLON/LUXE | JS22 1712 | 360 | 29.000 | 10,440.00 |
| ROBERTA | BLACK NYLON/LUXE | JS22 1712 | 486 | 29.000 | 14,094.00 |
| ROBERTA | KHAKI NYLON/LUXE | JS22 1713WEB | 120 | 29.000 | 3,480.00 |
| ROBERTA | BLACK NYLON/LUXE | JS22 1713WEB | 120 | 29.000 | 3,480.00 |
| RILEY | BLACK LEATHER | JS22 1714 | 600 | 34.500 | 20,700.00 |
| RILEY | WHITE LEATHER | JS22 1714 | 240 | 34.500 | 8,280.00 |
| RILEY | BLACK LEATHER | JS22 1715WEB | 168 | 34.500 | 5,796.00 |
| RILEY | WHITE LEATHER | JS22 1715WEB | 72 | 34.500 | 2,484.00 |
| WALLY WP | NAVY SUEDE WP | JS22 1716 | 240 | 33.800 | 8,112.00 |
| WALLY WP | GREY SUEDE WP | JS22 1716 | 240 | 33.800 | 8,112.00 |
| WALLY WP | BLACK SUEDE WP | JS22 1716 | 597 | 33.800 | 20,178.60 |
| WALLY WP | TAUPE SUEDE WP | JS22 1716 | 240 | 33.800 | 8,112.00 |



| | | | | | |
|---|---|---|---|---|---|
| WALLY WP | NAVY SUEDE WP | JS22 1717WEB | 120 | 33.800 | 4,056.00 |
| WALLY WP | GREY SUEDE WP | JS22 1717WEB | 120 | 33.800 | 4,056.00 |
| WALLY WP | BLACK SUEDE WP | JS22 1717WEB | 180 | 33.800 | 6,084.00 |
| WALLY WP | TAUPE SUEDE WP | JS22 1717WEB | 120 | 33.800 | 4,056.00 |
| WENDIE | BLACK DISTRESS | JS22 1718 | 894 | 33.000 | 29,502.00 |
| WENDIE | COGNAC DISTRESS | JS22 1718 | 600 | 33.000 | 19,800.00 |
| WENDIE | DK GREY DISTRESS | JS22 1718 | 600 | 33.000 | 19,800.00 |
| WENDIE | BLACK DISTRESS | JS22 1719WEB | 192 | 33.000 | 6,336.00 |
| WENDIE | COGNAC DISTRESS | JS22 1719WEB | 156 | 33.000 | 5,148.00 |
| WENDIE | DK GREY DISTRESS | JS22 1719WEB | 156 | 33.000 | 5,148.00 |
| WENDIE WP | KHAKI SUEDE | JS22 1720 | 180 | 33.000 | 5,940.00 |
| WENDIE WP | TAN SUEDE | JS22 1720 | 180 | 33.000 | 5,940.00 |
| WENDIE WP | KHAKI SUEDE | JS22 1721WEB | 120 | 33.000 | 3,960.00 |
| WENDIE WP | TAN SUEDE | JS22 1721WEB | 120 | 33.000 | 3,960.00 |
| WYONA WP | KHAKI SUEDE WP | JS22 1722 | 486 | 33.850 | 16,451.10 |
| WYONA WP | NAVY SUEDE WP | JS22 1722 | 357 | 33.850 | 12,084.45 |
| WYONA WP | TAUPE SUEDE WP | JS22 1722 | 690 | 33.850 | 23,356.50 |
| WYONA WP | BLACK SUEDE WP | JS22 1722 | 726 | 33.850 | 24,575.10 |
| WYONA WP | KHAKI SUEDE WP | JS22 1723WEB | 156 | 33.850 | 5,280.60 |
| WYONA WP | NAVY SUEDE WP | JS22 1723WEB | 120 | 33.850 | 4,062.00 |
| WYONA WP | TAUPE SUEDE WP | JS22 1723WEB | 156 | 33.850 | 5,280.60 |
| WYONA WP | BLACK SUEDE WP | JS22 1723WEB | 192 | 33.850 | 6,499.20 |
| ROGER | NATURAL EMBOSS | JS22 1724 | 336 | 31.800 | 10,684.80 |
| ROGER | KHAKI SUEDE/LEATHER | JS22 1724 | 429 | 29.200 | 12,526.80 |
| ROGER | SAND SUEDE/LEATHER | JS22 1724 | 372 | 29.200 | 10,862.40 |
| ROGER | BLACK SUEDE/LEATHER | JS22 1724 | 699 | 29.200 | 20,410.80 |
| ROGER | NATURAL EMBOSS | JS22 1725WEB | 180 | 31.800 | 5,724.00 |
| ROGER | KHAKI SUEDE/LEATHER | JS22 1725WEB | 156 | 29.200 | 4,555.20 |
| ROGER | SAND SUEDE/LEATHER | JS22 1725WEB | 120 | 29.200 | 3,504.00 |
| ROGER | BLACK SUEDE/LEATHER | JS22 1725WEB | 168 | 29.200 | 4,905.60 |
| VICKY | BLACK LEATHER | JS22 1726 | 234 | 40.500 | 9,477.00 |
| VICKY | BLACK LEATHER | JS22 1727WEB | 126 | 40.500 | 5,103.00 |
| VICTORIA | BLACK LEATHER | JS22 1728 | 144 | 50.500 | 7,272.00 |



| | | | | | |
|---|---|---|---|---|---|
| VICTORIA | BLACK LEATHER | JS22 1729WEB | 126 | 50.500 | 6,363.00 |
| VICEROY | BLACK LEATHER | JS22 1730 | 234 | 49.000 | 11,466.00 |
| VICEROY | BLACK LEATHER | JS22 1731WEB | 126 | 49.000 | 6,174.00 |
| NICO | LT GOLD METALLIC SUEDE | JS22 1736 | 180 | 38.500 | 6,930.00 |
| NICO | BLACK LEATHER | JS22 1736 | 180 | 38.500 | 6,930.00 |
| NICO | LT GOLD METALLIC SUEDE | JS22 1737WEB | 120 | 38.500 | 4,620.00 |
| NICO | BLACK LEATHER | JS22 1737WEB | 120 | 38.500 | 4,620.00 |
| NOCA | WHITE LEATHER | JS22 1740HERMANNS | 201 | 28.500 | 5,728.50 |
| HARLEY | GREY/PEACH KNIT | US22 1695 | 300 | 15.650 | 4,695.00 |
| HARLEY | OFF WHITE/PURPLE KNIT | US22 1695 | 300 | 15.650 | 4,695.00 |
| HARLEY | OFF WHITE/PURPLE KNIT | US22 1696VON MAUR | 312 | 15.650 | 4,882.80 |
| HARLEY | GREY/PEACH KNIT | US22 1697WEB | 72 | 15.650 | 1,126.80 |
| HARLEY | OFF WHITE/PURPLE KNIT | US22 1697WEB | 72 | 15.650 | 1,126.80 |
| WREN | GREEN/ORANGE 2 TONE KNIT | US22 1698 | 180 | 15.650 | 2,817.00 |
| WREN | BLACK/BLUE 2 TONE KNIT | US22 1698 | 1,440 | 15.650 | 22,536.00 |
| WREN | WHITE 2 TONE KNIT | US22 1698 | 240 | 15.650 | 3,756.00 |
| WREN | BLACK 2 TONE KNIT | US22 1698 | 240 | 15.650 | 3,756.00 |
| WREN | GREEN/ORANGE 2 TONE KNIT | US22 1700WEB | 72 | 15.650 | 1,126.80 |
| WREN | BLACK/BLUE 2 TONE KNIT | US22 1700WEB | 72 | 15.650 | 1,126.80 |
| WREN | WHITE 2 TONE KNIT | US22 1700WEB | 120 | 15.650 | 1,878.00 |
| WREN | BLACK 2 TONE KNIT | US22 1700WEB | 120 | 15.650 | 1,878.00 |
| HOLLY | DK GREY/LT GREY KNIT | US22 1701 | 360 | 15.650 | 5,634.00 |
| HOLLY | WHITE/BLACK KNIT | US22 1701 | 360 | 15.650 | 5,634.00 |
| HOLLY | DK GREY/LT GREY KNIT | US22 1702WEB | 84 | 15.650 | 1,314.60 |
| HOLLY | WHITE/BLACK KNIT | US22 1702WEB | 84 | 15.650 | 1,314.60 |
| WENDEE | WHITE KNIT | US22 1732 | 180 | 16.200 | 2,916.00 |
| WENDEE | PINK KNIT | US22 1732 | 180 | 16.200 | 2,916.00 |
| WENDEE | BLACK KNIT | US22 1732 | 180 | 16.200 | 2,916.00 |
| WENDEE | WHITE KNIT | US22 1733WEB | 84 | 16.200 | 1,360.80 |
| WENDEE | PINK KNIT | US22 1733WEB | 84 | 16.200 | 1,360.80 |
| WENDEE | BLACK KNIT | US22 1733WEB | 84 | 16.200 | 1,360.80 |
| WILL | SILVER NYLON | US22 1734 | 180 | 21.600 | 3,888.00 |



| | | | | | |
|---|---|---|---|---|---|
| WILL | BLACK NYLON | US22 1734 | 180 | 21.600 | 3,888.00 |
| WILL | KHAKI NYLON | US22 1734 | 180 | 21.600 | 3,888.00 |
| WILL | SILVER NYLON | US22 1735WEB | 72 | 21.600 | 1,555.20 |
| WILL | BLACK NYLON | US22 1735WEB | 96 | 21.600 | 2,073.60 |
| WILL | KHAKI NYLON | US22 1735WEB | 72 | 21.600 | 1,555.20 |
| HEARLD | BLACK KNIT | US22 1738 | 180 | 18.600 | 3,348.00 |
| HEARLD | KHAKI KNIT | US22 1738 | 180 | 18.600 | 3,348.00 |
| HEARLD | BLACK KNIT | US22 1739WEB | 84 | 18.600 | 1,562.40 |
| HEARLD | KHAKI KNIT | US22 1739WEB | 84 | 18.600 | 1,562.40 |
| WREN | BLACK 2 TONE KNIT | US22 1699VON MAUR | 480 | 15.650 | 7,512.00 |
| WREN | BLACK/BLUE 2 TONE KNIT | US22 1699VON MAUR | 108 | 15.650 | 1,690.20 |
| HANAH | GREY KNIT | US22 1692 | 300 | 14.500 | 4,350.00 |
| HANAH | GREY KNIT | US22 1694WEB | 96 | 14.500 | 1,392.00 |
| HANAH | BLACK KNIT | US22 1692 | 324 | 14.500 | 4,698.00 |
| HANAH | BLACK KNIT | US22 1694WEB | 156 | 14.500 | 2,262.00 |
| HANAH | KHAKI KNIT | US22 1692 | 300 | 14.500 | 4,350.00 |
| HANAH | KHAKI KNIT | US22 1694WEB | 84 | 14.500 | 1,218.00 |
| HANAH | CAMO/KHAKI KNIT | US22 1692 | 180 | 14.500 | 2,610.00 |
| HANAH | CAMO/KHAKI KNIT | US22 1694WEB | 96 | 14.500 | 1,392.00 |
| HANAH | WHITE KNIT | US22 1692 | 240 | 14.500 | 3,480.00 |
| HANAH | WHITE KNIT | US22 1694WEB | 120 | 14.500 | 1,740.00 |
| HANAH | WHITE KNIT | US22 1693VON MAUR | 480 | 14.500 | 6,960.00 |
| Total : | | | 64,261 | | 1,512,655.05 |

Additional Charge

| Debit note | Description | Amount |
|---|---|---|
| DN2022-052 | 5 pcs of Suitcase | $ 375.00 |
| DN2022-058 | Mould charge | $ 88,827.31 |
| DN2022-060 | Sample Fee for AW22 | $ 43,856.00 |
| Grand total : | | $ 133,058.31 |

Interest Charge

| DN2022-051 | 10% Interest | $ 27.25 |
|---|---|---|
| DN2022-055 | 10% Interest | $ 900.68 |
| DN2022-057 | 10% Interest | $ 1,580.17 |



| DN2022-059 | Extra 10 % interest for delayed payment | $ 24,343.18 |
| DN2022-061 | 10% Interest for unshipped orders (60 days) | $ 62,163.90 |
| Grand total : | | $ 88,087.25 |



**IN WITNESS** whereof this Deed has been executed by the parties as a deed on the date first above written.

Executed as a deed by                                    )
                                                         )
for and on behalf of                                     )
**STYLELINE STUDIOS LLC**                                )
in the presence of:                                      )


Executed as a deed by                                    )
                                                         )
for and on behalf of                                     )
**STYLELINE STUDIOS**                                    )
**INTERNATIONAL LIMITED**
in the presence of:                                      )

*For and on behalf of*
Styleline Studios International Limited

.................................................
*Authorized Signature(s)*

Execution copy

# ESCROW AGREEMENT

ESCROW AGREEMENT (the "Escrow Agreement") dated the 12nd day of August 2022 entered into by and among

(a)  Styleline Studios, LLC (the "Depositor"), a New York limited liability company, Number 421900, whose registered office is at 27 West 24 St., Suite 800 New York, NY 10010, and

(b)  Styleline Studios International Limited ("Assignee"), incorporated and registered in Hong Kong with CR Number 2194894 whose registered office is at Unit 7F-15, 7/F., Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R., and

(c)  Becker, LLC, 354 Eisenhower Parkway, Plaza II Suite 1500, Livingston, New Jersey 07039 (the "Escrow Agent")

Depositor and Assignee are hereinafter referred to as the "Parties."

**WHEREAS,** Depositor has undertaken to discharge in full by not later than the Extended Due Date, as hereinafter defined, its Existing Debt, including interest and costs, vis-à-vis the Assignee as set forth in Annex 2 to the Deed (as such term is defined below);

**WHEREAS,** according to clause 7 of a trademark assignment deed (the "Deed") entered into by and between the Assignee and the Depositor on August 10, 2022, the Assignee has undertaken, subject the terms and conditions set forth therein, including the repayment of the Existing Debt in full by and not later than the Extended Due Date, to transfer and assign to the Depositor the Trademarks scheduled in Annex 1 to the Deed;

**WHEREAS,** in order to secure the fulfillment of the obligation undertaken by the Assignee pursuant to clause 7 of the Deed, the Parties hereby agree to deliver to Escrow Agent United States Patent and Trademark Office form PTO 1594 for the intellectual property registrations (the "Escrow") set forth in Exhibit A; and

**WHEREAS,** Escrow Agent agrees to accept and hold such Escrow pursuant to the terms of this Escrow Agreement;

**NOW THEREFORE,** in consideration of the mutual promises and agreements herein contained, it is agreed as follows:-

1.  Escrow Agent acknowledges receipt of the Escrow from Depositor.

2.  The parties acknowledge that:

a. Escrow Agent is not a party to, and is not bound by or charged with notice of any agreements between the parties other than this Escrow Agreement.

b. Escrow Agent is acting solely as a stakeholder and depositary and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness, or validity of the identity or authority of any person executing any documents including this Escrow Agreement.

3. The Parties jointly and severally agree to indemnify, defend, save and hold harmless Escrow Agent from and against any loss, cost, damage and expense including attorney's fee and court costs (collectively, "**Expenses**") incurred by Escrow Agent in connection with, or in any way arising out of this Escrow Agreement, other than expenses resulting from the Escrow Agent's own gross negligence or willful misconduct. In furtherance of the indemnity obligations under this Escrow Agreement, Escrow Agent is granted a lien upon the Escrow for its Expenses which lien shall survive any judgment entered in any action arising under this Escrow Agreement. Upon its release of the Escrow or where the Escrow has been placed in the custody of the Court, Escrow Agent shall be released and discharged from all obligations imposed by the terms of this Escrow Agreement saving and reserving to Escrow Agent its lien upon the Escrow as aforesaid for its Expenses, which lien shall be payable to Escrow Agent equally by the Parties before disbursement of the Escrow.

4. In the event the Existing Debt (a) is not paid in full to the Assignee by the close of business (five PM EDT) on the Extended Due Date, as hereinafter defined, Escrow Agent is hereby irrevocably and unconditionally authorized to release the Escrow to the Assignee; or (b) is paid in full to the Assignee by the close of business (five PM EDT) on the Extended Due Date Escrow Agent is hereby irrevocably and unconditionally authorized to release the Escrow to the Depositor. Either of such releases is to be regarded as absolute, and irrespective of any disputes between the Parties, unless there is a court order preventing release and triggered by an affidavit by the Depositor or the Assignee (as the case may be) on or before the Extended Due Date which states that each condition set forth in clause 7 of the Deed have been or have not been (as the case may be) been timely and duly fulfilled.

5. Without prejudice to paragraph 4 above, the Escrow Agent shall release the Escrow according to the directions which shall be jointly given in a form reasonably satisfactory to Escrow Agent by the Parties from time to time.

6. The Escrow Agent shall be entitled to rely upon any written direction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other document including such documents as are transmitted by email or facsimile presented to Escrow Agent for any action required by Escrow Agent authorized or required under this Escrow Agreement or the Stipulation.

7. Subject to paragraph 4 above, the Parties agree that in the event that Escrow Agent receives any demand or is given any instruction regarding the release of the Escrow that is inconsistent

(c) This Escrow Agreement may be executed in counterparts.

(d) Governing Law.  This Escrow Agreement shall be governed by and constructed in accordance with the laws of the State of New York.  Venue of any case or controversy arising under or pursuant to this Escrow Agreement shall lie in the state or federal courts located in the State, City and County of the State of New York.

(e) Any notice required or sought to be delivered hereunder shall be deemed delivered as follows:

    a.   if sent by courier for overnight delivery, the business day after it shall have been delivered to the custody of the courier for delivery in the United States and the fourth business day after delivery to the custody of the courier if delivery is for delivery outside of the United States; or

    b.   if hand delivered, upon delivery.

    c.   notices under this Escrow Agreement shall be sent as follows:

        To Escrow Agent at: Becker LLC, 354 Eisenhower Parkway, Plaza II Suite 1500, Livingston, New Jersey 07039Attn:  Eric Perkins, Esq.,

        To Depositor at suite 800, 27 West 24th Street, New York, New York 10010 with a copy to Siegel & Reiner LLP, 130 East 59th Street, New York, New York 10022.

        To the Assignee: Hong Kong with CR Number 2194884 whose registered office is at Unit 7F-15, 7/F., Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories,  Hong Kong S.A.R., with a copy to Marco Pocci, MB Kemp LLP, Via Durini 4, Milan 20122, Italy.

(f) Facsimile Signature.  For the purposes of this Escrow Agreement, facsimile signatures will be considered as original signatures and will be relied upon as if they were original signatures.

(g) This Agreement constitutes the entire agreement between the parties concerning the holding of the Escrow by the Escrow Agent.  This Escrow Agreement shall not be modified except by an agreement, in writing, signed by the Parties and Escrow Agent.  The use of any terms in the singular tense shall be deemed to be used in the plural tense when the sense of this Escrow Agreement so requires.

(h) Capitalized terms not defined in this Escrow Agreement shall have the meanings ascribed to them in the Deed.



Execution Copy

Signature Page Follows

IN WITNESS WHEREOF, the Parties have duly executed this Escrow Agreement as of the date hereinabove first written.

Styleline Studios International Limited

For and on behalf of
Styleline Studios International Limited

Authorized Signature(s)

By: _

    Tina Ey Vean Liu, Director

Styleline Studios LLC

By: _____

    Jay Litvack, Managing Member

Escrow Agent

Becker, LLC

By: _____

    Name: Eric R. Perkins, Esq.
    Title: Partner





Exhibit A

FORM PTO 1594

Page 7 of 7

## DEED OF ASSIGNMENT

**THIS AGREEMENT** is made on   12th        day of   August   2022

**BETWEEN**

(1)   **STYLELINE STUDIOS, LLC** a New York limited liability company organized whose registered office is at 27 West 24 St., Suite 800, New York, NY 10010 (the "**Assignor**"); and

(2)   **STYLELINE STUDIOS INTERNATIONAL LIMITED** a company organized and existing under the laws of Hong Kong S.A.R. whose registered office is at Unit 7F-15, 7/F, Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R. (the "**Assignee**").

**WHEREAS:**

A.    Pursuant to an agreement of 12 August 2022 (the "**Main Agreement**") the Assignor agrees to assign to the Assignee all the Assignor's right, title and interest in the registered trademark details of which are set out in the schedule hereto (the "**Trademark**") together with the goodwill in the business attached to the Trademark; and the Assignee accepts the assignment.

B.    The parties have agreed to enter into this deed to assign the Trademark to the Assignee on the terms and conditions set out in this deed.

**NOW THIS AGREEMENT WITNESSES** as follow:

1.    In consideration of the promises and covenants contained herein as well as all other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the Assignor hereby sells, assigns, transfers, and conveys to the Assignee:

(a)    the whole and complete right, title and interest in and to the Trademark that has been granted and may be granted in the United States and any foreign countries (including all common law rights connected therewith) together with all and any goodwill relating to any goods and/or services in respect of which the Trademark are registered;

(b)    the right to claim to be the proprietor of the Trademark for the purpose of making further application(s) to register them as trade mark;

(c)    the right to institute and maintain in its own name proceedings and recover damages in respect of any acts whersoever or whensoever occurring which constitute infringement of the Trademark or passing off of the goodwill

- 1 -

**TRADEMARK**
**REEL: 007909 FRAME: 0818**

associated with the Trademark or any unfair competition in relation to the said goodwill or the Trademark.

all of which to hold unto the Assignee absolutely (the "**Assignment**").

2.    The Assignor warrants that:

(a)    the Trademark are legally and beneficially vested in the Assignor in order to enable it to carry out its obligations in this Assignment and that, to the best of its knowledge, no third party has any legal or other rights which would enable such third party to interfere with the use by the Assignee of the Trademark;

(b)    the Assignor has not done or omitted to do any act or thing whereby the Trademark may have become encumbered or otherwise prejudicially affected;

(c)    the Assignor has not granted or agreed to grant any license of the Trademark to any party other than the Assignee;

(d)    the exploitation of the Trademark by or with the consent of the Assignee will not infringe any rights of any third party; and

(e)    the Assignor will not from the date of this Assignment use the Trademark in any way except as is expressly authorized in writing by the Assignee.

3.    The Assignor hereby covenants with the Assignee that it will, at the cost of the Assignee, execute any documentation or do any act or thing reasonably necessary or desirable for the purpose of giving effect to this Assignment or registering the Assignee as the registered proprietor of the Trademark.

4.    The Assignor authorizes the United States Patent and Trademark Office and any other applicable jurisdictions outside the United States to record the transfer of the Trademark set forth in the schedule attached to Assignee as the recipient of Assignor's entire right, title, and interest therein.

5.    Nothing in this agreement is intended to confer any benefit on any third party (whether referred to by name, class, description or otherwise) or any right to enforce a term contained in this agreement.

6.    This Assignment and its terms shall be governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region of the People's Republic of China and the parties agree to submit to the non-exclusive jurisdiction of the Hong Kong courts as regards any claim or matter arising in relation to this Assignment.

TRADEMARK
REEL: 007909 FRAME: 0819

**IN WITNESS WHEREOF** this Assignment has been executed by or on behalf of the parties hereto on the date first above written.

SIGNED by                                                              )
Tina Lin Ey-Vean, Member                                              )
                                                                       )
for an on behalf of the Assignor                                      )
STYLELINE STUDIOS, LLC                                                )

SIGNED by                                                              )
Hau Yuen Ping, Candy, attorney-in-fact                                )
                                                                       )
for and on behalf of the Assignee                                     )
STYLELINE STUDIOS INTERNATIONAL                                       )
LIMITED

Schedule – The Trademark

| Trade Mark | Country | Application No. | File Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK 00914629943 | 9/29/2015 | UK 00914629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | UK | UK 00915054265 | 1/29/2016 | UK 00915054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK 00003104508 | 4/17/2015 | UK 00003104508 | 7/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |

RECORDED: 11/17/2022

**TRADEMARK
REEL: 007909 FRAME: 0821**



ATTORNEYS AT LAW

ERIC R. PERKINS

MEMBER OF NJ BAR

Becker LLC
Eisenhower Plaza Two
354 Eisenhower Parkway
Suite 1500
Livingston, New Jersey 07039

Direct:      (973) 251-8925
Main:       (973) 422-1100
Facsimile:  (973) 422-9122

eperkins@becker.legal

November 16, 2022

**VIA FEDERAL EXPRESS & EMAIL**
Irwin Siegel, Esq.
Siegel & Reiner LLP
130 East 59th Street
New York, New York  10022
isiegel@siegelreiner.com

Marco Pocci
Kemp LLC
5/F
Via Durini 4
20122 Milan, Italy
marco.pocci@kempllp.com

Re:  Styletine Studios International Limited – J/Slides Trademark

Gentlemen:

Attached please find the Notice from Styletine Studios International Limited received from the Assignee under the Escrow Agreement between the parties demanding the immediate transmittal of the USPTO Form 1594 reflecting the assignment of the J/Slides Trademark I am currently holding in Escrow on the basis of non-payment of the outstanding debt.  This together with emails from Styleline Studios LLC asking for extension of time for payment, it is clear that the precondition to releasing the USPTO Form 1594 to the Assignee has been met. Therefore, in accordance with Paragraph 4 of the Escrow Agreement, since there has been no payment made on the outstanding debt which was that subject of the Deed of Assignment, and the timeframes outlined in the Escrow have been met, as well as the attached Notice is in compliance therewith, I am hereby forwarding to Marco Pocci, attorney for Styletine Studios International Limited, the USPTO Form 1594 for the registration of the assignment  trademark J/Slides.  With this transmittal I am completing my responsibilities and duties as Escrow Agent under the Agreement.

Very truly yours,
BECKER LLC

Eric R. Perkins

ERP/ma
enclosures

NEW  YORK  •  NEW  JERSEY  •  PENNSYLVANIA  •  CALIFORNIA
www.becker.legal

900732744   11/17/2022

## TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM768527

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| STYLELINE STUDIOS, LLC | | 08/12/2022 | Limited Liability Company: |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | STYLELINE STUDIOS INTERNATIONAL LIMITED |
| Street Address: | 2-12 Au Pui Wan Street, Fo Tan, Shatin |
| Internal Address: | Unit 7F-15, 7/F, Valiant Industrial Centre |
| City: | New Territores |
| State/Country: | HONG KONG |
| Entity Type: | Limited Company: HONG KONG |

### PROPERTY NUMBERS Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 4746857 | J/SLIDES |

### CORRESPONDENCE DATA

Fax Number:     7035732514

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

Phone:     2023718976
Email:     firm@rabinberdo.com
Correspondent Name:     RABIN & BERDO, P.C.
Address Line 1:     2650 Park Tower Drive, Suite 800
Address Line 4:     Vienna, VIRGINIA 22180

| ATTORNEY DOCKET NUMBER: | MOLL-103TM |
|---|---|
| NAME OF SUBMITTER: | Hui Zhang |
| SIGNATURE: | /Hui Zhang/ |
| DATE SIGNED: | 11/17/2022 |

OP $40.00 4746857

Total Attachments: 4
source=MOLL-103TM_Asgn_4746857#page1.tif
source=MOLL-103TM_Asgn_4746857#page2.tif
source=MOLL-103TM_Asgn_4746857#page3.tif
source=MOLL-103TM_Asgn_4746857#page4.tif

## DEED OF ASSIGNMENT

**THIS AGREEMENT** is made on   12th      day of   August  2022

**BETWEEN**

(1)   **STYLELINE STUDIOS, LLC** a New York limited liability company organized whose registered office is at 27 West 24 St., Suite 800, New York, NY 10010 (the "**Assignor**"); and

(2)   **STYLELINE STUDIOS INTERNATIONAL LIMITED** a company organized and existing under the laws of Hong Kong S.A.R. whose registered office is at Unit 7F-15, 7/F, Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R. (the "**Assignee**").

**WHEREAS:**

A.   Pursuant to an agreement of 12 August 2022 (the "**Main Agreement**") the Assignor agrees to assign to the Assignee all the Assignor's right, title and interest in the registered trademark details of which are set out in the schedule hereto (the "**Trademark**") together with the goodwill in the business attached to the Trademark; and the Assignee accepts the assignment.

B.   The parties have agreed to enter into this deed to assign the Trademark to the Assignee on the terms and conditions set out in this deed.

**NOW THIS AGREEMENT WITNESSES** as follow:

1.     In consideration of the promises and covenants contained herein as well as all other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the Assignor hereby sells, assigns, transfers, and conveys to the Assignee:

(a)   the whole and complete right, title and interest in and to the Trademark that has been granted and may be granted in the United States and any foreign countries (including all common law rights connected therewith) together with all and any goodwill relating to any goods and/or services in respect of which the Trademark are registered;

(b)   the right to claim to be the proprietor of the Trademark for the purpose of making further application(s) to register them as trade mark;

(c)   the right to institute and maintain in its own name proceedings and recover damages in respect of any acts whersoever or whensoever occurring which constitute infringement of the Trademark or passing off of the goodwill

- 1 -

**TRADEMARK
REEL: 007909 FRAME: 0818**

associated with the Trademark or any unfair competition in relation to the said goodwill or the Trademark,

all of which to hold unto the Assignee absolutely (the "**Assignment**").

2.      The Assignor warrants that:

(a)      the Trademark are legally and beneficially vested in the Assignor in order to enable it to carry out its obligations in this Assignment and that, to the best of its knowledge, no third party has any legal or other rights which would enable such third party to interfere with the use by the Assignee of the Trademark;

(b)      the Assignor has not done or omitted to do any act or thing whereby the Trademark may have become encumbered or otherwise prejudicially affected;

(c)      the Assignor has not granted or agreed to grant any license of the Trademark to any party other than the Assignee;

(d)      the exploitation of the Trademark by or with the consent of the Assignee will not infringe any rights of any third party; and

(e)      the Assignor will not from the date of this Assignment use the Trademark in any way except as is expressly authorized in writing by the Assignee.

3.      The Assignor hereby covenants with the Assignee that it will, at the cost of the Assignee, execute any documentation or do any act or thing reasonably necessary or desirable for the purpose of giving effect to this Assignment or registering the Assignee as the registered proprietor of the Trademark

4.      The Assignor authorizes the United States Patent and Trademark Office and any other applicable jurisdictions outside the United States to record the transfer of the Trademark set forth in the schedule attached to Assignee as the recipient of Assignor's entire right, title, and interest therein.

5.      Nothing in this agreement is intended to confer any benefit on any third party (whether referred to by name, class, description or otherwise) or any right to enforce a term contained in this agreement.

6.      This Assignment and its terms shall be governed by and construed in accordance with the laws of the Hong Kong Special Administrative Region of the People's Republic of China and the parties agree to submit to the non-exclusive jurisdiction of the Hong Kong courts as regards any claim or matter arising in relation to this Assignment.

**TRADEMARK**
**REEL: 007909 FRAME: 0819**

**IN WITNESS WHEREOF** this Assignment has been executed by or on behalf of the parties hereto on the date first above written.

SIGNED by                                                               )
**Tina Liu Ey-Vean, Member**                                            )
                                                                        )
for an on behalf of the Assignor                                        )
**STYLELINE STUDIOS, LLC**                                              )

SIGNED by                                                               )
**Hau  Yuen Ping, Candy, attorney- in- fact**                          )
                                                                        )
for and on behalf of the Assignee                                       )
**STYLELINE STUDIOS INTERNATIONAL**                                     )
**LIMITED**

Schedule - The Trademark

| Trade Mark | Country | Application No. | File Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK 00914629943 | 9/29/2015 | UK 00914629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | UK | UK 00915054265 | 1/29/2016 | UK 00915054265 | 7/29/2016 | REGISTERED |
| J/SLIDES | UK | UK 00003104508 | 4/17/2015 | UK 00003104508 | 7/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |

- 4 -

**TRADEMARK
REEL: 007909 FRAME: 0821**

**From:** Dimitri Mavridakis <dimitrimavridakis@gmail.com>
**Sent:** Thursday, February 1, 2024 3:37 PM
**To:** Marco Pocci; Eric R Perkins
**Subject:** Fwd: Members of the company meeting held Feb 1 2024
**Attachments:** styline studios 1 feb 24.pdf

FYI

Begin forwarded message:

**From:** Dimitri Mavridakis <dimitrimavridakis@gmail.com>
**Date:** February 1, 2024 at 3:35:16 PM EST
**To:** Tina Liu <tinaevliu@gmail.com>, Jay <jay@jslidesfootwear.com>, DIMITRIMAVRIDAKIS@gmail.com
**Subject:** Fwd: Members of the company meeting held Feb 1 2024

The meeting was held in accordance with the Operating Agreement.  All Members of the Company were present. The resolution attached was adopted by a vote of 2 in favor and 1 against.  The Company will move forward accordingly.

# STYLELINE STUDIOS LLC

### 27 WEST 24TH ST, SUITE 800, NEW YORK, NY10010

Resolution presented at meeting of Members held Feb 1, 2024

Whereas, Members Tina Liu and Dimitri Mavridakis called a meeting of the Members of the Company for February 1, 2024 by TEAMS video conference, upon notice to all Members of the Company in accordance with the Operating Agreement of the Company (the "Notice") and said Notice having been served on Jay Litvack in compliance with the applicable provisions of the Operating Agreement of the Company, a copy of the Notice, being attached hereto as Schedule 1; and

whereas, all Members having been given notice of the Meeting, said meeting was held at the time and place set forth in the Notice; and

whereas, the Members reviewed the current financial condition of the Company, including the default notice received from the Company's secured creditor, Hildun Corporation; and

whereas, the Members determined that the Company has been and is currently insolvent and that it is in the best interests of the Company and its creditors that the Company undertake an orderly liquidation of its assets and liabilities and thereafter be dissolved.

Now therefore, be it

Resolved that the Company undertake an orderly liquidation of its assets and liabilities; and be it further

Resolved that Dimitri Mavridakis be and is hereby authorized, directed and empowered to take all requisite actions to liquidate the assets and liabilities of the Company, including but not limited to filing for protection under the applicable provisions of the U.S. Bankruptcy Code as he, in his business judgment shall determine, as well as retain Bankruptcy Counsel for the Company, and execute such documents and retainer agreements as necessary to carry out the liquidation of the Company; and be it further

Resolved that upon completion of the liquidation of the assets and liabilities of the Company, that the Company be dissolved.

January 18, 2024

Dear Members,

This correspondence shall serve to inform that **STYLELINE STUDIOS, LLC** (the "Company") will hold a Special Meeting of its Members on **February 1st, 2024, at 10 AM Eastern Time, at the Company's headquarters, located at 27 West 24th Street, suite 800 New York, NY 10010.** Remote attendance will also be permitted via the following dial-in numbers: Microsoft Teams meeting ID:9393320462026 Passcode: sthWGx

The Special Meeting is being called by two current Members, Tina Liu (holding a 33.33% membership interest of the Company) and Dimitri Mavridakis (holding a 33.33% membership interest of the Company), in accordance with Section 6.2 of the Company's Operating Agreement.

The Special meeting is being called for the purpose of reviewing the current operations of the Company and discuss the current financial status of the Company to reach consensus on a addressing the current financial needs of the Company.

Your continued participation, support and interest in the Company is sincerely appreciated.

Sincerely,

Tina Liu, Member

Dimitri Mavridakis

## NOTICE OF SPECIAL MEETING OF MEMBERS
## OF STYLELINE STUDIOS, LLC

You are invited to attend a special meeting of the Members (the "Special Meeting") of BIOFARMA US, LLC, a New Jersey limited liability company (the "Company"), to be held on **February 1st, 2024 at 10 AM Eastern Time, at the Company's headquarters, located at 27 West 24th Street, suite 800 New York, NY 10010.** Remote attendance will also be permitted via the following dial-in numbers: Microsoft Teams meeting ID:9393320462026 Passcode: sthWGx.

Only Members of record at the close of business on January 16, 2024, will be entitled to vote at the Special Meeting or at any postponements or adjournments thereof. A list of Members entitled to vote at the Special Meeting will be located at the Company's headquarters referenced above and will remain available for inspection until and during the Special Meeting.

The Special Meeting is being held to consider and vote on matters by two current Members, Tina Liu (holding a 33.33% membership interest of the Company) and Dimitri Mavridakis (holding a 33.33% membership interest of the Company), in accordance with Section 6.2 of the Company's Operating Agreement.

The Special meeting is being called for the purpose of reviewing the current operations of the Company, to discuss the current financial status of the Company to reach consensus on a addressing the current financial needs of the Company and take such actions as may be raised by the Members in accordance with the Operating Agreement of the Company.

Universal International Max Limited
Room 1621
22/A, Star House
3, Salisbury Road
Tsim Sha Tsui
Kowloon
Hong Kong S.A.R.

26 January 2024

_To the kind attention of_
_Mr. Dodo Chan (dodo.chan@hkorientalmax.com)_
_and_
_Ms. Michelle Liu (bund18@unimax.com)_

Our Ref: : 154

Your Ref

Name : Marco Pocci

T : +44 2036 210651

E : Marco.pocci@kempllp.com

Dear Sirs,

**Re:    J/Slides trademark**

We act for Styleline Studios International Limited (**"Our Client"**), and we refer to our cease-and-desist letter dated 5 January 2024 (the **"C&D Letter"**), the receipt we act for Styleline Studios International Limited (**"Our Client"**), and we refer to our letter dated 5 January 2012 (the **"C&D Letter"**), whereby we have required to cease and desist any manufacturing activities of footwear bearing J/SLIDES trademark, unless authorized by Our Client.

All capitalized term which are not defined in this letter shall have the same meaning ascribed thereto in the C&D Letter.

Despite initial appearances that you would comply with our request under the C&D Letter, notably you expressly required written authorization to manufacture and ship limited volume of Goods in the styles and quantities as indicated in Annex 1 and 2 in our subsequent letter of 12 January 2024.9The **"Authorization Letter"**, and this serves as acknowledgement and confirmation by you of Our Client's rights over the J/SLIDES trademark), we have now evidence that you



12 January 2024
Page 2 of 3

have failed to abide by the C&D Letter and that manufacturing Goods falling outside the Authorization Letter is currently under way by you, upon instruction of Styleline Studio LLC.

We must reiterate that Our Client is the sole legal and beneficial owner of, and owns all the rights, title, and interests in and to the trademark J/SLIDES and all common law rights therein and all applications and registrations as specified in the C&D Letter, including United States and China, as evidenced in the enclosed certificates.

This letter serves a <u>last formal notice</u> to inform you that Styleline Studio LLC has been using the Trademark registrations in violation of Our Client's rights to such intellectual property rights and has no rights whatsoever in respect of the Trademark.

Accordingly, any authorization/request from Styleline Studio LLC to manufacture the Goods is a blatant infringement to Our Clients rights.

Equally, any activity carried out by your company to use or apply the Trademark to the Goods would amount to infringement to Our Client rights, your company shall be held accountable for counterfeiting products, which as you may be aware is a serious offense.

In the circumstances, you are hereby required <u>for the very last time</u>:-

1.    to cease forthwith any manufacturing activities concerning Goods;

2.    to deliver up to us by and not later than 30 January 2024: -

2.1    all Goods in your possession custody or control to which the Trademark registrations has been applied; and

2.2    a witness statement, endorsed with a statement of truth, from a duly authorized representative of your company, confirming that you have complied fully and promptly with the obligations imposed by paragraph 1 and paragraph 2.1 above;

2.3    a written undertaking to pay such damages or profits relating to your infringement of the Trademark;

2.4    a written undertaking to pay our reasonable legal costs incurred in connection with your infringement of the Trademark registrations by the application thereof to the Goods, to be assessed if not agreed.



12 January 2024
Page 3 of 3

If proceedings become necessary (which may be issued and served without further notice to you), the remedies available to Our Client include reporting your company to the Chinese Authorities, an injunction before Courts in China, delivery up or at our option destruction of all infringing Goods.

Further, you will be held fully accountable for all damages suffered by Our Client who has already authorised us to commence legal proceedings before Courts in Hong Kong and United States to seek all available relief.

We would strongly suggest that you give this matter all required and urgent attention and consideration.

In the meantime, all Our Client rights and remedies are hereby fully reserved.

Yours faithfully,

*M.B. Kemp LLP*

**M.B. Kemp LLP**





**M.B. KEMP LLP**
128 City Road
London EC1V 2NX
United Kingdom
Tel: +44 7444 165 826
www.kempllp.com

7 February 2024

Pasadena Services Inc.
3580 Oceanside Rd.
Oceanside 11572 NY
United States

Dear Sirs,

**Re:      J/Slides trademark**

we act for Styleline Studios International Limited (**"Our Client"**), a company incorporated and registered in Hong Kong with Company Registration Number 2194884, whose registered office is at Unit 7F-15, 7/F., Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R..

Our Client is the sole legal and beneficial owner of, and owns all the rights, title, and interests in and to the trademark J/SLIDES and all common law rights therein and all applications and registrations therefore (the **"Trademark"**), including those listed below:

| Trade Mark | Country | Application No. | File Date | Regist. no. | Regist. date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 8/2/2016 | REGISTERED |
| J/SLIDES | Japan | 2015-043608 | 5/8/2015 | 5802609 | 10/30/2015 | REGISTERED |
| J/SLIDES | Korea | 40-2015-0037156 | 5/20/2015 | 40-1150538 | 12/23/2015 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | China | 16749476 | 4/20/2015 | 16749476 | 6/7/2016 | REGISTERED |
| J/SLIDES | UK | 3104508 | 4/17/2015 | 3104508 | 4/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |

We are given to understand that you have been advertising, selling and distributing footwear bearing the Trademark (the **"Goods"**), upon instruction of a company named Styleline Studio, LLC, with offices located at 27 West 24 St., Suite 800, New York, NY 10010, United States, which is acting through the medium of Mr. Jay Litvack.

This letter serves a formal notice to inform you that Styleline Studio LLC has been using the Trademark registrations in violation of Our Client's rights to such intellectual property rights, and ha no rights whatsoever in respect of the Trademark.



**M.B. KEMP LLP**
128 City Road
London EC1V 2NX
United Kingdom
Tel: +44 7444 165 826
www.kempllp.com

Accordingly, any authorization/request from Styleline Studio LLC to advertise, sell and distribute the Goods is a blatant infringement to Our Clients rights. Further, any activity carried out by your company to advertise, sell and distribute the Goods would amount to infringement to Our Client rights.

In the circumstance, you are hereby required:-

1.    to cease forthwith any advertising, sale and distribution activities concerning Goods;

2.    to deliver up to us by and not later than 15 February 2024: -

    2.1    all Goods in your possession custody or control to which the Trademark registrations has been applied; and

    2.2    a witness statement, endorsed with a statement of truth, from a duly authorized representative of your company, confirming that you have complied fully and promptly with the obligations imposed by paragraph 1 and paragraph 2.1 above;

    2.3    a written undertaking to pay such damages or profits relating to your infringement of the Trademark;

    2.4    a written undertaking to pay our reasonable legal costs incurred in connection with your infringement of the Trademark registrations by the application thereof to the Goods, to be assessed if not agreed.

If proceedings become necessary (which may be issued and served without further notice to you), the remedies available to Our Client include an injunction, delivery up or at our option destruction of all infringing Goods, damages or an account of profits, legal costs and interest.

In the meantime, all Our Client rights and remedies are hereby fully reserved.

Yours faithfully.

M.B. Kemp LLP



**M.B. KEMP LLP**
128 City Road
London EC1V 2NX
United Kingdom
Tel: +44 7444 165 826
www.kempllp.com

7 February 2024

The Atlanta Shoe Market
953 Harmony Road
Suite106
Eatonton
GA 31024
United States

Dear Sirs,

**Re:**    **J/Slides trademark**

We act for Styleline Studios International Limited (**"Our Client"**), a company incorporated and registered in Hong Kong S.A.R. with Company Registration Number 2194884, whose registered office is at Unit 7F-15, 7/F., Valiant Industrial Centre, 2-12 Au Pui Wan Street, Fo Tan, Shatin, New Territories, Hong Kong S.A.R..

Our Client has been in contact with your Laura O Brien and Connie Cavalier.

Our Client is the sole legal and beneficial owner of, and owns all the rights, title, and interests in and to the trademark J/SLIDES and all common law rights therein and all applications and registrations therefore (the **"Trademark"**), including those listed below:

| Trade Mark | Country | Application No. | File Date | Regist. no. | Regist. date | Status |
|---|---|---|---|---|---|---|
| J/SLIDES | European Union | 014629943 | 9/29/2015 | 014629943 | 1/14/2016 | REGISTERED |
| J/SLIDES | European Union | 015054265 | 1/29/2016 | 015054265 | 8/2/2016 | REGISTERED |
| J/SLIDES | Japan | 2015-043608 | 5/8/2015 | 5802609 | 10/30/2015 | REGISTERED |
| J/SLIDES | Korea | 40-2015-0037156 | 5/20/2015 | 40-1150538 | 12/23/2015 | REGISTERED |
| J/SLIDES | Canada | 1748689 | 10/1/2015 | 1,005,019 | 9/17/2018 | REGISTERED |
| J/SLIDES | China | 16749476 | 4/20/2015 | 16749476 | 6/7/2016 | REGISTERED |
| J/SLIDES | UK | 3104508 | 4/17/2015 | 3104508 | 4/17/2015 | REGISTERED |
| J/SLIDES | Hong Kong | 303378268 | 4/17/2015 | 303378268 | 11/25/2015 | REGISTERED |
| J/SLIDES | United States | 86/384,358 | 9/3/2014 | 4,746,857 | 6/2/2015 | REGISTERED |

We are given to understand that your company is currently organizing a footwear show in the United States, notable the Atlanta Shoe Market (from 17 to 19 February) (the **"Upcoming Show"**).

Our client has also advised that you had given access to the Upcoming Show to a company named



**M.B. KEMP LLP**
128 City Road
London EC1V 2NX
United Kingdom
Tel: +44 7444 165 826
www.kempllp.com

Styleline Studio, LLC, with offices located at 27 West 24 St., Suite 800, New York, NY 10010, United States, which is acting through the medium of Mr. Jay Litvack, as exhibitor for the Trademark.

This letter serves a formal notice to inform you that Styleline Studio LLC has been using the Trademark registrations in violation of Our Client's rights to such intellectual property rights, and has no right whatsoever in respect of the Trademark.

Accordingly, any request from Styleline Studio LLC to exhibit goods where the Trademark has applied at the Upcoming Shows, including showing or using the Trademark at boots at the Upcoming Show or to be listed in the relevant directories as the Trademark authorized user (in any capacity whatsoever), is a blatant infringement to Our Clients rights.

Further, any activity carried out by your company to allow Styleline Studio LLC to exhibit such goods and/or to use the Trademarks at the Upcoming Show would amount to infringement to Our Client rights.

In the circumstance, you are hereby required to deny access to Styleline Studio LLC to the Upcoming Shows. Failing to do so, and neglecting to make your independent assessment as to the ownership of the Trademark, will result in your company being regarded fully accountable for all damages Our Client may be suffering.

Please note that if proceedings become necessary (which may be issued and served without further notice to you), the remedies available to Our Client include an injunction, delivery up or at our option destruction of all infringing goods, damages or an account of profits, legal costs and interest.

In the meantime, all Our Client rights and remedies are hereby fully reserved.

Yours faithfully.

M.B. Kemp LLP

# STYLELINE STUDIOS INTERNATIONAL LIMITED

Unit 7/F-15, 7/F, Valiant Industrial Centre, 2-12 Au Pui Wan Street , Fo Tan Shatin, N.T, HK

Tel. : 852- 35903211

14 December 2023

Styleline Studio, LLC
27 West 24 St.
Suite 800
New York
NY 10010
<u>United States</u>

c.c.
Hilldun Corporation
36 East 31st Street
New York
NY 10016
<u>United States</u>

<u>*To the kind attention of Mr. Gary A. Wassner*</u>

Dear Sirs,

**Re:**     **Styleline Studios International Limited – J/Slides trademark**

we refer to the deed of assignment dated 12 August 2022 (the "**Deed of Assignment**").

All capitalised terms in this letter shall have the same meaning ascribed thereto in the and Deed of Assignment.

By the Deed of Assignment, Styleline Studio LLC has irrevocably and unconditionally acknowledged and agreed that:

a)    the 2018 Deed was and it is regarded rescinded by reason of Styleline Studios LLC's breach of agreement (i.e. non-payment) and/or terminated due to repudiatory breach; and

b)    accordingly, Styleline Studios International Limited was and is the sole legal and beneficial owner of, and owns all the rights, title, and interests in and to the Trademark registrations.

Despite the clear terms and conditions set forth in the Deed of Assignment, since November 2022 Styleline Studio LLC has been using the Trademark registrations in violation of Styleline Studios International Limited rights to such intellectual property rights.

This infringement is no longer acceptable to Styleline Studios International Limited, and in the circumstances, you are hereby demanded to cease and stop forthwith the use of the Trademark registrations, according to clause 6.4 of the Deed of Assignment.

Further, you are hereby required to deliver up to us by and not later than 22 December 2023: -

1.    all goods in your possession (the **Goods**), custody or control to which the Trademark registrations has been applied; and

. .     to retrieve all stocks of the Goods from all purchasers in the United States to the extent that such stocks remain within your power and use your best endeavours to retrieve such Goods which are no longer within your power and deliver up these stocks to us by the above specified deadline;

3.     a witness statement, endorsed with a statement of truth, from Mr. Jay Litvack, for and on behalf of Styleline Studios LLC, confirming that you have complied fully and promptly with the obligations imposed by paragraph 1, paragraph 2 and that the items supplied under paragraph 2 are comprehensive.

4.     a written undertaking to pay such damages or profits relating to your infringement of the Trade Mark by the application of the Sign to the Goods as may be agreed or in default of agreement, determined by the competent Court.

5.     a written undertaking to pay our reasonable legal costs incurred in connection with your infringement of the Trademark registrations by the application thereof to the Goods, to be assessed if not agreed.

In addition, Styleline Studios International Limited requires your proposals for financial compensation for the infringement.

If proceedings become necessary (which may be issued and served without further notice to you), the remedies available to Styleline Studios International Limited include an injunction, delivery up or at our option destruction of all infringing Goods, damages or an account of profits, legal costs and interest.

In the meantime, all Assignee rights and remedies are hereby fully reserved.

Yours faithfully

**Styleline Studios International Limited**

For and on behalf of
Styleline Studios International Limited

_____
Authorised Signature(s)

**Michael J. Schwab**

| | |
|---|---|
| **From:** | Dimitri Mavridakis <dimitrimavridakis@gmail.com> |
| **Sent:** | Monday, February 12, 2024 11:57 PM |
| **To:** | Michael J. Schwab |
| **Cc:** | Alexander D. Widell |
| **Subject:** | Fwd: J Slides relevant communication from CEO of Hilldun |

Sent from my iPhone

Begin forwarded message:

> **From:** "Gary A. Wassner" <gary@hilldun.com>
> **Date:** December 17, 2023 at 1:55:13 PM EST
> **To:** Marco POCCI <marco.pocci@kempllp.com>, "Richard L. Stehl" <rstehl@otterbourg.com>
> **Cc:** Tina Liu <tinaevliu@gmail.com>, Dimitri Mavridakis <dimitrimavridakis@gmail.com>, Eric R Perkins <eperkins@becker.legal>
> **Subject:** Re: J Slides
>
>
> I will review tomorrow morning with my attorneys. Richard Stehl is copied here. There is clearly a disconnect. Your references do not coincide with ours, regarding documents, contracts and guarantees. I'm sure once we provide you with all the documentation, the situation will have more clarity for us all.
>
> Gary A. Wassner CEO, Principal
> Hilldun Corporation
>
> 36 East 31st Street
> New York, New York 10016
>
> (212)244-2600 Phone
> (212)736-6148 Fax
> Http://www.hilldun.com
> Follow me on Twitter @gary_wassner
> New York 10001
>
> ---
>
> **From:** Marco POCCI <marco.pocci@kempllp.com>
> **Sent:** Sunday, December 17, 2023 11:58:31 AM
> **To:** Gary A. Wassner <gary@hilldun.com>
> **Cc:** Tina Liu <tinaevliu@gmail.com>; Dimitri Mavridakis <dimitrimavridakis@gmail.com>; Eric R Perkins <eperkins@becker.legal>
> **Subject:** RE: J Slides
>
> You don't often get email from marco.pocci@kempllp.com. Learn why this is important
>
> Mr. Wassner:

1

my name is Marco Pocci, I am the senior partner of Kemp LLP.

My colleague Eric R. Perkins, who is of counsel in New York for our law firm, is being copied to this message.

We act for Ms. Tina Liu, Styleline Studios International Limited and Mr. Dimitri Mavridakis.

My clients have asked us to liaise with you and your company in respect of the matter under reference, following you below email, which we all have found rather surprising. Mr. Tina Liu and Mr. Dimitri Mavridakis have both no recollection of having ever agreed to act as guarantor of Styleline Studio LLC vis-à-vis your company, Hilldun Corporation.

If you have different recollections, I would be grateful if you could forward me any documents which would corroborate your statement.

As far as the IP rights, Styleline Studios International Limited is the sole and exclusive owner of all worldwide registrations, and your statement that such rights are owned by Hildun is in fact, with all due respect, misconceived in law. To suggest that Styleline Studios International Limited cannot sell products bearing the trademarks without Hildun permission is, always with due respect, untenable and unsupported by any cogent grounds. In this respect, please see attached copy of a cease-and-desist letter which was addressed to Styleline Studio LLC. Furthermore, any action taken by Hildun in furtherance of the threats contained in your email, which might jeopardise, Styleline Studios International Limited business in US, will be met with a claim for substantial costs and damages.

As my clients have already informed you, Mr. Jay Litvack, has been acting in the most unconscionable and reprehensible manner, also in violation of the terms and conditions set forth in the operating agreement jeopardising its own employees and Styleline Studios International Limited business and my clients interest, in furtherance of his own self interests. You may notice that Article 4.1.B of the Operating Agreement provides that no Member (i.e. Mr Jay Litvack) acting alone , may bind the Company to any agreement with or obligation to any third party or claim to have the ability to so bind the Company. You are put on notice that Mr. Jay Litvack has never been granted by my clients authorization to act alone vis-a- vis Hilldun Corporation.

In the circumstances, Ms. Tina Liu and Mr. Dimitri Mavridakis, who hold the majority of the voting interest, have left with no other option but to proceed with Styleline Studio LLC's dissolution, pursuant to Article 9 of the Operating Agreement.

Notwithstanding the above, we agree with you that the best way to sort this all out and to move on in a healthy way is to cooperate with Hilldun Corporation, and in this respect we would suggest to meet with you as soon as practicable.

Yours faithfully,

Marco Pocci

&lt;image003.jpg&gt;    **MARCO POCCI**
**LEAD PARTNER - LONDON**

**M.B. KEMP LLP**

M: +852 9765 5881
M: +44 7529 953971
E: marco.pocci@kempllp.com
W: www.kempllp.com

This email is sent by and on behalf of M.B. KEMP LLP. It may be confidential and may also be legally privileged. If you have received this email in error, please inform us immediately and delete all copies. Email communications with M.B. KEMP LLP may be monitored and a record kept.

## M.B. KEMP LLP

128 City Road, London EC1V 2NX, UK
T: +44 2036 210651 • www.kempllp.com

5/F, Via Durini 4, 20122 Milan, Italy
T: +39 02 78625650 • F: +39 02 78625689 • www.kempllp.com

23/F Pico Tower, 66 Gloucester Road, Hong Kong
T: +852 3170 1088 • F: +852 3170 1077 • www.kempllp.com

A list of M.B. KEMP LLP partners is open for inspection at the above addresses.

**From:** Gary A. Wassner <gary@hilldun.com>
**Sent:** Saturday, December 16, 2023 1:21 AM
**To:** Tina Liu <tinaevliu@gmail.com>; Marco POCCI <marco.pocci@kempllp.com>
**Subject:** Re: J Slides

I'm sorry to hear all of this.

The facts though are that Hilldun has a 1st lien on all the IP, inventory and assets of the company.   I'd prefer to work this out amicably nevertheless. I've do have both your and your two partner's personal guarantees. It is in all your best interests to cooperate at this point in time.  You cannot sell the shoes independent of hilldun. We'd be forced to file injunctions, and attach the proceeds of any sales generated from the trademarks to any retailers.

My point is that the three of you are in this together when it comes to Hilldun. What you do otherwise with your manufacturing facilities is up to you. But the assets relating to the trademarks belong to us. And your personal guarantees back up those assets.

Please take some time to consider the options. The best way to sort this all out and to move on in a healthy way is to cooperate.

Gary A. Wassner CEO, Principal
Hilldun Corporation
Partner Brand Velocity Group
Chairman Interluxe Holdings LLC

3

36 East 31st Street
New York, New York 10016

(212)244-2600 Phone
(212)736-6148 Fax
Http://www.hilldun.com
Follow me on Twitter @gary_wassner

Sent from my iPhone

**From:** Tina Liu <tinaevliu@gmail.com>
**Sent:** Friday, December 15, 2023 2:51:53 PM
**To:** Gary A. Wassner <gary@hilldun.com>; Marco Pocci <marco.pocci@kempllp.com>
**Subject:** J Slides

> Dear Gary,
>
> Thank you for reaching out.
> I agree with your statement that it is impossible to run any business without terms which is why I find myself in a terrible situation as a supplier with 2.7 million in debt + interest for over 2 years now.
> It is because of this reason and as a responsible partner I did my outmost to support the pandemic situation so we can ensure continuation without interruptions.
>
> Unfortunately the relationship with Jay LITVACK has come to an end due to not only the debt but also a long list activities that have ben going on and have come to light especially this past year which are contrary and unacceptable with NY state law partnership agreements.
> We can no longer be associated with Jay LITVACK and therefore we will exercise our rights to the full extend of the law.
> I wish I had better news but he has made a path forward impossible both morally & financially.
> Also Jay LITVACK & the LLC has been operating the IP of the brand without formal authorization or agreement as it was clearly indicated on the deed that Jay had signed.
>
> I have included below the communication Jay LITVACK sent us as a reason to cancel all the orders.
> I am also including the Nov 14 e-mail that Jay is referring to as it was the note advising him that we are stopping manufacturing because he was delaying shipment of orders, changing dates and receiving cancellations from customers which has been going on from the beginning of the Fall season.
>
> The total orders that are either ready to be shipped or will be completed by end of the month which are slated for customers deliveries for your awareness which Jay had confirmed days/weeks prior both verbally and in writing he was taking (all deliveries for Dec) which then he terminated with his e-mail. The quantities are 21284 pairs with a total value of $487,274.85.
>
> Let me know if there is any additional clarity you might need and either myself of my legal advisor Marco, who is cc'd in this email will be available to explain.
>
> Tina
>
> <image001.jpg>
> <image002.jpg>

4